**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CYBER LITIGATION INC.,[1]<br><br>        Debtor. | Chapter 11<br><br>Bankr. No. 20-12702 (CTG) |
| DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust,<br><br>        Plaintiff,<br><br>vs.<br><br>ADAM P. ROGAS,<br><br>        Defendant. | Adv. No. **Refer to Summons** |

## COMPLAINT

Plaintiff Drivetrain, LLC ("Plaintiff"), in its capacity as Trustee of the Cyber Litigation Trust (the "Plan Trust") of the estate of NS8 Inc. n/k/a Cyber Litigation Inc. ("NS8" or "Debtor"), sues Defendant Adam P. Rogas ("Rogas") for damages and other relief as follows.

### I.      NATURE OF THE ACTION

1.     NS8 was a cybersecurity startup founded in 2016 that reported enormous financial success with tens of millions of dollars in annual revenue. However, nearly all of NS8's customers were fake. They were concocted by Rogas, who served as both Chief Executive Officer and Chief Financial Officer for virtually the entirety of NS8's pre-bankruptcy existence. With the assistance of a few other officers, Rogas, using falsified financial statements and customer counts, was able to convince outside investors to invest more than $150,000,000 in NS8. Rogas then caused

---

[1]    Debtor and the last four digits of its federal taxpayer identification number is as follows: Cyber Litigation Inc. (6056). The notice address for Debtor is Cyber Litigation Inc., PO Box 34120, Las Vegas, NV 89133.

approximately $72,000,000 of these funds to be transferred directly to NS8's early investors and employees through a fraudulent tender offer in June 2020.

2.     The investors were left with nothing, while Rogas, and other senior executives and employees who participated in, or turned a blind eye to his fraud, received millions of dollars through the tender offer, in addition to significant compensation in the form of wages, salary, bonuses, and employee benefits for services that provided little to no value but rather perpetuated a fraudulent enterprise.  For his part, Rogas received $17,542,458.50 in tender offer proceeds, in addition to hundreds of thousands of dollars in salary, bonuses, and benefits, and millions more in expense reimbursements and other transfers.  Simply, this is a classic fraudulent transfer that Plaintiff is entitled to avoid and recover from Rogas.

3.     But that is not the end of the story.  Rogas is not a mere beneficiary of the fraud that he masterminded and conducted over several years.  As a fiduciary to NS8 and its investors, Rogas must be held accountable for each and every dollar that investors lost as a result of his fraud. Rogas worked meticulously for nearly four years to dupe and deceive as many individuals and institutions as possible to contribute as much capital as possible to his scheme, in order to delay the discovery of his fraud and maximize the profits that he and his aides enjoyed at the expense of those investors, small and large, who bought into his vision and his lies.

4.     Accordingly, Plaintiff not only seeks to avoid and recover the fraudulent transfers that Rogas received, but also seeks full compensation for the damages he caused to NS8, its creditors, and investors as the architect of the fraud at the center of this case – actions for which he was indicted and ultimately pled guilty in federal court.

**II.      JURISDICTION AND VENUE**

5.       This Court has subject matter jurisdiction over this adversary proceeding, which arises under title 11 in this chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334(b).

6.       This adversary proceeding is a "core" proceeding to be heard and determined by this Court pursuant to 28 U.S.C. § 157(b)(2) and this Court may enter final orders for matters contained herein.

7.       Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1409.

8.       Pursuant to Local Bankruptcy Rule 7008-1, Plaintiff consents to entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**III.     THE PARTIES**

9.       On October 27, 2020 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10.      On April 13, 2022, the Plan Trust was established pursuant to Debtor's *Modified Second Amended Chapter 11 Plan of Liquidation* (the "Plan"), and Plaintiff became trustee of the Plan Trust.

11.      Rogas was a founder of NS8 and served as its CEO and CFO and as a member of its Board of Directors until he resigned on September 1, 2020.

12.      Rogas is an inmate at FPC Yankton, a minimum-security federal prison camp located at 1016 Douglas Avenue, Yankton, South Dakota 57078, where he is serving a five-year sentence.

IV.    FACTUAL BACKGROUND

A.    **The Founding of NS8 and Rogas's Role.**

13.    In August 2016, Rogas and five other individuals co-founded NS8 and received founder's shares.

14.    In his capacities as an officer, director, and founder of NS8, Rogas was primarily responsible for the company's financial reporting and fundraising activities discussed below, exerted significant control over NS8's business, and was highly compensated.

B.    **NS8 Was a Fraud.**

15.    NS8's purported business was to develop and sell electronic tools to help online vendors combat advertising fraud and assess the risk of fraud associated with customer transactions. Specifically, Rogas and NS8's other founders claimed to have developed it as a cybersecurity fraud prevention services company, in part to serve a growing need to manage and mitigate cybersecurity theft.[2]

16.    Throughout NS8's existence, Rogas controlled NS8's financial and sales information despite having other executive finance and sales officers in place. Rogas also maintained exclusive control over both NS8's revenue bank account and the data and metrics underlying NS8's purported sales revenue and customer counts.

17.    But under Rogas's leadership, NS8's business was failing dramatically. Between 2016 and 2020, its expenses exceeded $13 million while it generated less than $500,000 in gross revenue.

---

[2]    *See, e.g.*, Farnaz M. Alemi, Bloomberg Law (May 27, 2021, 4:01 AM), How Cybercriminals Are Stealing Your Ad Dollars, available at https://news.bloomberglaw.com/securities-law/how-cybercriminals-are-stealing-your-ad-dollars (reporting that experts estimate that the global digital advertising space loses $51 million per day to advertising fraud).

18.     Despite these awful results, to attract outside investment, Rogas caused NS8 to falsely report, through doctored bank statements, financial statements, and other corporate documents, a picture of financial success.

19.     For example, in 2017, while Rogas caused NS8 to report to investors that it had over 180 paying customers, the actual number was fewer than 30.  Likewise, NS8 generated less than $25,000 in gross revenue in 2017.  Yet, NS8's financial statements, falsified as a result of Rogas's fraud, reported that its revenues were $275,000.

20.     Rogas also caused NS8 to falsely report that it had earned over $8.5 million in gross revenue in 2018, and over $39.6 million in gross revenue in 2019, even though its annual revenue in any year never exceeded $170,000.

21.     Accordingly, throughout 2016 to 2020, NS8's expenses and liabilities were significantly higher than its assets and NS8 was never profitable.

22.     Based on the false information that Rogas and his aides generated, outside investors began to view NS8 as a potential unicorn.[3]  By the fall of 2019, NS8 had raised nearly $79 million in equity investments from outside investors who invested based upon fictitious revenues and false customer numbers that Rogas and his aides submitted to them.

23.     Approximately $50 million of these investments were made in connection with a Series A Preferred Stock fundraising in September and November 2019.  Rogas subsequently raised $72 million more in connection with another Series A Preferred Stock fundraising in April 2020.

---

[3]     A "unicorn" in venture capital parlance is a privately-held startup with an enterprise valuation in excess of $1 billion. Rodriguez, Salvador (September 3, 2015). "The Real Reason Everyone Calls Billion-Dollar Startups 'Unicorns'". International Business Times. IBT Media Inc.

24.     In connection with each of NS8's fundraisings, Rogas communicated directly with NS8's then-current and potential investors and used false bank statements and financial statements to solicit their investments.  The false financial statements and other information Rogas relied on were also made available to these investors via electronic shared files.  Rogas also incorporated false financial and revenue information into presentations he made to investors and the company's directors.

25.     Using these investments, Rogas caused NS8 to pay millions of dollars in excessive compensation and stock buybacks to the NS8 employees and officers who turned a blind eye to his scheme and supported him in convincing outside investors to invest in NS8.

26.     In an April 24, 2022 letter (the "Sentencing Letter") that Rogas wrote to the Honorable John P. Cronan, the Judge who presided in the criminal case (see *United States v. Adam Rogas, case no.:1:20-cr-00539-JPC* in the United States District Court, Southern District of New York) filed against Rogas shortly after he resigned from NS8, Rogas confessed to his fraudulent acts and conduct, stating, "I deeply regret breaking the law as I raised the additional capital. I misrepresented our total number of paying customers in order to maintain our narrative of success. Worse, when challenged to back up this narrative I doctored financial documents to support our inflated numbers, eventually, by tens of millions of dollars. I knowingly committed this crime for the purposes of deceiving potential investors."

###### C.     The Whistleblower.

27.     When NS8 employees who discovered evidence of Rogas's fraud came forward and were not willing to remain silent, Rogas retaliated and acted to terminate their employment to prevent them from exposing his scheme.

28.     In August 2019, for example, an NS8 employee (the "Whistleblower") informed David Hansen ("Hansen"), Rogas's Chief of Staff and NS8's Chief Information Officer, that he had uncovered evidence that NS8 may have falsely inflated its customer counts.

29.     The Whistleblower told Hansen that unless NS8 addressed this inflated customer data, he would reveal his allegations to NS8's customers, investors, and other parties.

30.     Hansen subsequently informed Rogas of the Whistleblower.

31.     At Rogas's request, Hansen provided Rogas with the ability to view what the Whistleblower was doing on his work computer in real time.

32.     Hansen explained to Rogas that because NS8's IT system had an autosave password function, it would be possible for Rogas to access the Whistleblower's password protected work applications as well as the Whistleblower's personal non-NS8 email accounts.

33.     Specifically, Hansen told Rogas: "I want to give you a password to login [to the whistleblower's] laptop . . . [f]rom there, I'm hoping [the Whistleblower] is dumb enough to have his Keeper password [the autosave function] memorized and see what's in there."

34.     Rogas then obtained the Whistleblower's laptop and laptop password from Hansen, which allowed Rogas to access the Whistleblower's work applications and personal email. The next day, the Whistleblower's personal accounts, including his Facebook, Hotmail and Dropbox were all accessed using his laptop.

35.     Rogas subsequently fired the Whistleblower.

7

D.   **NS8's Tender Offer.**

36.   Rogas orchestrated a fraudulent tender offer (the "Tender Offer") to ensure that he and his aides be paid millions of dollars at the expense of NS8's investors.

37.   Rogas began orchestrating the Tender Offer at least as early as February 2020, when he was advised by counsel that a stock redemption he had been planning with other shareholders over the previous two months should be conducted as a tender offer.  Rogas intended to fund the Tender Offer primarily with capital raised from NS8 investors through the Series A Preferred Stock offering that would close in spring 2020.

38.   While negotiating the fundraising, Rogas encountered a potential roadblock: other members of NS8's Board of Directors learned that NS8 and several of its employees had received subpoenas in December 2019 and March 2020 relating to an investigation by the United States Securities and Exchange Commission (the "SEC") into a whistleblower complaint that the SEC had received in July 2019.

39.   Upon learning of the December 2019 subpoenas, certain other Board members delayed the fundraising to allow for outside professionals to conduct independent diligence into NS8's financials, platform partners, customers, and key executives.

40.   After NS8 disclosed the March 2020 subpoenas, these other Board members delayed the Board's approval of the fundraising until NS8's counsel, which was conducting a comprehensive internal investigation in response to the initial SEC subpoenas, completed its review of thousands of documents and communications as well as countless interviews of employees, and submitted its findings to the Board.

41.   However, Rogas had so cleverly concealed his fraud that he was able to hide it from these professionals.  For example, at one point a junior auditor was dispatched to NS8's offices

with the mandate to observe an NS8 employee logging into the company's bank accounts, and to confirm the bank balances on a computer screen. Rogas orchestrated a charade where he made it look like he was logging into the company's bank account, when in fact he displayed doctored bank records.

42.     On April 15, 2020, NS8's Board of Directors conducted a meeting at which Rogas and other NS8 officers and employees reported on the company's financial performance, cash on hand, and continuing revenue and customer growth. , The information Rogas and others reported to the Board was false. Rogas also provided updates to the Board on the progress of the Series A Preferred Stock fundraising and Tender Offer transactions.

43.     On the same day, in anticipation of the Tender Offer, the Board formally approved the fundraising. The transaction closed on April 21, 2020. Rogas, once again using fake financials, had convinced outside investors to invest nearly $73 million in NS8.

44.     On May 11, 2020, NS8 notified its shareholders—including former directors, officers, founders and employees of NS8—that it was commencing the Tender Offer, in which NS8 would repurchase tendered shares for $18.50 per share.

45.     NS8 falsely represented to investors that NS8 believed its cash and revenues, among other sources of liquidity, were "adequate for the needs of the Company for at least the next 24 months." With the offer, NS8 sent annual financial statements to its investors for 2018 and 2019, as well as quarterly financial statements for the first quarters of 2019 and 2020. As a result of Rogas's fraud, each of these statements was entirely false.

46.     The deadline to tender shares was June 8, 2020. Shareholders elected to tender so many of their shares that the Tender Offer was oversubscribed. The oversubscription caused NS8

9

to make a pro rata deduction for any seller who elected to tender more than approximately 30% of their eligible shares.

47.     Again, Rogas planned to use the proceeds of the latest Series A Preferred Stock fundraising to finance the Tender Offer.  He knew that the investors' money would be paid to NS8's earlier investors and employees, and that because NS8's revenues and customers were fake, its remaining investors would almost certainly lose all of their investments.

48.     On or around June 23, 2020, NS8 distributed, from its bank accounts, over $72 million in exchange for the shares that it repurchased in the Tender Offer.  The $18.50 per share price that NS8 paid these transferees was exponentially higher than the actual value (if any) of the shares, as the value of the shares NS8 purchased in the Tender Offer was based exclusively on Rogas's fraudulent financial statements that cleverly hid the fact that NS8 was insolvent.

49.     For his part, Rogas received $17,542,458.50 (the "Tender Offer Proceeds").

50.     Other former employees, officers, directors and early investors of NS8 received over $50 million as a result of the Tender Offer.

51.     In his Sentencing Letter, referencing the fall 2019 and spring 2020 Series A Preferred Stock fundraisings and the Tender Offer, Rogas stated to the court: I submit this letter feeling heartbroken and humiliated. Three years ago, I used materially misleading financial statements to raise approximately $123 million from investors for NS8 . . . . I am ashamed to admit that I altered bank statements to show millions of dollars of fictional customer revenue and assets. Months later, I directly benefited when NS8 conducted a tender offer with these new investor funds."

52.     Rogas stated further in the Sentencing Letter: "Based on my fraudulent representations, we raised $123 million. Some of those funds were used to conduct a tender offer

to earlier investors. As a founder, as part of a larger agreement, I personally received $10 million plus an additional $7.5 million to re-purchase additional shares of company stock."

53. The Tender Offer Proceeds were in addition to the salary and bonuses that NS8 paid to Rogas (the "Employment Proceeds"). In the two years prior to the Petition Date, the Employment Proceeds included $629,755.25 of salary and $200,000.00 of bonuses.

54. In addition to the Tender Offer Proceeds and Employment Proceeds, millions of dollars of other transfers were made out of NS8's bank accounts to Rogas (the "Other Transfers"). Within the two years prior to the Petition Date, Rogas received such Other Transfers in an aggregate amount of no less than $4,497,500.00 (the "Other Transfers").

55. Rogas also benefited from the use of an American Express corporate credit card paid by NS8, to which he made extensive charges (the "Credit Card Charges"). In the two years prior to the Petition Date, Rogas made Credit Card Charges in an aggregate amount of no less than $3,303,373.07.

**E.      The Fraud Unravels and NS8 Files its Chapter 11 Case.**

56. In June 2020, following the Tender Offer, Rogas's fraudulent scheme began to unravel. Given NS8's seemingly rapid growth, certain Board members impressed upon Rogas that it was imperative that NS8 supplement and expand its executive leadership team. These officers, once hired, had a significant impact on how the company was run. Almost immediately, the new officers began to question and determinedly investigate discrepancies and irregularities that incumbent NS8 officers previously had identified yet ignored.

57. On September 1, 2020, Rogas abruptly resigned from NS8.

58. On September 10, 2020, the majority of NS8's employees were formally notified that they were being laid off, effective as of September 11, 2020. NS8 had hired these employees

11

as a result of Rogas's fraud and was ultimately forced to lay them off following the discovery of his fraud and the extent to which he overstated NS8's revenues and cash.

59.    On October 27, 2020, NS8 filed its chapter 11 case.  The investors whom Rogas victimized ultimately asserted tort damages claims against NS8's estate in an aggregate amount of more than $135,000,000.

60.    As of the Petition Date, NS8's employee headcount was reduced to six, whereas, as of May 30, 2020, NS8 had approximately 215 employees at office locations in Las Vegas, San Francisco, San Ramon, Miami, Amsterdam, Singapore, and Melbourne.

**F.      Rogas Is Arrested and Ultimately Sentenced to 60 Months in Prison.**

61.    On September 17, 2020, Rogas was arrested by the Federal Bureau of Investigations and charged with one count of securities fraud, one count of fraud in the offer or sale of securities, and one count of wire fraud.  *United States v. Rogas*, *supra*, ECF No. 7.

62.    On March 16, 2022, Rogas pled guilty to securities fraud. *See United States v. Rogas*, *supra*, ECF No. 59.

63.    At his plea hearing, Rogas engaged in the following dialogue with Judge Cronan, where he unequivocally admitted to the specific elements of his crimes, including his criminal intent:

> THE COURT: So Mr. Rogas, just to go over a couple of other things that you said . . . . When you made material misrepresentations to investors, first of all, did you know what you were doing was wrong and illegal?
>
> THE DEFENDANT: I knew -- yes.
>
> THE COURT: Yes, you did know.
>
> THE DEFENDANT: I did know.
>
> THE COURT: And at the time you made those misrepresentations, you knew they were false; is that right?

THE DEFENDANT: Yes.

THE COURT: And did you intend for potential investors to believe those misrepresentations to be true and to invest based on that incorrect understanding?

THE DEFENDANT: Yes.

. . . .

THE COURT: And you knew it was illegal to make misrepresentations to investors.

THE DEFENDANT: Yes.

64.    On November 3, 2022, Rogas was sentenced to sixty months in prison. *See United States v. Rogas*, *supra*, ECF No. 80.

65.    On December 9, 2022, Judge Cronan entered an order requiring Rogas to pay restitution in the amount of $112,276,409.50 to his victims. *See United States v. Rogas*, *supra*, ECF No. 88. This figure represented certain investor losses less distributions they received from NS8's estate, plus certain legal fees and expenses one investor incurred while cooperating with the government's investigation and prosecution. *See United States v. Rogas*, *supra*, ECF No. 74.

**G.    Rogas Consents to Judgment Against Him in Favor of the SEC.**

66.    On the same day as Rogas was arrested by the FBI and charged with the crimes for which he is now in prison, the SEC filed a civil complaint against Rogas and several entities that he controls, based on this exact same underlying conduct. *U.S. Sec. & Exch. Comm'n v. Rogas*, 20-cv-07628 (S.D.N.Y. Sept. 17, 2020), ECF No. 1.

67.    The SEC filed an amended complaint on November 22, 2022.

68.    Rogas ultimately consented to the entry of a judgment against him on the SEC's amended complaint. Accordingly, on September 18, 2024, the United States District Court for the Southern District of New York entered judgment in favor of the SEC. The judgment ordered

13

Rogas to, *inter alia*, disgorge the Tender Offer Proceeds, which disgorgement was "deemed satisfied" by the restitution ordered in his criminal case.

**FIRST CAUSE OF ACTION**
**(Avoidance and Recovery of Actual Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550)**

69.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

70.     Within the two years prior to the Petition Date, NS8 transferred to Rogas $17,542,458.50 of Tender Offer Proceeds in connection with the Tender Offer.

71.     Within the two years prior to the Petition Date, NS8 paid Rogas a total of no less than $829,755.25 in Employment Proceeds on account of his employment at NS8.

72.     Within the two years prior to the Petition Date, NS8 also made Other Transfers to Rogas in a total amount of no less than $4,497,500.00.

73.     All of the above transfers derived from one of NS8's bank accounts and NS8 had an interest in the property transferred.

74.     All of the above transfers were made, and received, with the actual intent to hinder, delay, or defraud NS8 and its creditors/investors.  And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the inevitability that the fraud would be uncovered, and the investors' shares would be worth virtually nothing, such transfers are also presumed to have been made with actual intent to hinder, delay, or defraud creditors.

75.     NS8 did not receive anything of value in exchange for such transfers.

76.     By reason of the foregoing, the above transfers constitute actual fraudulent transfers which should be avoided pursuant to Bankruptcy Code § 548(a)(1)(A).

14

77.     Rogas was the initial transferee of these transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit these transfers were made.

78.     Pursuant to § 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover these transfers from Rogas, plus interest thereon to the date of payment and the costs of this action

**SECOND CAUSE OF ACTION**
**(Avoidance and Recovery of Actual Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 544 and 550 and 6 Del. Code § 1301, et seq.)**

79.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

80.     Within the four years prior to the Petition Date, NS8 transferred to Rogas $17,542,458.50 of Tender Offer Proceeds in connection with the Tender Offer.

81.     Within the four years prior to the Petition Date, NS8 paid Rogas a substantial salary, bonuses, and benefits as a director and officer of NS8, including, without limitation, the Employment Proceeds.

82.     Within the four years prior to the Petition Date, NS8 also made the Other Transfers to Rogas.

83.     All of the above transfers to Rogas derived from one of NS8's bank accounts and NS8 had an interest in the property transferred.

84.     All of the above transfers to Rogas were made, and received, with the actual intent to hinder, delay, or defraud NS8 and its creditors/investors.  And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the inevitability that the fraud would be uncovered, and the investors' shares would be worth virtually nothing, such transfers are also presumed to have been made with actual with intent to hinder, delay, or defraud creditors.

15

85.     NS8 did not receive anything of value in exchange for such transfers, and NS8 did not receive valid consideration in exchange for the funds.

86.     As its mastermind, Rogas was aware and had knowledge of the fraud.

87.     At all relevant times, NS8 had actual creditors holding unsecured claims allowable within the meaning of §§ 502 and 544(b) of the Bankruptcy Code, and § 1301 of Title 6 of the Delaware Code.

88.     Therefore, these transfers are voidable under § 544(b) of the Bankruptcy Code and 6 Delaware Code § 1304(a).

89.     By reason of the foregoing, the above transfers to Rogas constitute actual fraudulent transfers which should be avoided, unwound and recovered pursuant to Bankruptcy Code §§ 544 and 550(a), and applicable state law.

### THIRD CAUSE OF ACTION
**(Avoidance and Recovery of Constructive Fraudulent Transfers
Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550)**

90.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     During the two-year period immediately preceding the Petition Date, NS8 transferred the Tender Offer Proceeds and Employment Proceeds, and made the Other Transfers, to Rogas.  These transfers constitute transfers of the Debtor's property interests.

92.     Debtor received no consideration or received less than reasonably equivalent value on account of these transfers.

93.     At the time of each of these transfers, Debtor (a) was insolvent, or Debtor became insolvent as a result of the transfers; and/or (b) was engaged, or about to engage, in business or a transaction for which any property remaining with the Debtor or for whose benefit the transfers

16

were made was an unreasonably small capital; and/or (c) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

94.     Therefore, these transfers are voidable under § 548(a)(1)(B) of the Bankruptcy Code.

95.     Rogas was the initial transferee of these transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit these transfers were made.

96.     Pursuant to § 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover these transfers from Rogas, plus interest thereon to the date of payment and the costs of this action.

**FOURTH CAUSE OF ACTION**
**(Avoidance and Recovery of Constructive Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 544(b) and 550 and 6 Delaware Code §§ 1304(a), 1305, and 1307)**

97.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98.     Pursuant to § 544(b) of the Bankruptcy Code, a trustee or debtor-in-possession may avoid, *inter alia*, any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502 of the Bankruptcy Code.

99.     During the four-year period immediately preceding the Petition Date, NS8 transferred to Rogas the Tender Offer Proceeds and substantial salary, bonuses, and benefits as an employee of NS8, including, without limitation, the Employment Proceeds, and made the Other Transfers to Rogas.  These transfers to Rogas constitute transfers of the Debtor's property interests.

100.    Debtor received no consideration or less than reasonably equivalent value on account of the transfers.

17

101.    At the time of these transfers, Debtor (a) was insolvent, or Debtor became insolvent as a result of the transfers, (b) was engaged, or about to engage, in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction, and/or (c) intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as such debts matured.

102.    At all relevant times, Debtor had actual creditors holding unsecured claims allowable within the meaning of §§ 502 and 544(b) of the Bankruptcy Code, and § 1301 of Title 6 of the Delaware Code.

103.    Therefore, these transfers are voidable under § 544(b) of the Bankruptcy Code and 6 Delaware Code §§ 1304(a) and 1305.

104.    Rogas was the initial transferee of these transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit these transfers were made.

105.    Pursuant to Bankruptcy Code § 550(a) and 6 Delaware Code § 1307, Plaintiff is entitled to recover these transfers from Rogas, plus interest thereon to the date of payment and the costs of this action.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

106.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

107.    At times relevant to the allegations in this Complaint, Rogas was a director, officer, and/or employee of NS8.

108.    As a director and officer of NS8, a Delaware corporation, Rogas owed NS8 fiduciary duties, including but not limited to fiduciary duties of good faith, candor, care, and loyalty.

18

109.  Rogas repeatedly breached his fiduciary duties to NS8 by, among other things:

- Falsifying NS8's bank statements, revenues, and customer numbers and preparing or causing NS8 to prepare false financial statements and other financial documents and information;

- Defrauding NS8 and its investors;

- Causing NS8 to hire far more employees than were necessary to run its actual business and incur massive operating losses for nearly four years to create the illusion of a highly profitable enterprise while he perpetrated his fraud at the expense of the company and its investors;

- Causing NS8 to pay millions of dollars in excessive compensation and stock buybacks to himself and the NS8 employees and officers who helped him perpetrate and conceal his fraud;

- Silencing and firing whistleblowers, deceiving professionals hired to audit and conduct diligence into NS8, and otherwise concealing his fraud from NS8, its Board of Directors, and its investors;

- Causing NS8 to accept investments and incur liabilities based on the false financial statements, revenues, and customer numbers, and other false financial documents and information, that he prepared or caused to be prepared;

- Causing NS8 to repurchase its own stock for tens of millions of dollars in the Tender Offer knowing that the stock was worthless; and

- Causing NS8 to use the proceeds of the Series A Preferred Stock fundraisings to finance the Tender Offer, including the $17,542,458.50 of Tender Offer Proceeds paid to Rogas himself, knowing that NS8 would never be able to redeem those investments.

110.  The numerous breaches of duty by Rogas, as detailed in this Complaint, directly caused the value of NS8's business to be destroyed and caused more than $150,000,000 in damages to NS8, its investors and creditors.

### SIXTH CAUSE OF ACTION
**(Fraud)**

111.  Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112. Rogas repeatedly made false representations to NS8, its investors, and others by, among other things, intentionally and grossly overstating its bank account balances, revenues and customer numbers, gross margin, and the extent and profitability of NS8's operations to current and prospective investors, the other members of its senior management team, the Board of Directors, and corporate partners.

113. At all times, Rogas knew these representations were false, and that NS8's actual bank account balances, revenues, and customer numbers, gross margin, and profits were in truth much smaller than he stated or reported.

114. Rogas prevented NS8 and its investors from discovering that these representations were false by acting meticulously to conceal his fraud.

115. Rogas's false representations were material.

116. NS8 actually relied on Rogas's false representations and as a result, among other effects, continued incurring operating losses while expanding as though it were a highly successful business, raised increasingly large amounts capital to support its operations and expansion, conducted the Tender Offer using the proceeds of those investments, and paid millions of dollars in excessive compensation and stock buybacks to Rogas and the NS8 employees and officers who helped him perpetrate and conceal his fraud.

117. NS8's investors in fact relied on Rogas's false representations and as a result, among other things, invested more than $150,000,000 in NS8, which Rogas used to both perpetrate and conceal his fraud as it grew larger and larger.

118. Rogas made these false representations knowing that they would induce, and were intended to induce, such reliance by NS8 and its investors.

119.   NS8 and its investors reasonably and justifiably relied on Rogas's false representations.

120.   As a result of their reliance on Rogas's false representations, as detailed in this Complaint, NS8, its investors and creditors suffered more than $150,000,000 in damages and the value of NS8's business was destroyed.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

121.   Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

122.   Throughout his fraud, Rogas ensured that he was handsomely compensated from the proceeds of the investments that he caused NS8's investors to make and NS8 to accept.

123.   Rogas received $17,542,458.50 of Tender Offer Proceeds, which were artificially inflated by his fraud, and substantial salary, bonuses, and benefits as a director and officer of NS8, including, without limitation, the Employment Proceeds.

124.   Rogas benefited from his employment contract(s) with NS8, and his participation in the Tender Offer, which were products and/or results of his fraud and other unjust conduct that both prolonged NS8's existence and allowed Rogas the opportunity to obtain such contract(s) and enter into the Tender Offer.

125.   Rogas's unjust conduct constitutes grounds to rescind his employment contract(s) and any contract for the sale of his shares to NS8 in connection with the Tender Offer.

126.   In addition to the Tender Offer Proceeds and Employment Proceeds, Rogas received no less than $4,497,500.00 of Other Transfers from NS8 and made no less than $3,303,373.07 of Credit Card Charges at NS8's expense.

127.    Rogas was unjustly enriched by the salary and bonuses he received, including, without limitation, the Employment Proceeds and the Tender Offer Proceeds, and by the Other Transfers and Credit Card Charges.

128.    Rogas received such amounts, and made such charges, at the expense, and to the detriment, of the Debtor, its creditors and investors.

129.    It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Rogas to be permitted to retain such amounts, which he received, and continues to benefit from, without justification.

130.    Plaintiff is entitled to restitution from Rogas and an order disgorging and repaying such amounts.

## EIGHTH CAUSE OF ACTION
### (Disallowance of all Claims Pursuant to 11 U.S.C. § 502(d) and (j))

131.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

132.    Rogas is a transferee of transfers avoidable (the "Avoidable Transfers") under §§ 544 and/or 548 of the Bankruptcy Code, which property is recoverable under § 550 of the Bankruptcy Code.

133.    Rogas has not paid the amount of the Avoidable Transfers, or turned over such property, for which he is liable under 11 U.S.C. § 550.

134.    Pursuant to 11 U.S.C. § 502(d), any and all claims of Rogas and/or his assignees, against the Debtor's chapter 11 estate or Plaintiff must be disallowed until such time as he pays to Plaintiff the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

135.    Pursuant to 11 U.S.C. § 502(j), any previously allowed claims of Rogas against Debtor's estate must be reconsidered and disallowed until such time as Rogas pays to Plaintiff the aggregate amount of the Avoidable Transfers.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court grant it the following relief against Rogas:

A.      On Plaintiff's First through Fourth Counts, judgment in favor of Plaintiff and against Rogas, avoiding all of the transfers and directing Rogas to return to Plaintiff the amount of the transfers, pursuant to §§ 544(a), 548, and 550(a) of the Bankruptcy Code, and 6 Delaware Code §§ 1301, 1304(a), 1305, and 1307, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action including, without limitation, attorneys' fees;

B.      On Plaintiff's Fifth and Sixth Counts, judgment in favor of Plaintiff and against Rogas and requiring Rogas to pay compensatory and punitive damages, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action including, without limitation, attorneys' fees;

C.      On Plaintiff's Seventh Count, judgment in favor of Plaintiff and against Rogas, awarding Plaintiff damages against, and disgorgement and restitution from, Rogas, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action including, without limitation, attorneys' fees;

D.      On Plaintiff's Eighth Count, judgment in favor of Plaintiff disallowing any claims held or filed by Rogas against Debtor's estate until Rogas returns the avoidable transfers to Plaintiff pursuant to 11 U.S.C. §§ 502(d) and (j); and

E.    Granting Plaintiff such other and further relief as this Court may deem just and proper.

*[Remainder of page intentionally left blank]*

Dated: October 28, 2024
      Wilmington, Delaware

**BLANK ROME LLP**

By: */s/ Jordan L. Williams*
Stanley B. Tarr (No. 5535)
Jordan L. Williams (No. 7128)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464
Email: stanley.tarr@blankrome.com
      jordan.williams@blankrome.com

-and-

John E. Lucian (*pro hac vice*)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-5500
Facsimile:    (215) 569-5555
Email: john.lucian@blankrome.com

*Counsel for Plaintiff*