**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CYBER LITIGATION INC.,[1]<br><br>     Debtor. | Chapter 11<br><br>Bankr. No. 20-12702 (CTG) |
| DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust,<br><br>     Plaintiff,<br><br>vs.<br><br>ADAM P. ROGAS,<br><br>     Defendant. | Adv. No. 24-50180 (CTG) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAN TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

Dated: July 10, 2025
   Wilmington, Delaware

**BLANK ROME LLP**
Stanley B. Tarr (No. 5535)
Jordan L. Williams (No. 7128)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email: stanley.tarr@blankrome.com
jordan.williams@blankrome.com

-and-

John E. Lucian (*pro hac vice*)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-5500
Facsimile: (215) 569-5555
Email: john.lucian@blankrome.com

*Counsel for the Plan Trustee*

---

[1] Debtor and the last four digits of its federal taxpayer identification number is as follows: Cyber Litigation Inc. (6056). The notice address for Debtor is Cyber Litigation Inc., PO Box 34120, Las Vegas, NV 89133.

**TABLE OF CONTENTS**

**Page(s)**

Nature and Stage of the Proceeding.................................................................................1

Summary of Argument ......................................................................................................1

Statement of Undisputed Facts .........................................................................................3

      A.      NS8's Founding .........................................................................3

      B.      Rogas's Fraud and Fundraising .................................................3

      C.      The April 2020 Series A and Tender Offer Transactions ...........6

      D.      The Fraud Unravels...................................................................10

      E.      The Chapter 11 Case.................................................................11

      F.      The Criminal Proceeding ..........................................................12

      G.      The SEC Proceeding .................................................................14

Legal Standard ..................................................................................................................14

Argument ...........................................................................................................................15

      I.      Actual Fraudulent Transfer Claims..............................................16

            A.      NS8 Presumptively Had Legal Title to the Funds Transferred to Rogas..................................................................................16

            B.      NS8 Made the Transfers to Rogas with Intent to Hinder, Delay, and Defraud Its Investors and Other Creditors ...........17

      II.      Constructive Fraudulent Transfer Claims .....................................24

            A.      NS8 Did Not Receive Reasonably Equivalent Value ...............24

            B.      NS8 Was Insolvent Before and After the Tender Offer .............26

      III.      Recovery of Avoided Transfers......................................................28

      IV.      Breach of Fiduciary Duty...............................................................29

            A.      Rogas Breached His Fiduciary Duties of Care and Loyalty to NS8 by Perpetrating His Multi-Year Fraud .........................29

            B.      NS8 Suffered Massive Damages, Including Its Liabilities to Its Investors and the Compensation NS8 Paid to or for Rogas.......33

      V.      Fraud ..............................................................................................35

      VI.      Unjust Enrichment .........................................................................39

      VII.      Prejudgment Interest ......................................................................40

Conclusion ........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
    637 F. Supp. 3d 141 (D. Del. 2022)................................................................35, 38

*AFD Fund v. Transmed Foods, Inc. (In re AmeriServe Food Distrib., Inc.)*,
    315 B.R. 24 (Bankr. D. Del. 2004) .........................................................................17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................................15

*Barnard v. DeCillis (In re Ideal Mortg. Bankers, Ltd)*,
    539 B.R. 213 (Bankr. E.D.N.Y. 2015)....................................................................32

*Bayou Superfund, LLC v. WAM Long/Short-Fund II, L.P.*,
    362 B.R. 624 (Bankr. S.D.N.Y. 2007)...............................................................21, 23

*Beard Research, Inc. v. Kates*,
    8 A.3d 573 (Del. Ch. 2010), *aff'd sub nom. ASDI Inc. v. Beard Research, Inc.*,
    11 A.3d 749 (Del. 2010) ..........................................................................................29

*Burlington Motor Carriers Inc. v. MCI Telecomms. (In re Burlington Motor
    Holdings, Inc.)*,
    231 B.R. 874 (Bankr. D. Del. 1999) ........................................................................34

*Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*,
    500 B.R. 384 (Bankr. D. Del. 2013), *aff'd*, 537 B.R. 182 (D. Del. 2015)...............34

*Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*,
    Adv. No. 11-52005, 2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) ..................22

*Carlson v. Arnot-Ogden Mem'l Hosp.*,
    918 F.2d 411 (3d Cir. 1990).....................................................................................15

*Carter v. McGrady*,
    292 F.3d 152 (3d Cir. 2002).....................................................................................15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................................15

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund LLC (In re
    Bayou Grp., LLC)*,
    439 B.R. 284 (S.D.N.Y. 2010)........................................................................22, 23, 27

*Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*,
  Adv. No. 22-50439, 2023 WL 6938144 (Bankr. D. Del. Oct. 19, 2023) ....................17, 18, 19

*Drivetrain, LLC v. X. Com., Inc.*,
  Adv. No. 22-50448, 2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) ......................... *passim*

*FBI Wind Down Inc. Liquidating Tr. v. Innovative Delivery Sys., Inc. (In re FBI
  Wind Down, Inc.)*,
  581 B.R. 387 (Bankr. D. Del. 2018) .......................................................................17

*Finn v. All. Bank*,
  860 N.W.2d 638 (Minn. 2015).................................................................................21

*Giuliano v. Fleming (In re Nobilis Health Corp.)*,
  661 B.R. 891 (Bankr. D. Del. 2024) .........................................................29, 30, 32

*Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*,
  Adv. No. 21-51190, 2023 Bankr. LEXIS 1471 (Bankr. D. Del. Apr. 18, 2023) ....................21

*Hechinger Inv. v. Universal Forest Products (In re Hechinger)*,
  489 F.3d 568 (3d Cir. 2007)....................................................................................40

*Kaucher v. Cty. of Bucks*,
  455 F.3d 418 (3d Cir. 2006)....................................................................................15

*Kelley v. Opportunity Fin., LLC (In re Petters Co., Inc.)*,
  550 B.R. 457 (Bankr. D. Minn. 2016) ....................................................................21

*Liquidation Tr. of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re
  Hechinger Inv. Co. of Del.)*,
  327 B.R. 537 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) ................................20

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................................15

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In
  re R.M.L., Inc.)*,
  92 F.3d 139 (3d Cir. 1996).................................................................................24, 25

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
  854 A.2d 121 (Del. Ch. 2004).................................................................................32

*Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*,
  470 B.R. 289 (D. Del. 2012)....................................................................................17

*Miller v. Black Diamond Cap. Mgmt., L.L.C. (In re Bayou Steel BD Holdings,
  L.L.C.)*,
  651 B.R. 179 (Bankr. D. Del. 2023) ........................................................................30

iii

*Montemayor v. City of San Antonio*,
    276 F.3d 687 (5th Cir. 2001) .................................................................................15

*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs
    Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
    405 B.R. 527 (Bankr. D. Del. 2009) ........................................................................25

*Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l
    Amusements Inc. (In re Midway Games, Inc.)*,
    428 B.R. 303 (Bankr. D. Del. 2010) ........................................................................16

*Orabi v. Att'y Gen. of the U.S.*,
    738 F.3d 535 (3d Cir. 2014) .....................................................................................2

*PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*,
    128 F. App'x 839 (3d Cir. 2005) .............................................................................16

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,
    458 B.R. 87 (Bankr. S.D.N.Y. 2011) ......................................................................26

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) .................................................................................................15

*SB Liquidation Tr. v. Preferred Bank (In re Syntax-Brillian Corp.)*,
    Adv. No. 10-51389, 2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) ...........17, 19, 37

*SEC v. Rogas*,
    20-07628 (S.D.N.Y. Sept. 17, 2020) .......................................................................14

*Stewart v. Wilmington Tr. SP Servs.*,
    112 A.3d 271 (Del. Ch. 2015) .................................................................................17

*Travellers Int'l, AG v. TWA (In re TWA)*,
    134 F.3d 188 (3d Cir. 1998) ...................................................................................27

*Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*,
    318 A.3d 450 (Del. Ch. 2024) .................................................................................36

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
    176 F. Supp. 3d 387 (D. Del. 2016) ........................................................................36

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007) ...................................................................................25

*Warfield v. Byron*,
    436 F.3d 551 (5th Cir. 2006) ...................................................................................26

*Wells Fargo Bank, N.A. v. Est. of Malkin*,
   278 A.3d 53 (Del. 2022) ...................................................................................39

*Zayed v. Buysse*,
   Civ. No. 11-1042, 2012 WL 12893882 (D. Minn. Sept. 27, 2012) .......................................21

*Zazzali v. 1031 Exchange Grp. LLC (In re DBSI, Inc.)*,
   476 B.R. 413 (Bankr. D. Del. 2012) ...................................................................23

*Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*,
   477 B.R. 504 (Bankr. D. Del. 2012) ...................................................................22

*Zazzali v. Mott (In re DBSI, Inc.)*,
   445 B.R. 344 (Bankr. D. Del. 2011) ...................................................................28

**Statutes**

6 Del. C.
   § 1304(a)(1) ...............................................................................................16, 17
   § 1304(a)(2) ...............................................................................................24
   § 1304(b) ...................................................................................................20

11 U.S.C.
   § 101(54) ...................................................................................................16
   § 544(b)(1) .................................................................................................16
   § 548(a)(1)(A) .............................................................................................16, 17
   § 548(a)(1)(B) .............................................................................................24, 26
   § 550(a) .....................................................................................................28

**Other Authorities**

Fed. R. Civ. P. § 56(a) ........................................................................................15

Plaintiff Drivetrain, LLC, (the "Plan Trustee") in its capacity as plan trustee of the Cyber Litigation Trust (the "Plan Trust") of the estate of NS8 Inc. n/k/a Cyber Litigation Inc. ("NS8"), files this memorandum of law and the accompanying declaration of Timothy Daileader (the "Daileader Declaration")[1] in support of its motion for summary judgment (the "Motion").

## NATURE AND STAGE OF THE PROCEEDING

1.     NS8 commenced its chapter 11 case on October 27, 2020 (the "Petition Date"). On April 13, 2022, the Plan Trust was established pursuant to the *Debtor's Modified Second Amended Chapter 11 Plan of Liquidation* [Bankr. D.I. 706][2] (the "Plan"), and Plaintiff became trustee of the Plan Trust. On October 28, 2024, the Plan Trustee filed its *Complaint* [Adv. D.I. 1] (the "Complaint") against Defendant Adam Rogas. Defendant filed his *Answer* [Adv. D.I. 7] (the "Answer") on January 17, 2025.

## SUMMARY OF ARGUMENT

2.     The Plan Trustee sued Rogas to recover damages and proceeds from the fraudulent scheme Rogas masterminded and orchestrated during his tenure as CEO and as a member of NS8's Board of Directors. By deceiving NS8 and its investors with false financial information and customer data, Rogas caused those investors to suffer more than $135 million in losses. Rogas himself received over $17.5 million in proceeds from NS8's fraudulent tender offer, as well as other compensation as CEO. The Plan Trustee seeks recovery of these funds from Rogas because they are the result of fraudulent transfers, breached fiduciary duties, fraud, and unjust enrichment, all of which benefited Rogas while harming creditors.

---

[1]     Capitalized terms used, but not defined herein shall have the meanings given to them in the Daileader Declaration.

[2]     The main docket for Case No. 20-12702 (CTG), is referred to herein as "Bankr. D.I."

3.      Rogas co-founded NS8, a cyber fraud prevention company, in 2016. Ironically, NS8 itself was a fraud, which Rogas meticulously conducted and concealed. Many sophisticated investors suffered significant losses as a result of Rogas's fraudulent scheme, including those investors who believed in NS8 the most, invested the most, and were most invested in its future. This adversary proceeding is the climax, though not the conclusion, of the Plan Trustee's efforts to recover those investors' losses, which to date has resulted in the recovery of tens of millions of dollars for NS8's creditors, as the Court is aware from settlements it has approved.

4.      Rogas has already confessed—under oath and in writing—that NS8's "success" was a sham. In his April 24, 2022 sentencing letter (the "Sentencing Letter") to the Honorable John P. Cronan, the U.S. District Court Judge for the Southern District of New York who presided in his eventual criminal case, Rogas admitted, "I deeply regret breaking the law . . . . I misrepresented our total number of paying customers in order to maintain our narrative of success. . . . [and] doctored financial documents to support our inflated numbers, eventually, by tens of millions of dollars. I knowingly committed this crime for the purposes of deceiving potential investors."[3]

5.      Those admitted facts leave no room for doubt or trial. Among other facts and evidence, Rogas's own guilty plea, sentencing letter, and sworn admissions evidence the very elements the Plan Trustee must prove. During his plea hearing, Rogas unequivocally admitted to making material misrepresentations to potential investors, knowing they were false, and intending for the investors to rely upon those misrepresentations.

---

[3]    A true and correct copy of the Sentencing Letter, which was attached as Exhibit 1 to the Sentencing Memorandum of Defendant Adam Rogas, *United States v. Rogas*, Crim. No. 20-00539 (S.D.N.Y. Oct. 13, 2020), ECF No. 67, is attached hereto as **Exhibit A**. Although certain documents from Rogas's criminal and SEC proceedings are attached to this Motion for the Court's convenience, the Court may take judicial notice of them as publicly filed documents. *See, e.g., Orabi v. Att'y Gen. of the U.S.*, 738 F.3d 535, 537 (3d Cir. 2014) (stating that the court "may take judicial notice of the contents of another Court's docket").

2

6.      The overwhelming evidence, including Rogas's formal admissions regarding the extensive fraudulent activities in which he engaged, clearly establish there is no genuine dispute of material fact and the Plan Trustee is entitled to summary judgment as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

### A.      NS8's Founding.

7.      NS8 was a cybersecurity startup that Rogas co-founded in 2016 to develop and sell electronic tools to help online vendors assess the fraud risks involving customer transactions. *Declaration of Daniel P. Wikel, Chief Restructuring Officer of NS8 Inc., in Support of Chapter 11 Petition and First Day Motions* ¶¶ 9–10 [Bankr. D.I. 9] (the "Wikel First Day Declaration"). From NS8's founding until September 1, 2020, Rogas served as its Chief Executive Officer and as a member on its Board of Directors. *Id.* ¶ 11. In these capacities, Rogas was in charge of NS8's financial reporting and fundraising activities. *Id.*

### B.      Rogas's Fraud and Fundraising.

8.      However, Rogas admitted he falsified the customer data he and NS8 gave to its investors throughout the entirety of NS8's pre-petition existence, to falsely show NS8 had far more customers than it actually had. Daileader Decl. ¶¶ 4, 7, 10. In fact, Rogas doctored nearly all of NS8's financial statements and other books and records to portray it as a successful company, when nothing could have been further from the truth. *Id.* ¶ 7.

9.      In reality, NS8 did not have the vast majority of paying customers Rogas claimed by 2020. *Id.* ¶ 4. Rather, between 2016 and 2020, NS8's annual revenue never exceeded $170,000, its total revenues were less than $500,000, and its aggregate expenses were many millions. *Id.* Nonetheless, Rogas reported, or caused NS8 to report, it had revenues of more than $275,000 through June 2017, more than $8,500,000 in 2018, and nearly $39,600,000 in 2019. *Id.* ¶ 7.

3

10.     Rogas routinely conveyed false information and documentation directly to investors. For example, in update emails Rogas sent to investors or potential investors, Rogas represented NS8 had more than 110 customers as of April 2017, 180 customers as of July 2017, and 380 customers as of October 2017, as a result of growth driven by its platform partners, when NS8 only had approximately 45 or less customers by the end of 2017. *Id.* By way of further example:

- In a July 2017 email to NextGen Venture Partners, Rogas attached NS8's July investor update representing that NS8 had more than 180 customers.

- In a January 2018 email to Arbor Ventures, Rogas attached a presentation representing NS8 had generated more than $2.6 million of annual recurring revenue since November 2016 and had more than 500 customers.

- In a February 2018 email to Dave Hanna, at Rogas's direction, his assistant attached reporting representing NS8 had nearly 600 customers as of February 2018, NS8's monthly recurring revenue for February 2018 was more than $240,000, and NS8's total monthly recurring revenue for 2017 was more than $960,000.

- In a July 2018 email to Arbor Ventures, Rogas attached financial statements and projections reporting $6.7 million of annual recurring revenue, more than $2.1 million of revenue from January 2018 through June 2018, and nearly 2,000 customers.

- In a September 2018 email to Dave Hanna, Rogas reported monthly revenue of more than $3.6 million of revenue from January 2018 through August 2018.

- In an October 2018 email to Lytical Ventures, Rogas reported more than $960,000 of revenue in September 2018.

- In an October 2018 email to Arbor Ventures, Rogas represented NS8 as having more than 1,800 customers as of the end of September 2018.

*Id.* In all of these representations, Rogas vastly overstated NS8's actual revenues and customer counts. *Id.*

11.     At the same time as he was reporting false numbers to investors, Rogas was also deceiving NS8's Board. For example, at the Board meetings in the first, second, and third quarters

of 2018, and in the first and second quarters of 2019, NS8's profit and loss statements generated by Rogas showed its total income was, respectively:

- $1,400,872.99 from January 2017 through January 2018;

- $1,946,454.52 from January 2017 through March 2018;

- $2,134,734.90 from January 2018 through June 2018;

- $8,504,312.36 from January 2018 through December 2018; and

- $18,728,281.27 from January 2018 through May 2019.

*Id.* ¶ 8. Each of these numbers massively inflated NS8's actual income, perpetuating Rogas's fraud. *Id.* Similarly, the Board presentations grossly overstated NS8's total customers, as they represented, successively, that NS8 had more than 560 merchant customers via the company's platform partners as of January 2018, more than 810 merchants by April 2018, more than 1,090 merchants by June 2018, more than 2,215 merchants by December 2018, and more than 5,010 merchants by May 2019. *Id.*

12.     To stave off perpetual liquidity crises, Rogas was constantly raising investor-capital for NS8 and using those funds to finance NS8's pre-petition operations. Wikel First Day Decl. ¶ 13; Daileader Decl. ¶¶ 9, 13. Accordingly, Rogas caused NS8 to raise approximately:

- $9,000,000 from investors in 2016 and 2017;

- $11,000,000 in early 2019;

- $50,000,000 in late 2019; and

- $73,000,000 in April 2020.

Wikel First Day Decl. ¶ 14; Daileader Decl. ¶¶ 11–12. Thus, as NS8's fictitious success grew, so did the amount of capital Rogas needed to raise to conceal his fraud. *See* Daileader Decl. ¶ 13.

13.     Rogas tricked NS8's investors into making investments using the false financial statements and other documents he generated as well as the fake revenues and customers reflected

therein. *Id.* ¶¶ 10, 14; Answer ¶¶ 1, 18. Rogas's fraud is written all over NS8's agreements, including the Series A Preferred Stock Purchase Agreements (the "September 2019 SPA" and "April 2020 SPA") it entered into with its investors.[4] Both stock purchase agreements contained customary representations concerning the accuracy of NS8's financial statements, financial condition, and operating results. Daileader Decl. ¶ 15. Those representations were falsely made by Rogas. *Id.* Similar false representations were made in NS8's other fundraising documents, and its investors relied on those representations. *See, e.g.*, Proof of Claim No. 15, Addendum to Proof of Claim ¶¶ 5, 15 (listing representations and warranties NS8 breached in a purchase agreement for NS8's Series Seed-3 Preferred Stock made on or about November 7, 2017); Proof of Claim No. 16, Addendum to Proof of Claim ¶¶ 4, 13 (listing representations and warranties NS8 breached in a Note Purchase Agreement made on or about December 7, 2018).[5]

14.     Rogas finally confessed to his extensive fraud in his Sentencing Letter. In the letter, Rogas stated: "I deeply regret breaking the law as I raised the additional capital. I misrepresented our total number of paying customers in order to maintain our narrative of success. Worse, when challenged to back up this narrative I doctored financial documents to support our inflated numbers, eventually, by tens of millions of dollars. I knowingly committed this crime for the purposes of deceiving potential investors." Ex. A, at 5.

### C.     The April 2020 Series A and Tender Offer Transactions.

15.     As early as February 2020, Rogas and NS8 began working on plans for the company to repurchase shares of its stock from early investors and employees (the "Tender Offer").

---

[4]     True and correct copies of the September 2019 SPA and April 2020 SPA, and the disclosure schedules thereto, are attached to the Daileader Declaration as **Exhibit C** and **Exhibit D**, respectively.

[5]     These proofs of claim, filed by TDF Ventures Fund IV, LP, and Lytical Ventures CI, LP, are found in the NS8's claims register.

6

Daileader Decl. ¶ 17. They planned to fund the Tender Offer primarily with capital raised from investors in the prospective Series A transaction. *Id.*; Answer ¶ 37.

16.     The lead investors in the Series A transaction were funds managed by Edison Partners, AXA Venture Partners, and Lightspeed Venture Partners, respectively. Daileader Decl. ¶ 18. These funds previously made substantial investments in NS8 and were the lead investors in the September 2019 Series A transaction. *Id.* With their investments, each investor group respectively obtained a right to appoint one of the five members of NS8's Board of Directors following the September 2019 Series A transaction, appointing Lenard Marcus (Edison), Alex Scherbakovsky (AXA), and Bradley Twohig (Lightspeed). *Id.*

17.     While negotiating the April 2020 Stock Purchase Agreement, NS8 disclosed to Marcus, Scherbakovsky, and Twohig that NS8 and several of its employees had received subpoenas in December 2019 and March 2020 relating to an SEC investigation into a July 2019 whistleblower complaint, which NS8 previously disclosed in connection with the September 2019 Stock Purchase Agreement. *Id.* ¶¶ 19–20, 23. Upon learning of the December 2019 subpoenas, Marcus, Scherbakovsky, and Twohig delayed the Series A transaction and caused Edison, AXA, and Lightspeed to engage Ernst & Young, and Kroll (a division of Duff & Phelps) to conduct independent diligence into NS8's financials, platform partners, customers, and key executives. *Id.* ¶¶ 20–22.

18.     After NS8 disclosed the March 2020 subpoenas, Marcus, Scherbakovsky, and Twohig delayed the Board's approval of the Series A transaction. *Id.* ¶ 23. Those Board members decided they would not approve the transaction until Crowell & Moring LLP, NS8's legal counsel, which was conducting a comprehensive internal investigation in response to the initial SEC

7

subpoenas, completed its review of thousands of documents and communications as well as countless interviews of employees, and submitted its findings to the Board. *Id.*

19.     Thus, Marcus, Scherbakovsky, and Twohig caused the Board to implement a comprehensive diligence process designed to protect NS8's interests and confirm no fraud was occurring. *See id.* ¶¶ 20–24. Such process was not completed until early April when, among other things:

- Ernst & Young confirmed it verified current bank account balances for all bank accounts, and had obtained bank statements and reconciliations for the period of December 2018 through February 2020 and found no instances of fraud or wrongdoing; and

- Crowell & Moring likewise confirmed its internal investigation yielded no showing of fraud or wrongdoing.

Only after receiving this diligence from an Am Law 100 firm and a "big three" accounting firm, did Marcus, Scherbakovsky, and Twohig approve the April 2020 Series A transaction in their capacity as members of NS8's Board of Directors. *Id.* ¶ 24.[6]

20.     On April 15, 2020, NS8's Board of Directors held a meeting at which Rogas and other NS8 officers and employees reported on, *inter alia*, the company's financial performance, cash on hand, and continuing revenue and customer growth. *Id.* ¶ 25. The information Rogas and his subordinates presented to the Board, including Marcus, Scherbakovsky, and Twohig, was false. *Id.* Rogas further provided an update on the progress of the proposed Series A stock offering and Tender Offer (i.e., the repurchase of outstanding shares) transactions. *Id.* Anticipating undertaking the Tender Offer, the Board on the same day formally approved the Series A stock offering. *Id.* ¶ 26. The Series A transaction closed on April 21, 2020. *Id.* ¶ 27. The Series A Stock Purchase

---

[6]     *See generally* Answer ¶¶ 38–41 (admitting to the general allegations surrounding the Board's investigation in connection with approving the Series A transaction in response to the subpoenas).

Agreement included the authorization for NS8 to use its investment proceeds in connection with the Tender Offer. *Id.*

21.    On May 11, 2020, with the Board's formal approval and the Series A investment proceeds in hand, NS8 announced the Tender Offer to its stockholders by circulating an Offer to Purchase at a price of $18.50 per share (the "Purchase Offer").[7] *Id.* ¶¶ 28–29. The Purchase Offer falsely represented to investors that NS8 believed its cash and revenues, among other sources of liquidity, were "adequate for the needs of the Company for at least the next 24 months." *Id.* ¶ 29. Further deceiving to its investors, NS8 also attached to the Purchase Offer false annual financial statements for 2018 and 2019, as well as false quarterly financial statements for the first quarters of 2019 and 2020. *Id.*

22.    In reality, however, NS8 was, and remained, insolvent, and its stock worthless. *Id.* ¶ 30. But the share price was built up using bank statements doctored by Rogas, Rogas' fictional customers and sales to them, and the financial statements Rogas prepared or caused to be prepared for NS8, which likewise were false and prepared in fraud. Consequently, the transaction's share price was materially higher than the shares' actual value had all the misrepresentations, lies, and deceptions been excluded. *Id.* As a result, NS8's tendering stockholders, including Rogas, received massive windfalls funded by capital contributions from NS8's Series A investors that purchased new shares less than one month earlier. *Id.* ¶¶ 17–18, 30–31.

23.    Ultimately, NS8 used approximately $72 million of the funds from the Series A investments to pay for the Tender Offer. *See* Wikel First Day Decl. ¶ 16. Settlement payments to the tendering shareholders were made on or about June 23, 2020, which further depleted NS8's

---

[7]    A true and correct copy of the Purchase Offer is attached to the Daileader Declaration as **Exhibit I**.

assets and worsened both its capacity to cover its liabilities and to fund its actual operating losses. Daileader Decl. ¶ 32.

24.     Rogas received $17,542,458.50 through the Tender Offer (the "Tender Offer Proceeds"). Answer ¶ 49. Of these proceeds, Rogas used approximately $7,500,000 to pay off a loan he previously had borrowed in connection with purchasing NS8 shares from co-founder Paul Korol. *Id.* ¶ 2.

### D.     The Fraud Unravels.

25.     After the Tender Offer, Rogas's fraudulent scheme quickly began to unravel. Daileader Decl. ¶ 33. In order to improve financial controls at NS8 and reduce their reliance on Rogas, the Board recruited new officers who identified irregularities previously ignored. *Id.* After delaying ceding his control over and visibility into NS8's bank accounts to the new officers, and with the reckoning of his fraud in sight, Rogas abruptly resigned on September 1, 2020. *Id.* ¶¶ 33–34.

26.     By the time he resigned from NS8, in addition to the Tender Offer Proceeds, Rogas collected a substantial salary, bonuses, and other compensation from NS8 (collectively, the "Employment Proceeds").[8] *Id.* ¶ 35.

27.     On September 10, 2020, the majority of NS8's over two hundred employees were formally notified they were being laid off, effective as of September 11, 2020. *Id.* ¶ 34. NS8 had hired these employees as a result of Rogas's fraud and was ultimately forced to lay them off following the fraud's discovery and the extent to which Rogas had overstated NS8's revenues and cash. *Id.*

---

[8]     The Plan Trustee reserves the right to prove the amount of Employment Proceeds Rogas received at trial or otherwise following the Court's disposition of this Motion.

**E.      The Chapter 11 Case.**

28.      On October 27, 2020 (the "Petition Date"), NS8 filed its chapter 11 case. The investors whom Rogas victimized were ultimately determined to have fraud claims against NS8's estate in an aggregate amount of up to at least $135,644,991.80. *See Declaration of Daniel P. Wikel in Support of Confirmation of Debtor's Chapter 11 Plan of Liquidation* ¶ 13 [Bankr. D.I. 709] (the "Wikel Confirmation Declaration").

29.      On September 3, 2021, Rogas's counsel entered their appearances in NS8's case. *See Notice of Appearance and Request for Service of Papers* [Bankr D.I. 511].

30.      On March 8, 2022, NS8 filed its modified Plan, including a "Plan Settlement," pursuant to which the fraudulent inducement claims of the Supporting Sponsors (as defined in the Plan) were allowed for all purposes in the aggregate amount of approximately $116,362,000.00 (the "Supporting Sponsor Claims") and the fraudulent inducement claims of NS8's other investors were allowed for voting purposes (collectively with the Supporting Sponsor Claims, the "Investor Claims"). Plan §§ III.D, V.A–B. The other Investor Claims were ultimately allowed after confirmation. Daileader Decl. ¶ 37; *see also Post-Confirmation Report for the Quarter Ending March 31, 2025*, at 7 [Bankr. D.I. 893] (the "2025-Q1 Post-Confirmation Report") (reporting that $135,670,694 of general unsecured claims had been allowed).

31.      On March 11, 2022, the Court entered an order confirming the Plan. *See* Bankr. D.I. 723 (the "Confirmation Order"). The Confirmation Order approved the Plan Settlement and ordered that, upon the Plan's effective date, it was "immediately effective and ***enforceable and deemed binding*** on the Debtor, all Creditors and Holders of Interests, and ***all other Persons***." Confirmation Order ¶¶ T, 4, 10 (emphasis added). The Plan became effective on April 13, 2022. *See* Bankr. D.I. 747.

11

**F.     The Criminal Proceeding.**

32.     On September 17, 2020, Rogas was arrested by the FBI and charged with securities fraud, fraud in the offer or sale of securities, and wire fraud relating to, *inter alia*, the $123 million Series A transactions. Sealed Complaint ¶ 6, *United States v. Rogas*, Crim. No. 20-00539 (S.D.N.Y. Oct. 13, 2020), ECF No. 7.

33.     On March 16, 2022, Rogas pled guilty to securities fraud. *United States v. Rogas*, *supra*, ECF No. 59 (the "Plea Hearing Transcript").[9] At his plea hearing, Rogas engaged in the following dialogue with Judge Cronan, where he unequivocally admitted to the specific elements of his crimes, including his criminal intent:

> THE COURT: So Mr. Rogas, just to go over a couple of other things that you said . . . . When you made material misrepresentations to investors, first of all, did you know what you were doing was wrong and illegal?
>
> THE DEFENDANT: I knew -- yes.
>
> THE COURT: Yes, you did know.
>
> THE DEFENDANT: I did know.
>
> THE COURT: And at the time you made those misrepresentations, you knew they were false; is that right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And did you intend for potential investors to believe those misrepresentations to be true and to invest based on that incorrect understanding?
>
> THE DEFENDANT: Yes.
>
> . . . .
>
> THE COURT: And you knew it was illegal to make misrepresentations to investors.
>
> THE DEFENDANT: Yes.

Ex. B, at 25:13–26:7.

---

[9]     A true and correct copy of an excerpt of the Plea Hearing Transcript is attached hereto as **Exhibit B**.

34.     Rogas submitted his Sentencing Letter on April 24, 2022. He confessed in the Sentencing Letter that he "directly benefited" from the fraud he and NS8 perpetrated on its investors and admitted personal responsibility for the fraud. Ex. A, at 1. In his Sentencing Letter, in reference to the Series A and Tender Offer transactions, Rogas stated: "I submit this letter feeling heartbroken and humiliated. Three years ago, I used materially misleading financial statements to raise approximately $123 million from investors for NS8 . . . . I am ashamed to admit that I altered bank statements to show millions of dollars of fictional customer revenue and assets." *Id.*

35.     Referring again to the Series A and Tender Offer transactions, Rogas stated later in the Sentencing Letter: "Based on my fraudulent representations, we raised $123 million . . . . It is gut-wrenching to reflect on how many of those deals were based on my criminal acts of deception. I clearly lost my way and hurt innocent people who trusted me." *Id.* at 6.

36.     On November 3, 2022, Judge Cronan sentenced Rogas to serve five years at Federal Prison Camp Yankton in South Dakota. *See United States v. Rogas*, *supra*, ECF No. 80, at 2. At the sentencing hearing, Judge Cronan found:

> This was a lengthy fraud that entailed the defendant creating a host of fraudulent documents ranging from spreadsheets, listing fictitious customers, to monthly bank statements with doctored company assets. And he passed these bogus documents off as authentic to investors, to the auditor, and to potential hires. I, therefore, cannot view this crime as simply an uncharacteristic mistake in judgment as the defense raised. I agree with the government's characterization of the defendant's fraud as brazen, calculated and long-running.

*United States v. Rogas*, *supra*, ECF No. 81, at 76:5–14 (the "Continued Sentencing Hearing Transcript").[10]

---

[10]    A true and correct copy of an excerpt of the Continued Sentencing Hearing Transcript is attached hereto as **Exhibit C**.

37.     On November 9, 2022, Judge Cronan entered a Preliminary Order of Forfeiture imposing a money judgment against Rogas in the amount of $17,542,459.00 tying to proceeds traceable to his fraud. *See United States v. Rogas*, *supra*, ECF No. 79, at 2.

38.     On December 9, 2022, Judge Cronan entered an order requiring Rogas to pay $112,276,409.50 as restitution to his victims. *See United States v. Rogas*, *supra*, ECF No. 88, ¶ 1. This figure ties to certain "investor losses," less distributions they received from NS8's estate, plus certain legal fees and expenses one investor incurred while cooperating with the government's investigation and prosecution. *See United States v. Rogas*, *supra*, ECF No. 74, at 1.

**G.     The SEC Proceeding.**

39.     On the same day Rogas was arrested by the FBI and charged with the crimes for which he served time in prison, the SEC filed a civil complaint against Rogas and several entities he controls, based on identical underlying conduct. *SEC v. Rogas*, 20-07628 (S.D.N.Y. Sept. 17, 2020), ECF No. 1. The SEC filed an amended complaint on November 22, 2022. *See SEC v. Rogas*, *supra*, ECF No. 79.

40.     Rogas ultimately consented to the entry of a judgment against him on the SEC's amended complaint. *See SEC v. Rogas*, *supra*, ECF No. 211. Accordingly, on September 18, 2024, the United States District Court for the Southern District of New York entered judgment in favor of the SEC. *See SEC v. Rogas*, *supra*, ECF No. 216. The judgment ordered Rogas to, *inter alia*, disgorge the Tender Offer Proceeds, which disgorgement was "deemed satisfied" by the restitution ordered in his criminal case. *Id.* at 4.

## LEGAL STANDARD

41.     Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a

reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). When there is no dispute as to material facts, summary judgment is appropriate. *See Carter v. McGrady*, 292 F.3d 152, 157 n.2 (3d Cir. 2002). While this Court may not make credibility determinations or weigh the evidence pursuant to *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), "*Reeves* does not require [the Court] to reject **the plainly obvious**." *Montemayor v. City of San Antonio*, 276 F.3d 687, 693 (5th Cir. 2001) (emphasis added).

42.     The movant "bears the initial responsibility of informing the . . . court of the basis for its motion" and identifying what "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party carries its burden, the burden shifts to the non-moving party, which "may not rest upon the mere allegations or denials of his pleading . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The non-moving party must "do more than [create] some **metaphysical doubt** as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis added). Summary judgment similarly cannot be avoided by introducing only "a mere scintilla of evidence." *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 413 (3d Cir. 1990).

## **ARGUMENT**

43.     The Plan Trustee asserts claims for actual and constructive fraudulent transfers against Rogas in Counts I–IV of the Complaint, for breach of fiduciary duty in Count V, for fraud in Count VI, for unjust enrichment in Count VII, and for disallowance of Rogas's claims in Count VIII. The Plan Trustee requests entry of summary judgment in its favor on each of these claims.[11]

---

[11]   The Plan Trustee does not move for summary judgment with respect to the Other Transfers and Credit Card Charges (each as defined in the Complaint).

I.    **ACTUAL FRAUDULENT TRANSFER CLAIMS**

44.    The Plan Trustee's actual fraudulent transfer claims arise under section 548(a)(1)(A) of the Bankruptcy Code and section 1304(a)(1) of the Delaware Uniform Fraudulent Transfer Act ("DUFTA"). [12] Under either statute, the substantive elements of the Plan Trustee's actual fraudulent transfer claims are the same. [13] They include the transfer of an interest of NS8 in property with intent to hinder, delay, or defraud its present or future creditors. 11 U.S.C. § 548(a)(1)(A); 6 Del. Code § 1304(a)(1). The undisputed facts establish that each of these elements is met.

A.    **NS8 Presumptively Had Legal Title to the Funds Transferred to Rogas.**

45.    The term "transfer" is broadly defined in the Bankruptcy Code and includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." 11 U.S.C. § 101(54). NS8 paid the Tender Offer Proceeds and Employment Proceeds to Rogas with funds that originated from its bank accounts. Daileader Decl. ¶¶ 32, 36. The Plan Trustee is entitled to presumptions that NS8 had legal title to such funds and that they would have been property of the estate. [14] Thus, the requirement that NS8 had an interest in the transferred property is satisfied.

---

[12]    The Plan Trustee may assert claims under DUFTA through the Bankruptcy Code's strong-arm provision, section 544(b)(1). The strong-arm power allows the Plan Trustee to stand in the shoes of an actual creditor of NS8 to avoid a transfer of the debtor's property that such creditor could have avoided under nonbankruptcy law. *See* 11 U.S.C. § 544(b)(1); 5 *Collier on Bankruptcy* ¶ 544.01 (Richard Levin & Henry J. Sommer eds., 16th ed. 2025). NS8's investors filed at least twenty-one claims asserting nearly $136,000,000 of damages for fraud in its chapter 11 case. *See* Wikel Confirmation Decl. ¶ 13. Therefore, the Plan Trustee may exercise such creditor's rights to assert DUFTA fraudulent transfer claims against Rogas. *See, e.g.*, *See Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In re Midway Games, Inc.)*, 428 B.R. 303, 325 (Bankr. D. Del. 2010).

[13]    *See PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 F. App'x 839, 847 (3d Cir. 2005) (stating that "[w]e need not discuss the [actual-intent fraudulent transfer] provisions of the [DUFTA] . . . because they are substantially the same as the relevant parts of the Bankruptcy Code").

[14]    *See FBI Wind Down Inc. Liquidating Tr. v. Innovative Delivery Sys., Inc. (In re FBI Wind Down, Inc.)*, 581 B.R. 387, 400 (Bankr. D. Del. 2018) (recognizing that "[i]t is 'well-settled case law' that any bank accounts under the legal title of the debtor, as well as any deposits in such accounts credited to the debtor, are presumptively considered property of the debtor's estate," which "presumption holds even in cases where the account contains

**B.      NS8 Made the Transfers to Rogas with Intent to Hinder, Delay, and Defraud Its Investors and Other Creditors.**

46.      The undisputed facts establish that NS8 transferred the Tender Offer Proceeds and Employment Proceeds to Rogas with actual intent to hinder, delay, and defraud its investors and other creditors. As this Court already decided in a related adversary proceeding, Rogas's admitted fraudulent intent controls the analysis as to the Tender Offer Proceeds. *E.g.*, *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, Adv. No. 22-50439, 2023 WL 6938144, at *2 (Bankr. D. Del. Oct. 19, 2023).

47.      The Bankruptcy Code and DUFTA allow the Plan Trustee to avoid transfers made by NS8 with intent to either hinder, delay, or defraud. 11 U.S.C. § 548(a)(1)(A); 6 Del. C. § 1304(a)(1). The statutes are disjunctive, such that "any one of the three requisite states of mind . . . is sufficient to establish the intent element." *SB Liquidation Tr. v. Preferred Bank (In re Syntax-Brillian Corp.)*, Adv. No. 10-51389, 2016 WL 1165634, at *4 (Bankr. D. Del. Feb. 8, 2016). "The only relevant intent is that of the debtor." *Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 300 (D. Del. 2012).

48.      Critically, Rogas's fraudulent intent is imputed to NS8. The "knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself." *Stewart v. Wilmington Tr. SP Servs.*, 112 A.3d 271, 302–03 (Del. Ch. 2015). "Thus . . . so long as a corporation's agent had the requisite fraudulent intent when it caused the corporation to carry out the transaction, that intent is imputed to the corporation." *DDE Partners*, 2023 WL 6938144, at *8. With respect to NS8's decision to conduct the Tender

---

commingled funds"); *AFD Fund v. Transmed Foods, Inc. (In re AmeriServe Food Distrib., Inc.)*, 315 B.R. 24, 29 (Bankr. D. Del. 2004) (citing *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990)) (recognizing that property transferred by the debtor is a transfer of an interest of the debtor in property if it "would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings").

17

Offer, other Board members' authorization for the Tender Offer "will be insufficient to break the causal connection between [Rogas's] fraudulent intent and a corporate decision if the [B]oard . . . was 'controlled' by [Rogas]." *Id.* at 11.

49. Rogas has unequivocally admitted to defrauding NS8's investors to raise the funds NS8 used for the Tender Offer. *E.g.*, Ex. A, at 1, 5–6; Ex. B, at 25:13–26:7; *SEC v. Rogas*, *supra*, ECF No. 211; Answer ¶¶ 1, 18. He also defrauded NS8's Board of Directors. As this Court correctly decided in *DDE*, "[t]he line between Rogas' intent to defraud creditors and the debtor's decision to purchase its shares in the tender offer is as straight as an arrow." 2023 WL 6938144, at *13. Specifically, the other Board members "were 'controlled' by Rogas in the sense that he deceived them into believing, by virtue of his fraud, that the transaction was fair to the debtor," when in reality, "the company was deeply insolvent." *Id.* This Court is not even the only court to recognize Rogas's fraudulent intent, as Judge Cronin also concluded that "[Rogas's] fraud [w]as brazen, calculated and long-running." Ex. C, at 76:12–14.

50. Indeed, the undisputed facts of this adversary proceeding establish, as they established in DDE, that Rogas controlled NS8's Board and caused it to approve the Tender Offer. Rogas cannot deny that NS8 was insolvent when it entered into the Tender Offer, as it had never generated a profit and used the capital it raised from the investors that Rogas was defrauding to fund the operating losses he was hiding, and the Tender Offer's transfers to its subscribers only rendered NS8 even more insolvent. *See* Argument § II.B, *infra*. Because the shares NS8 purchased were worthless, NS8 received no value for the payments made to subscribers in the Tender Offer. *See* Argument § II.A, *infra*.

51. The non-Rogas Board members were blind to these essential facts and had in fact been deceived when they approved the Tender Offer. Rogas' acts ensured they would be, as he

18

had been providing false financial and sales data to the Board for years, had exclusive control over and visibility into NS8's bank accounts, had controlled NS8's financial and sales data, and successfully acted to conceal his fraud when non-Rogas Board members engaged outside professionals to investigate NS8. Daileader Decl. ¶¶ 4–5, 7–8, 10, 13–15, 18–25, 29; *see also* Answer ¶ 114 (stating that "Rogas admits that he took affirmative steps to prevent others from understanding that certain representations were inaccurate, wrong, or false").

52.     Moreover, notwithstanding that the Board consented to the Tender Offer, Rogas was the driving force behind planning and generating interest among stockholders for the transaction and providing the Board (including representatives of three investors whose capital NS8 used to fund the Tender Offer) with fraudulent information necessary to gain its consent. Daileader Decl. ¶¶ 17–18, 25. As a result, there can be no doubt that "the board's decision to approve the tender offer was the direct (and intended) result of Rogas' fraud." *DDE Partners*, 2023 WL 6938144, at *13. Further, "[b]ecause Rogas' fraud was the *sine qua non* of the tender offer, his intent to hinder, delay or defraud creditors is imputed to the debtor." *Id.*

53.     However, imputation is not the only legal theory by which the facts establish actual fraud. For example, pursuant to the natural consequences doctrine, the Plan Trustee is entitled to a presumption of fraudulent intent because the natural consequence of using nearly all of the funds that NS8 had just raised from a group of investors while "purposefully concealing massive losses" is to "delay . . . payment to [them]." *Syntax-Brillian*, 2016 WL 1165634, at *6 (recognizing that if the natural consequence of a transfer is to hinder, delay, or defraud creditors, the Court may find that it was an intentional fraudulent transfer).

54.     The badges of fraud also unequivocally establish actual fraud. The badges of fraud set forth in DUFTA include:

(1)     The transfer or obligation was to an insider;

(2)     The debtor retained possession or control of the property transferred after the transfer;

(3)     The transfer or obligation was disclosed or concealed;

(4)     Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     The transfer was of substantially all the debtor's assets;

(6)     The debtor absconded;

(7)     The debtor removed or concealed assets;

(8)     The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

6 Del. C. § 1304(b). [15] Other badges of fraud that courts have considered in analogous circumstances include:

(12)    Concealment of the debtor's true financial condition or the existence of irregularities in records or false financial statements[16];

---

[15]   *See also Liquidation Tr. of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 551 (D. Del. 2005) (listing as badges of fraud under the Bankruptcy Code's fraudulent transfer provisions "(1) the relationship between the debtor and the transferee; (2) consideration for conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor; and (6) secrecy or concealment of the transaction"), *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

[16]   *See Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*, Adv. No. 21-51190, 2023 Bankr. LEXIS 1471, at *8 (Bankr. D. Del. Apr. 18, 2023); *Bayou Superfund, LLC v. WAM Long/Short-Fund II, L.P.*, 362 B.R. 624, 634 (Bankr. S.D.N.Y. 2007).

(13)   The debtor and/or its agents pleaded guilty to or were convicted of felonies related to the fraudulent conduct[17]; and

(14)   The payment was made as part of a Ponzi scheme.[18]

Even just a few badges of fraud can establish a presumption of fraudulent intent. *Drivetrain, LLC v. X. Com., Inc.*, Adv. No. 22-50448, 2023 WL 1804627, at *4 (Bankr. D. Del. Feb. 7, 2023). No individual badge is dispositive. *Id.* at *3. However, more than enough badges of fraud are present here to show that NS8 acted with the requisite fraudulent intent.

55.   *First*, NS8 transferred the Tender Offer Proceeds to Rogas shortly after it incurred a substantial $73 million debt to its investors as a result of the April 2020 Series A transaction. *See* Argument § II.B, *infra*.

56.   *Second*, NS8 not only was insolvent when it transferred the Tender Offer Proceeds to Rogas, but the Tender Offer rendered it even more insolvent. *See id.*

57.   *Third*, the undisputed facts show that Rogas and NS8 were concealing the company's true financial condition throughout the entirety of its existence, including in connection with the Series A and Tender Offer transactions. Daileader Decl. ¶¶ 4–5, 7–8, 10, 13–15, 18–25, 29; *see also* Answer ¶ 114 (stating that "Rogas admits that he took affirmative steps to prevent others from understanding that certain representations were inaccurate, wrong, or false").

58.   *Fourth*, because its shares were virtually worthless, NS8 received far less than reasonably equivalent value in exchange for the transfer, if it received any value at all. *See* Argument § II.A, *infra*.

---

[17]   *See Zayed v. Buysse*, Civ. No. 11-1042, 2012 WL 12893882, at *17 (D. Minn. Sept. 27, 2012); *Bayou Superfund*, 362 B.R. at 634.

[18]   *See Finn v. All. Bank*, 860 N.W.2d 638 (Minn. 2015); *Kelley v. Opportunity Fin., LLC (In re Petters Co., Inc.)*, 550 B.R. 457, 468 (Bankr. D. Minn. 2016).

59.     *Fifth*, by using nearly all of the proceeds of the April 2020 investments for the Tender Offer, NS8 extinguished any hope of repaying its creditors. Daileader Decl. ¶ 32. Thus, the Tender Offer constituted a transfer of a material and significant portion of NS8's assets, which fundamentally changed NS8's financial condition for the worse.[19]

60.     *Sixth*, NS8 received both SEC subpoenas in the months before the Tender Offer. *Id.* ¶¶ 19, 23. Those subpoenas were tantamount to a threatened lawsuit, notifying NS8 it was the subject of a federal investigation.

61.     *Seventh*, Rogas pleaded guilty to securities fraud for the scheme he perpetrated through NS8 and received a sixty-month sentence. *See United States v. Rogas*, *supra*, ECF Nos. 59, 80. He also consented to entry of judgment against him (and judgment was entered against him) in the SEC action. *See SEC v. Rogas*, *supra*, ECF Nos. 211, 216.

62.     *Eighth*, Rogas turned NS8 into a Ponzi scheme and caused NS8 to transfer the Tender Offer Proceeds to him as part of that scheme.

63.     That NS8 was a Ponzi scheme not only evidences the existence of the last badge of fraud but independently entitles the Plan Trustee to a presumption of fraudulent intent.[20] *Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 510–11 (Bankr. D. Del. 2012); *see also Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund LLC (In re Bayou Grp., LLC)*,

---

[19]    When a transfer encompasses a significant part of a debtor's assets, this badge is met. The significance of the assets to the company is more important to the inquiry than the mere percentage of assets that were transferred. *See Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*, Adv. No. 11-52005, 2012 WL 4793241, at *14 (Bankr. D. Del. Oct. 9, 2012) (stating that "[t]he law is not 'majority of,' but, the more amorphous 'substantially all'" of the debtor's assets and that "[o]ne can easily imagine substantially all of a company's asset[s] being less than a majority"). Thus, courts have found that a transfer of "substantially all" of a debtor's assets has occurred where "the company has fundamentally changed" as a result of the transfer. *Id.*

[20]    "The logic for applying a presumption of actual intent to defraud in the Ponzi scheme scenario is tied to the fact that a Ponzi scheme 'cannot work forever.' When the pool of investors runs dry—as it will—the operator knows that the scheme will collapse and that those still invested in the enterprise will lose their money." *See Bayou Grp.*, 439 B.R. at 306 n.19.

439 B.R. 284, 307 (S.D.N.Y. 2010) (finding that fraudulent intent was presumed for purposes of summary judgment where a Ponzi scheme was demonstrated).

64. Modern precedent defines Ponzi schemes broadly. Courts generally recognize "any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud" as a Ponzi scheme. *Bayou Superfund*, 362 B.R. at 633. Thus, this Court has stated that "a Ponzi scheme exists where 'money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme.'" *Zazzali v. 1031 Exchange Grp. LLC (In re DBSI, Inc.)*, 476 B.R. 413, 422 (Bankr. D. Del. 2012).

65. The way Rogas operated NS8 plainly fits this flexible definition. As NS8 could have failed earlier based upon its practically non-existent sales revenue, Rogas repeatedly defrauded investors into making increasingly larger investments. Daileader Decl. ¶ 13. NS8's ever-growing need for capital, therefore, puts it squarely within the modern definition of a Ponzi scheme. It even acknowledged that one purpose of the Tender Offer was to facilitate future offerings by reducing supply and allowing NS8 to take advantage of higher share prices. *See* Purchase Offer, at 13.

66. Rogas secured the Employment Proceeds by actual fraud to which he now has confessed. Not only were such transfers afflicted by many of the same badges of fraud applicable to the Tender Offer and made to perpetuate the NS8 Ponzi scheme, but because NS8 had only a fraction of the business Rogas made it appear to have, and only survived by defrauding its investors, there could be no legitimate purpose to the compensation it paid to him. The sole purpose those transfers served was to hinder, delay, and defraud NS8's creditors as Rogas diverted the funds,

23

necessarily consisting largely or entirely of the capital creditors invested in NS8, to his own use and benefit, including to finance his efforts to raise more capital and delay the discovery of his fraud.

67.     Accordingly, the Plan Trustee has more than established actual fraud as to the Tender Offer Proceeds and Employment Proceeds. There are no less than four bases upon which the Plan Trustee has shown actual fraud—direct evidence, the natural consequences doctrine, the badges of fraud, and the Ponzi presumption—any of which individually supports summary judgment, and which collectively establish an overwhelming case.

## II.    CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS

68.     The Plan Trustee's constructive fraudulent transfer claims arise under section 548(a)(1)(B) of the Bankruptcy Code and section 1304(a)(2) of DUFTA.[21] These provisions authorize the Plan Trustee to avoid a transfer of an interest of NS8 in property to Rogas if NS8 received less than reasonably equivalent value in exchange and, *inter alia*, was or became insolvent under the balance sheet and inadequate capital tests. *See* 11 U.S.C. § 548(a)(1)(B); 6 Del. C. § 1304(a)(2). As discussed above, there is no genuine dispute of material fact regarding NS8's interest in the Tender Offer Proceeds and Employment Proceeds. *See* Argument § I.A, *supra*. The other elements of the Plan Trustee's constructive fraud claims are also satisfied.

### A.    NS8 Did Not Receive Reasonably Equivalent Value.

69.     When analyzing whether a debtor received reasonably equivalent value, courts need not measure the value given if it is clear initially that no value was conferred. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148, 150 (3d Cir. 1996). Only if there was some value do courts examine whether there was reasonably

---

[21]    The Plan Trustee may assert constructive fraudulent transfer claims under DUFTA through the Bankruptcy Code's strong-arm provision. *See supra* n.12.

equivalent value, "tak[ing] into account the fair market value of the item received by, or services performed for, the debtor; the existence of an arm's-length relationship between the debtor and the transferee; and the good faith of the transferee." *Id.* at 149.

70.     The term "reasonably equivalent value" is not defined in the Bankruptcy Code, but as the Third Circuit has noted, "a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 546 (Bankr. D. Del. 2009) (quoting *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)).

71.     The stock NS8 received in exchange for the Tender Offer Proceeds was the only value that it received in exchange for such transfer. However, NS8's share price was materially over-stated because its valuation was based on Rogas's false financial statements. Daileader Decl. ¶ 30. As a result, the price NS8 paid is irrelevant to the reasonably equivalent value analysis. *See VFB*, 482 F.3d at 632 (stating that "[t]he market capitalization" of a business that is "inflated by . . . manipulations" is not considered "good evidence of value"). In reality, NS8's shares were essentially worthless. Daileader Decl. ¶ 30. Accordingly, there can be no genuine dispute of material fact that NS8 received less than reasonably equivalent value in exchange for the Tender Offer Proceeds that Rogas received for NS8's worthless stock.

72.     Further, as has been acknowledged by Rogas in his guilty plea and established through the above evidence, the essence of the work that Rogas performed for NS8—while serving as its CEO and as a director—was an illegal, multi-year scheme to defraud NS8 and its investors. Consequently, Rogas cannot claim that he provided any value to NS8 for the Employment Proceeds. To the contrary, he destroyed whatever value NS8 had by causing it to suffer increasingly large operating losses and incur increasingly large liabilities to its investors while

breaching his fiduciary duties to NS8 and pushing it deeper into insolvency while continuing his criminal conduct that ultimately landed him in federal prison. *See* Argument §§ II.B, IV.A, *infra.*

73.     Thus, NS8 did not receive reasonably equivalent value in exchange for the Employment Proceeds. *See, e.g.*, *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (holding that payments for broker services rendered to a fraudulent scheme were not made for reasonably equivalent value and stating "[i]t takes cheek to contend that in exchange for the payments he received, the [company] benefited from his efforts to extend the fraud by securing new investments"); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 112 (Bankr. S.D.N.Y. 2011) (holding that "the Trustee has sufficiently alleged [that the defendants] breached fiduciary duties to [the company], and thus did not provide services that might otherwise have constituted adequate consideration in exchange for their receipt of salaries and bonuses").

### B.     NS8 Was Insolvent Before and After the Tender Offer.

74.     There can also be no genuine dispute of material fact regarding NS8's insolvency. "The Bankruptcy Code defines an 'insolvent' entity as one for which the sum of its 'debts is greater than all of such entity's property, at fair valuation.'" *X. Com.*, 2023 WL 1804627, at *6 (citing 11 U.S.C. § 101(32)(A)). Under DUFTA, a debtor is also "considered insolvent if it engaged in a transaction whereby the debtor undertook liabilities unreasonably disproportional to the value received." *See id.* (citing 6 Del. C. § 1304(a)(2)).[22] The former standard is known as the "balance sheet test" and the latter as the "inadequate capital" test. *See id.*

75.     The undisputed facts show the Tender Offer only rendered NS8 even more insolvent than it already was. Rogas and NS8 had recently raised approximately $123 million of Series A investments based on their fraud. *See* Daileader Decl. ¶ 12. Thus, NS8 was liable to the

---

[22]     The Bankruptcy Code also has an inadequate capital test. *See* 11 U.S.C. § 548(a)(1)(B).

stockholders who made those investments for at least $123 million of fraudulent inducement claims. *See X. Com.*, 2023 WL 1804627, at *6 (recognizing that "[w]hen an investor is fraudulently induced into making an investment based on a company's material misrepresentations, the investor immediately becomes a creditor" and has "a tort claim against the company for having been defrauded into making those investments"). Indeed, under the purchase agreements, the investors' funding depended on the accuracy of NS8's false financial statements. Daileader Decl. ¶ 15.

76. However, the Series A investors were not the only investors to whom NS8 was liable for fraud prior to making the Tender Offer. NS8 is liable to at least twenty-one of its investors in an aggregate amount of no less than $135,670,694.[23] *See* 2025-Q1 Post-Confirmation Report, at 7. "These claims, even if contingent or unliquidated, are nevertheless 'debt' that is properly considered when determining insolvency." *X. Com.*, 2023 WL 1804627, at *6; *see also Bayou Group*, 439 B.R. at 335 (holding that equity holder's claims for fraudulent misrepresentation made at the time of the initial investment were properly considered in an insolvency analysis); *Travellers Int'l, AG v. TWA (In re TWA)*, 134 F.3d 188, 197–98 (3d Cir. 1998) (holding that contingent liabilities could be considered in an insolvency analysis).

77. The other undisputed facts concerning NS8's financial condition also confirm it was insolvent at all relevant times, even before the Tender Offer, including when Rogas received Employment Proceeds. *See* Daileader Decl. ¶¶ 4, 9, 32 (explaining that NS8 was never profitable, relied on fraudulently obtained investor capital to fund its operations, and used most of the funds that it could have used to pay investor fraud claims to instead fund the Tender Offer); Answer ¶ 21 (admitting that "he is generally aware that between 2016 and 2020, NS8's expenses and

---

[23] These fraud liabilities far outstripped NS8's total assets when it filed its chapter 11 case mere months after the Tender Offer. *See Schedules of Assets and Liabilities for NS8 Inc.*, at 29 (scheduling $2,457,339.06 of assets) [Bankr. D.I. 115].

liabilities exceeded its revenue and "that he is generally aware that NS8 did not turn a profit between 2016 and 2020"). Thus, long before the Tender Offer and after, NS8's liabilities exceeded its assets. Daileader Decl. ¶ 4.

78.     The balance sheet test and inadequate capital tests, therefore, are satisfied. *See X. Com.*, 2023 WL 1804627, at *6 (recognizing that the nature of Rogas's fraudulent scheme would have left NS8 in "a state of perpetual insolvency"). The Plan Trustee is also entitled to a presumption of insolvency because NS8 was a Ponzi scheme inasmuch as funds from new investments were used to make payments to redeem older investments.[24] For these simple reasons, under any analysis of the facts and law, NS8 was insolvent at all relevant times. Thus, there is no genuine dispute of material fact that the Plan Trustee is entitled to summary judgment on its constructive fraudulent transfer claims against Rogas.

## III.     RECOVERY OF AVOIDED TRANSFERS

79.     Section 550(a) of the Bankruptcy Code allows the Plan Trustee to recover transfers avoided under sections 544 and 548 from initial transferees, subsequent transferees, and persons for whose benefit the initial transfers were made. 11 U.S.C. § 550(a). Rogas is the initial or subsequent transferee of the Tender Offer Proceeds and Employment Proceeds. Daileader Decl. ¶¶ 32, 36; Answer ¶¶ 2, 53. Because the transfer of such funds to Rogas is avoidable as actually and constructively fraudulent transfers, there can be no genuine dispute of material fact that the Plan Trustee is entitled to recover such funds from Rogas.

---

[24]     *See, e.g.*, *Zazzali v. Mott (In re DBSI, Inc.)*, 445 B.R. 344, 349 (Bankr. D. Del. 2011) (accepting that a Ponzi scheme is, "by definition insolvent . . . as it [is] dependent on constant infusions of cash from new investors to satisfy obligations owed to prior ones").

## IV.    BREACH OF FIDUCIARY DUTY

80.     In each of his capacities as a Board Director and officer, Rogas owed NS8 the fiduciary duties of care and loyalty. Rogas flouted and blatantly disregarded each of these duties while defrauding NS8 and its creditors throughout his employment with NS8. Among other damages, Rogas caused NS8 to incur massive liabilities to its investors, the payment and satisfaction of which was the central feature of the Plan. The Plan Trustee is entitled to summary judgment against Rogas for the full amount of these damages.

### A.    Rogas Breached His Fiduciary Duties of Care and Loyalty to NS8 by Perpetrating His Multi-Year Fraud.

81.     There are only two elements necessary to establish a claim for breach of fiduciary duty: "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010). Directors and officers owe fiduciary duties to the corporations they serve under Delaware law, including the duties of care and loyalty. *Giuliano v. Fleming (In re Nobilis Health Corp.)*, 661 B.R. 891, 902–03 (Bankr. D. Del. 2024).

82.     The duty of care requires fiduciaries to, *inter alia*, "act prudently in carrying out their responsibilities." *Id.* at 903. Courts do not analyze the "substance of the decision at issue," but instead determine whether the decision-making process "reflected good faith consideration." *Id.* A director or officer breaches his duty of care if he was "grossly negligent," which requires "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Id.*

83.     The duty of loyalty requires fiduciaries to place the corporation's interests above their own interests. *Id.* A director or officer breaches his duty of loyalty if he was "conflicted and pursued [his] own interests above those of the company or . . . failed to pursue the best interests of

29

the company in good faith." *Id.* Thus, "[t]he requirement to act in good faith is a subsidiary element of the duty of loyalty." *Miller v. Black Diamond Cap. Mgmt., L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*, 651 B.R. 179, 188 (Bankr. D. Del. 2023). A director or officer fails to act in good faith by engaging in conduct that is "motivated by a subjective bad intent" or conduct that is an "intentional dereliction of duty or the conscious disregard for one's responsibilities." *Id.* at 189.

84.     The Delaware Supreme Court has identified a non-exhaustive list of examples of conduct lacking good faith, including "[1] where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, [2] where the fiduciary acts with the intent to violate applicable positive law, or [3] where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Id.* (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)).

85.     There can be no genuine dispute Rogas violated each of these standards.

86.     Rogas falsified NS8's customer and financial data throughout its existence to portray NS8 as a successful company with far more customers and revenue than it actually had. Daileader Decl. ¶¶ 4, 7–8, 10, 14–15, 25; Answer ¶¶ 1, 18. In reality, NS8 continually operated at a massive loss throughout its existence. Daileader Decl. ¶ 4. As a result of Rogas's fraud, NS8 hired far more employees than it actually needed to run its business. *Id.* Rogas also caused NS8 to pay millions of dollars in excessive compensation and stock buybacks to himself and other employees and officers who turned a blind eye to his scheme and helped him convince outside investors to invest in NS8. *Id.* ¶ 6.

87.     To conceal his fraud, Rogas, *inter alia*, falsified NS8's bank statements and prepared (or caused NS8 to prepare) false financial statements and other financial documents or reports. *Id.* ¶¶ 7–8, 10, 15; Answer ¶¶ 1, 18, 112. He used this information to deceive NS8's

investors into perpetually investing more capital into the company and its Board of Directors into approving larger fundraisings. Daileader Decl. ¶¶ 7–15, 25–28; Ex. A, at 1, 5–6; Ex. B, at 25:13–26:7; *SEC v. Rogas*, *supra*, ECF No. 211; Answer ¶ 24. Rogas continued to successfully conceal his fraud even after the Board hired third-party professionals, including a top law firm and accounting firm, to conduct a comprehensive internal investigation as a result of the July 2019 whistleblower complaint and SEC subpoenas. Daileader Decl. ¶¶ 18–24; Answer ¶ 41.

88.     The result of Rogas's deceptions was that investors ultimately purchased no less than $143 million of virtually worthless NS8 stock. Daileader Decl. ¶¶ 11–13. NS8 ultimately repurchased a portion of this worthless stock at a massively inflated valuation using approximately $72 million of the Series A investments. Wikel First Day Decl. ¶ 16; Daileader Decl. ¶¶ 29–30. NS8 was forced to file its chapter 11 case shortly after Rogas's fraud fell apart. Wikel First Day Decl. ¶¶ 21–23. In Rogas's ensuing criminal and civil proceedings, he pled guilty to, and was convicted of, securities fraud, and consented to the entry of a judgment of more than $17.5 million for violations of the Securities Exchange Act. *United States v. Rogas*, *supra*, ECF Nos. 59, 80; *SEC v. Rogas*, *supra*, ECF Nos. 211, 216.

89.     Clearly, Rogas's actions as CEO and a director of NS8 were more than enough to breach each of his fiduciary duties. Perpetrating a multi-year criminal scheme to defraud the company and its investors goes far beyond mere "reckless indifference" or "deliberate disregard" for NS8 or its shareholders and is certainly "without the bounds of reason." Such misconduct also undoubtedly constitutes a failure to "pursue the best interests of the company in good faith" and "intentional dereliction of duty or the conscious disregard for one's responsibilities." Rogas caused NS8 to incur more than $135 million of liabilities to its investors—liabilities that it would never

31

be able to fully repay and from which it would never be able to recover. *See generally* Wikel Confirmation Decl. ¶ 13; Daileader Decl. ¶ 32.

90.     Rogas cannot claim as a defense the notion his fraud allowed NS8 to continue operating for a period of time by using the capital that he raised. Judge Cronin already rejected any defense asserting NS8 was successful, in stating that any intent Rogas attributes to his actions to help NS8 succeed was "no defense or excuse for the fraud that he perpetrated." Ex. C, at 72:21–73:7. But more importantly, "[u]nder Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." *E.g.*, *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004). As this Court recently recognized, "there surely is a point at which a . . . company's officers or directors breach their fiduciary duties to the company by flouting applicable law." *Fleming*, 661 B.R. at 914 (emphasis added).

91.     Certainly, Rogas reached that point here. Therefore, he must be held liable for all of the damages NS8 suffered as a result of his illegal conduct. *See Barnard v. DeCillis (In re Ideal Mortg. Bankers, Ltd)*, 539 B.R. 213, 220 (Bankr. E.D.N.Y. 2015) (holding that the guilty plea and allocution of debtor's former CEO to bank fraud were admissible in the adversary proceeding for breach of fiduciary duty, and granting summary judgment in favor of trustee because the guilty plea was sufficient to establish that there was no triable issue of fact as to whether the defendant breached her fiduciary duties to the debtors with respect to the misappropriation of mortgage funds); Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 652 (2010) (observing that "courts . . . have had little difficulty in concluding that directors breach their fiduciary duty when they knowingly cause the corporation to violate the law and are responsible for any harm suffered by the corporation as a result").

32

**B.     NS8 Suffered Massive Damages, Including Its Liabilities to Its Investors and the Compensation NS8 Paid to or for Rogas.**

92.     By breaching his fiduciary duties to NS8, Rogas caused it to suffer more than $135 million of damages. These damages, i.e., the Investor Claims, represent NS8's liabilities to the investors who trusted Rogas and relied on the revenues and customer data he claimed NS8 had when investments were made. Each investor has fraudulent inducement claims against NS8 as a result of Rogas's scheme. *See X. Com.*, 2023 WL 1804627, at *6 (recognizing that investors have tort claims against companies when they are fraudulently induced into investing).

93.     Due to the number and size of fraudulent inducement claims Rogas caused NS8 to incur, NS8 was forced to address them in its Plan. As set forth in the Plan, the Investor Claims include at least the following:

| Claimant | Amount |
|---|---|
| Lightspeed Venture Partners | $49,149,980 |
| AXA Venture Partners | $40,061,738 |
| Edison Partners IX L.P. | $23,500,000 |
| SCP (Sorensen) | $7,500,000 |
| Lytical Cyber Partners 1, LP | $3,500,000 |
| NextGen | $3,450,976 |
| TDF Ventures | $2,360,000 |
| Blu Venture | $2,248,000 |
| Jeremy Liew | $2,000,000 |
| Bradley Twohig | $500,000 |
| Ravi Mhatre | $450,000 |
| The Mhatre 2011 Irrevocable Children's Trust | $300,000 |
| Nieh Family Investments LP - Fund 1 | $280,000 |
| Jeff Nuechterlein/Nue Capital LLC | $100,000 |
| IRAR Trust FBO Peter Nieh 3600398 | $70,000 |
| Hillcrest Venture Partners | $50,000 |
| Kathryn Stewart | $50,000 |
| Janmohamed Family Trust | $50,000 |
| Forbes McPherson | $25,000 |
| Dave Salwen | $15,000 |
| Marilyn Jones | $10,000 |
| ***Total*** | ***$135,670,694*** |

Plan Ex. B; 2025-Q1 Post-Confirmation Report, at 7; *see also* Wikel Confirmation Declaration (acknowledging fraud damages claims in an aggregate amount of at least $135,644,991.80).

94.     No less than $116,362,000 of the Investor Claims were allowed when the Plan was confirmed.[25] Plan § V.B; Confirmation Order ¶¶ 4, 10, 26. Such claims were the Supporting Sponsor Claims, i.e., the claims that were filed or held by the Supporting Sponsors who participated in the Plan Settlement. Plan § V.B. The Supporting Sponsor Claims were allowed because the settlement was "necessary and integral to [the] Plan . . . and the success" of NS8's case. *Id.* The other Investor Claims were ultimately allowed after confirmation. Daileader Decl. ¶ 37; *see also* 2025-Q1 Post-Confirmation Report, at 7 (reporting that $135,670,694 of general unsecured claims have been allowed).

95.     There can be no genuine dispute over the validity or amount of the Investor Claims or that Rogas is responsible for each such claim. Judge Cronan already determined Rogas owes restitution to NS8's investors for these claims.[26] *See United States v. Rogas*, *supra*, ECF No. 88, ¶ 1. ***But for*** Rogas's fraud, NS8's investors never would have made these investments and NS8

---

[25]   "[O]nce a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless a compelling reason to do so appears." *E.g.*, *Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*, 500 B.R. 384, 398 (Bankr. D. Del. 2013), *aff'd*, 537 B.R. 182 (D. Del. 2015). Therefore, allowance of these claims is the law of the case and is binding in this adversary proceeding. *See, e.g.*, *Burlington Motor Carriers Inc. v. MCI Telecomms. (In re Burlington Motor Holdings, Inc.)*, 231 B.R. 874, 875 (Bankr. D. Del. 1999) (holding that "the confirmation order is a final order of this court and is the law of the case"). The Confirmation Order is also binding as to the allowance of the claims pursuant to the doctrine of claim preclusion. *See, e.g.*, 4 *Collier*, *supra*, ¶ 502.02[3][c] (stating that, "[a]s a general rule, court orders finally determining proofs of claim are entitled to res judicata effect, even in situations where the order was entered without objection").

Moreover, Rogas and his counsel received extensive notice of the Plan and confirmation proceedings. *E.g.*, Bankr. D.I. 612, 636, 655, 663, 719, 728. He also appeared and participated in NS8's bankruptcy case. For example, on September 3, 2021, he filed a *Notice of Appearance and Request for Service of Papers* [Bankr. D.I. 511] and a *Motion for an Order Authorizing Payment of Defense Costs and Other Loss Under Directors and Officers Liability Insurance Policy* [D.I. 514]. The parties resolved Rogas's motion as set forth in the *Certification of Counsel* [Bankr. D.I. 577] filed on October 22, 2021. Based on such notice, and because Rogas appeared and participated in NS8's chapter 11 case, but did not object to confirmation of the Plan, the provisions of the Plan and Confirmation Order allowing the Supporting Sponsor claims are binding in this adversary proceeding. Indeed, by their terms they are "binding on the Debtor, all Creditors and Holders of Interests, ***and all other Persons***." Confirmation Order ¶ 10 (emphasis added).

[26]   Issue preclusion bars Rogas from relitigating Judge Cronan's determination that NS8's investors were victims of Rogas's fraud. *See, e.g.*, *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 637 F. Supp. 3d 141, 145 (D. Del. 2022) ("Collateral estoppel, also known as issue preclusion, bars parties from relitigating matters that they previously had a full and fair opportunity to litigate.").

never would have incurred these liabilities to them. Daileader Decl. ¶¶ 7–15, 25. Rogas must be held responsible in this adversary proceeding for causing NS8 to recklessly assume obligations to its investors far beyond its ability to ever repay them while concealing NS8's business was a sham.[27]

## V.     FRAUD

96.     As Rogas himself admitted through his guilty plea (and established repeatedly throughout this bankruptcy case), the company is a victim of Rogas's fraud. The same facts supporting the Plan Trustee's breach of fiduciary duty claims also establish Rogas is guilty of fraud. The elements of fraud under Delaware state law include:

(1)     "The defendant falsely represented or omitted facts that the defendant had a duty to disclose";

(2)     "[T]he defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth";

(3)     "[T]he defendant intended to induce the plaintiff to act or refrain from acting";

(4)     "[T]he plaintiff acted in justifiable reliance on the representation; and

(5)     "[T]he plaintiff was injured by its reliance."

*E.g.*, *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 400 (D. Del. 2016); *accord Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 463 & n.34 (Del. Ch. 2024). The Plan Trustee has evidenced each of these elements.

---

[27]  Rogas also caused NS8 to suffer other damages in the form of the excessive compensation it paid to him or on his behalf (including the Tender Offer Proceeds and Employment Proceeds). NS8 reserves the right to prove the amount of these damages (beyond the Tender Offer Proceeds) and any other damages at trial or otherwise following the Court's disposition of this Motion. However, if the Plan Trustee is awarded the full amount of the Investor Claims as damages for its breach of fiduciary duty claims, it would be unnecessary to further increase the damages awarded for such claims by other amounts. The Plan Trustee has already recovered tens of millions of dollars from third parties who benefited from Rogas's fraud. The Plan Trustee is willing to reduce the amount of requested damages for its breach of fiduciary duty claims by such amounts (net of the Plan Trustee's costs and expenses incurred pursuing the recoveries).

97.     *First*, throughout his employment as CEO and chairman of the Board of NS8, Rogas repeatedly made material, false representations to NS8 (as well as its investors and others) by, among other things, intentionally and grossly overstating its bank account balances, revenues and customer numbers, and the extent and profitability of NS8's operations. Daileader Decl. ¶¶ 7–8, 10, 14–15, 25, 29; *see* Paragraph 33 *supra*. The materiality of Rogas's misrepresentations is undeniable given the size of the business he claimed NS8 had compared to the actual size of its operations and the amount of investments he successfully solicited. *Id.* ¶¶ 4, 7, 11–13.

98.     *Second*, at all times, Rogas knew those representations were false, and that NS8's actual bank account balances, revenues, and customer numbers, and profits were in truth much smaller than he stated or reported. *See generally id.* ¶¶ 4–5, 7; Paragraph 33 *supra*. This is not case of reckless indifference or mistake. Rogas was the architect of the deliberate fraud. Ex. A, at 1, 5–6; Ex. B, at 25:13–26:7; *SEC v. Rogas*, *supra*, ECF No. 211.

99.     *Third*, Rogas intended to induce NS8 to continue operating and soliciting investments (and investors to continue investing). *See, e.g.*, Ex. A, at 5–6 (stating that "I felt confident about our winning trajectory. I continued to raise money to buy the time we needed . . . . Buying more time, very quickly became the only piece of advice I received . . . increase the runway and don't mess this up. . . . it felt like a necessary action to keep the company going"). Rogas has actually admitted he intended for NS8's investors to believe and invest based on his misrepresentations. *See, e.g.*, Ex. B, at 25:23–26:1 ("[D]id you intend for potential investors to believe those misrepresentations to be true and to invest based on that incorrect understanding?" "Yes."); Answer ¶ 118 (stating "Rogas admits that he made certain representations that were inaccurate, incorrect, or false intending to induce third parties to invest in NS8").

100.   Even if Rogas had not admitted to his intent, there simply is no other plausible explanation for perpetrating this multi-year fraud. The law presumes that Rogas intended to induce NS8 to continue operating and raising capital, and to induce its investors to continue investing in NS8, as that was the natural consequence of his actions. *See, e.g.*, *Syntax-Brillian*, 2016 WL 1165634, at *6 (Bankr. D. Del. Feb. 8, 2016) (acknowledging that persons "are presumed to intend the natural consequences of their acts"); Restatement (Second) of Torts § 8A cmt. b (Am. Law Inst. 1965) (stating that "[i]ntent is not, however, limited to consequences which are desired" and "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result").

101.   Rogas admitted that he intended to induce NS8 and its investors to rely on his misrepresentations. *See* Paragraph 33 *supra*. Indeed, he successfully concealed his fraud for years and even deceived third-party professionals, including a top law firm and accounting firm, that the Board hired to conduct an internal investigation of NS8. Daileader Decl. ¶¶ 16, 18–24; Answer ¶¶ 41, 114. His actions confirm he specifically intended to induce their reliance.

102.   *Fourth*, Rogas succeeded at inducing NS8 (and its investors) to rely on his misrepresentations when they made and accepted the investments that he brokered. This could only continue for four years *because* Rogas convinced them NS8 was a success. If they knew the truth, NS8 never would have continued operating for as long as it did, its investors never would have invested $143 million in the company, and NS8 never would have incurred the resulting liabilities. *See, e.g.*, Daileader Decl. ¶¶ 19–24 (detailing how NS8's investors and its Board delayed the April 2020 Series A transaction when they learned about the SEC subpoenas and whistleblower complaint to conduct an investigation); *id.* ¶ 34 (detailing how NS8 promptly wound down its business and filed for bankruptcy after discovering Rogas's fraud); *see also* Ex. C, at 61:12–15

37

("THE COURT: . . . $123 million was in fact invested in NS8 based on the defendant's fraud.").[28] *See* Paragraph 36 *supra* (Judge Cronan's finding that Rogas defrauded the auditor, among others).

103.    Rogas cannot deny that it was reasonable for NS8 (and its investors) to rely on his misrepresentations. As founder, CEO, and a director of NS8, Rogas directed its operations, controlled its financial and other reporting, and spearheaded its fundraising activities. *Id.* ¶ 5; Answer ¶¶ 1–2, 11, 14, 16, 18. As a result, NS8 and its investors were justified in relying on Rogas's fabrications, particularly after the law and accounting firms hired to investigate NS8 after the SEC subpoenas gave the green light. *See generally* Daileader Decl. ¶¶ 19–24.

104.    *Fifth*, NS8 incurred overwhelming liabilities to its investors and paid Rogas substantial compensation in reliance on his fraud. The damages to which the Plan Trustee is entitled on account of Rogas' fraud include the full amount of damages the Plan Trust is entitled to on account of its breach of fiduciary duty claims. *See* Argument § III.B, *supra*.

105.    Rogas also cannot deny that at least the first three of these elements are met, as he pleaded guilty to securities fraud and effectively admitted to each of those elements in his criminal proceeding. *See generally* Ex. B, at 25:13–26:7 (admitting that he made material misrepresentations to investors, which he knew at the time were false, and that he intended for potential investors to believe those misrepresentations and invest based thereon). Issue preclusion, therefore, bars him from relitigating them. *E.g.*, *Acceleration Bay*, 637 F. Supp. 3d at 145.

106.    Accordingly, there is no genuine dispute of material fact that the Plan Trustee is entitled to summary judgment against Rogas for fraud. It is essential the Plan Trustee prevails against Rogas on this claim to render justice against him and to ensure NS8 and the other victims

---

[28]    The proofs of claim that NS8's investors filed in its chapter 11 case asserting fraudulent inducement claims are further evidence that they relied on Rogas's misrepresentations.

of his fraud are compensated as fully as possible for the harm he has caused them – justice and equity demand nothing less.

## VI.   UNJUST ENRICHMENT

107.   The undisputed facts show that the Plan Trustee is entitled to restitution for the Tender Offer Proceeds and Employment Proceeds to the extent they are not recoverable as fraudulent transfers or payable as damages on account of the Plan Trustee's breach of fiduciary duty and fraud claims, to prevent Rogas from unjustly and inequitably retaining four years of windfall benefits at the expense of NS8's creditors. The criminal restitution ordered by Judge Cronan makes this obvious. *See United States v. Rogas*, *supra*, ECF No. 88 at ¶ 1 ("As a condition of his supervised release in this matter, Adam Rogas, the Defendant, shall pay restitution in the total amount of $112,276,409.50, to the victims of the offense charged in Count One").

108.   Under Delaware law, "[u]njust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Wells Fargo Bank, N.A. v. Est. of Malkin*, 278 A.3d 53, 69 (Del. 2022). The elements of a claim for unjust enrichment are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.*

109.   Based on the undisputed facts, there has, in each case, been an enrichment and corresponding impoverishment, because Rogas enjoyed the benefits of the Tender Offer Proceeds and Employment Proceeds while NS8 was left with Rogas's worthless stock and the consequences of his fraud. There is no justification for allowing Rogas to retain the benefits of these windfalls while NS8 and the estate's creditors suffer massive losses.

110.    Finally, if such proceeds are not recoverable as fraudulent transfers or payable as damages for breach of fiduciary duty or fraud, then there is no other remedy provided by law. Accordingly, the Plan Trustee is entitled to summary judgment on its unjust enrichment claim.

## VII.    PREJUDGMENT INTEREST

111.    The Third Circuit has stated that "prejudgment interest should be awarded unless there is a sound reason not to do so." *See Hechinger Inv. v. Universal Forest Products (In re Hechinger)*, 489 F.3d 568, 580–81 (3d Cir. 2007). The Plan Trustee respectfully requests the Court award prejudgment interest on the Tender Offer Proceeds and Employment Proceeds (subject to n. 27, *supra*) from the date of the relevant transfers and on the damages for breach of fiduciary duty and fraud from the date each Investor Claim accrued.

## CONCLUSION

112.    WHEREFORE, the Plan Trustee requests that the Court enter summary judgment in its favor and grant the Plan Trustee such other and further relief as is just and equitable.

Dated: July 10, 2025
      Wilmington, Delaware

**BLANK ROME LLP**

By: */s/ Stanley B. Tarr*
Stanley B. Tarr (No. 5535)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:    (302) 425-6400
Facsimile:     (302) 425-6464
Email: stanley.tarr@blankrome.com

-and-

John E. Lucian (*pro hac vice*)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-5500
Facsimile:     (215) 569-5555
Email: john.lucian@blankrome.com

*Counsel for the Plan Trustee*

40