**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CYBER LITIGATION INC.,[1]<br><br>              Debtor.<br><br>DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust,<br><br>              Plaintiff,<br><br>vs.<br><br>ADAM P. ROGAS,<br><br>              Defendant. | Chapter 11<br><br>Bankr. No. 20-12702 (CTG)<br><br><br><br>Adv. No. 24-50180 (CTG) |

**DECLARATION OF TIMOTHY DAILEADER IN SUPPORT OF**
**PLAN TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

I, Timothy Daileader, hereby declare pursuant to 28 U.S.C. § 1746:

1.      I submit this Declaration in support of the *Plan Trustee's Motion for Summary Judgment* (the "Motion") filed concurrently herewith.[2]

2.      I am a Partner at Drivetrain, LLC, the Plan Trustee and Plaintiff in this adversary proceeding. I have served in various capacities as an independent director, a creditor's representative, an *ad hoc* committee member, and a financial consultant for entities in and around bankruptcies for over thirty years. I was engaged by NS8 shortly before the Petition Date to serve as an independent director and served as such until the Effective Date of NS8's chapter 11 plan, after which I began managing Drivetrain's role as Plan Trustee.

---

[1]    Debtor and the last four digits of its federal taxpayer identification number is as follows: Cyber Litigation Inc. (6056). The notice address for Debtor is Cyber Litigation Inc., PO Box 34120, Las Vegas, NV 89133.

[2]    Capitalized terms used, but not defined herein shall have the meanings given to them in the Motion.

3.      Except as otherwise indicated, all facts set forth herein are based on my personal knowledge and experience while serving as a director of NS8 and/or managing Drivetrain's role as Plan Trustee, upon information learned from a review of NS8's books and records and materials provided to me by counsel, the filings in NS8's chapter 11 case, and upon discussions with certain of NS8's advisors. If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

**B.      NS8's Reported and Actual Finances.**

4.      Between 2016 and 2020, NS8's total revenues were less than $500,000 and its expenses were many millions. During this time, NS8 was never profitable, and its liabilities were significantly higher than its assets. Additionally, nearly all of the customers that NS8 appeared to have by 2020 were fake, falsely made up by Rogas. As a result of Rogas's fraud, NS8 hired far more employees than it actually needed to run its business, incurred their unnecessary employment expenses, and suffered costs, along with the employees, with their termination.

5.      Throughout NS8's existence and until he resigned, Rogas maintained exclusive control over, and visibility into, both NS8's revenue bank account, and the data and metrics underlying NS8's purported sales revenue and customer counts. He also controlled NS8's financial and sales data even when other executive finance and sales officers were in place.

6.      Rogas caused NS8 to pay millions of dollars in excessive compensation and stock buybacks to NS8 employees and officers who unfortunately deferred to his scheme and supported him in convincing outside investors to invest in NS8.

7.      To paint a false picture of financial success, Rogas reported or caused NS8 to report false financial and customer data, and Rogas doctored NS8's bank statements, financial statements, corporate documents, and customer spreadsheets. For example:

- NS8 generated less than $25,000 in revenue in 2017, but NS8 falsely reported it had earned over $275,000 in revenue through June 2017; and

- NS8's annual revenue never exceeded $170,000, but NS8 falsely reported to investors it had earned over $8,500,000 in annual revenue in 2018 and nearly $39,600,000 in 2019.

Rogas routinely conveyed false information and documentation directly to investors. For example, in update emails Rogas sent to investors or potential investors, Rogas represented NS8 had more than 110 customers as of April 2017, 180 customers as of July 2017, and 380 customers as of October 2017, as a result of growth driven by its platform partners, when NS8 only had approximately 45 or less customers by the end of 2017. True and correct copies of such emails are attached hereto as **Exhibit A-1**, **Exhibit A-2**, and **Exhibit A-3**, respectively. By way of further example:

- In a July 2017 email to NextGen Venture Partners, Rogas attached NS8's July investor update representing that NS8 had more than 180 customers.

- In a January 2018 email to Arbor Ventures, Rogas attached a presentation representing NS8 had generated more than $2.6 million of annual recurring revenue since November 2016 and had more than 500 customers.

- In a February 2018 email to Dave Hanna, at Rogas's direction, his assistant attached reporting representing NS8 had nearly 600 customers as of February 2018, NS8's monthly recurring revenue for February 2018 was more than $240,000, and NS8's total monthly recurring revenue for 2017 was more than $960,000.

- In a July 2018 email to Arbor Ventures, Rogas attached financial statements and projections reporting $6.7 million of annual recurring revenue, more than $2.1 million of revenue from January 2018 through June 2018, and nearly 2,000 customers.

- In a September 2018 email to Dave Hanna, Rogas reported monthly revenue of more than $3.6 million of revenue from January 2018 through August 2018.

- In an October 2018 email to Lytical Ventures, Rogas reported more than $960,000 of revenue in September 2018.

- In an October 2018 email to Arbor Ventures, Rogas represented NS8 as having more than 1,800 customers as of the end of September 2018.

3

In all of these representations, Rogas vastly overstated NS8's actual revenues and customer counts. True and correct copies of the emails are attached hereto as **Exhibit A-4**, **Exhibit A-5**, **Exhibit A-6**, **Exhibit A-7**, **Exhibit A-8**, **Exhibit A-9**, and **Exhibit A-10**, respectively.

8.     At the same time that Rogas was reporting false numbers to investors, Rogas was further deceiving NS8's Board. For example, at the Board meetings in the first, second, and third quarters of 2018, and in the first and second quarters of 2019, NS8's profit and loss statements generated by Rogas showed NS8's total income was, respectively:

- $1,400,872.99 from January 2017 through January 2018;

- $1,946,454.52 from January 2017 through March 2018;

- $2,134,734.90 from January 2018 through June 2018;

- $8,504,312.36 from January 2018 through December 2018; and

- $18,728,281.27 from January 2018 through May 2019.

Each of these numbers massively inflated NS8's actual income, perpetuating Rogas's fraud. Similarly, the Board presentations grossly overstated NS8's total customers, as they represented, successively, that NS8 had more than 560 merchant customers via the company's platform partners as of January 2018, more than 810 merchants by April 2018, more than 1,090 merchants by June 2018, more than 2,215 merchants by December 2018, and more than 5,010 merchants by May 2019. True and correct copies of the Board presentations reflecting these numbers are attached hereto as **Exhibit B-1**, **Exhibit B-2**, **Exhibit B-3**, **Exhibit B-4**, and **Exhibit B-5**, respectively.

**C.     Rogas's Fundraising Activities.**

9.     Due to its inability to generate revenues and cash flows through its operations, NS8 could have failed very early in its existence if it had not been for the outside capital Rogas raised from its investors.

10.     Rogas and NS8 used the false bank statements, financial statements, corporate documents, and customer spreadsheets he generated, and the fake revenues and thousands of customers reflected therein, to fraudulently attract outside investments (and to convince the Board to authorize NS8 to accept those investments).

11.     By fall 2019, for example, NS8 had raised more than $70 million in equity investments from outside investors, including approximately $50 million of investor-capital through a Series A Preferred Stock Purchase Agreement dated September 13, 2019 (the "September 2019 SPA"), a true and correct copy of which, and the disclosure schedules thereto, is attached hereto as **Exhibit C**.

12.     By spring 2020, NS8 had raised nearly $73 million more through a Series A Preferred Stock Purchase Agreement dated April 15, 2020 (the "April 2020 SPA"), a true and correct copy of which, and the disclosure schedules thereto, is attached hereto as **Exhibit D**. Thus, NS8 obtained approximately $123 million of investor-capital in the aggregate through its Series A transactions.

13.     In total, Rogas was able to convince outside investors to invest more than $143 million in NS8 through progressively larger fundraisings over nearly four years, which he depended on to avert NS8's perpetual liquidity crises.

14.     Again, nearly all of these investments were obtained through fraud and deception, as Rogas grossly overstated NS8's revenue, gross margin, and the extent and profitability of its operations to current and prospective investors, the other members of NS8's senior management team, board of directors, and corporate partners.

15.     Rogas's fraud was written all over NS8's agreements. For example, NS8 specifically represented in each of the Series A agreements that the financial statements (including

balance sheets, income statements, and statements of cash flows) delivered to the investors "fairly present in all material respects the financial condition and operating results of [NS8]." *See* September 2019 SPA § 2.14; April 2020 SPA § 2.14. It was a condition precedent to the investors' obligations under each stock purchase agreement that these representations be "true and correct in all respects." *See* September 2019 SPA § 4.1; April 2020 SPA § 4.1. They were false.

### D.    The Whistleblower Complaint.

16.    On or about July 11, 2019, at least three NS8 employees who suspected that Rogas and NS8 had been providing false information to investors and potential investors filed an anonymous securities fraud whistleblower complaint with the United States Securities and Exchange Commission (the "SEC"). *See* April 2020 SPA, Ex. C, Subsection 2.7. NS8 ultimately fired the three employees and subsequently entered into agreements settling claims they asserted against NS8. *Id.*

### E.    The April 2020 Series A and Tender Offer Transactions.

17.    Rogas and NS8 began planning a "Tender Offer" as early as February 2020 when negotiations for the April 2020 Series A transaction were already underway. The Tender Offer was a transaction whereby NS8 would repurchase shares of stock from its early investors and employees. Rogas and NS8 planned for the proceeds of the April 2020 investments to be used to finance the Tender Offer. Rogas was the driving force in developing interest among stockholders for participating in the Tender Offer. A true and correct copy of a February 2020 email thread wherein Rogas describes such efforts is attached hereto as **Exhibit E**. *See* Ex. E (stating that "I have been in frank and open communications with literally everyone on our cap table, reviewing our business, our prospects, our current financial status and the wives of now deceased shareholders for the last 60 plus days quite frankly herding cats in an effort to get this across the finish line").

6

18.    The lead investors in the April 2020 Series A transaction were funds managed by Edison Partners, AXA Venture Partners, and Lightspeed Venture Partners, respectively. The funds managed by Edison, AXA, and Lightspeed previously made substantial investments in NS8 and were the lead investors in the September 2019 Series A transaction. Based on their investments, each investor group respectively obtained a right to appoint a representative to NS8's Board of Directors and collectively held three of the five Board seats after the September 2019 Series A transaction. Their representatives on the Board were Lenard Marcus (Edison), Alex Scherbakovsky (AXA), and Bradley Twohig (Lightspeed).

19.    During the course of negotiations over the April 2020 Stock Purchase Agreement, NS8 disclosed to Marcus, Scherbakovsky, and Twohig that NS8 and several of its employees had received subpoenas in December 2019 relating to an SEC investigation into the July 2019 whistleblower complaint. NS8 previously informed them of the whistleblower complaint, which it disclosed in connection with the September 2019 Stock Purchase Agreement.

20.    In light of this development, Marcus, Scherbakovsky, and Twohig delayed the April 2020 Series A transaction. Before moving forward with the transaction, they required additional financial due diligence and caused Edison, AXA, and Lightspeed to engage Ernst & Young and Kroll, a division of Duff & Phelps, for that purpose.

21.    Ernst & Young, which Lightspeed previously had engaged to diligence its original investment in NS8, was re-engaged again in March 2020 to reconcile revenues and expenses based on bank statements, platform partner payments, and other data, verify live bank account balances, interview NS8's platform partners concerning the parties' relationships, and interview NS8's top customers. Ernst & Young was able to complete much of the requested diligence in an accelerated timeframe and reported findings satisfactory to the investors.

22.     Kroll was engaged by AXA to conduct background investigations into NS8 and certain of its officers, including Rogas, Paul Korol, Eric Kay, David Hansen, Phil Vizzaccaro, and Sean Clauretie. The objective of the Kroll investigation was to identify material legal proceedings, significant business or personal controversies, corporate governance issues, and other issues. Kroll also reported finding satisfactory to the investors.

23.     In March 2020, the SEC issued additional subpoenas to NS8 and several of its employees, which NS8 disclosed to the Board. Marcus, Scherbakovsky, and Twohig considered this development to be material, requiring them to delay the Board's approval of the Series A transaction. Those Board members then decided they would not approve the transaction until Crowell & Moring LLP, NS8's legal counsel, which was conducting a comprehensive internal investigation in response to the initial SEC subpoenas, completed its review of thousands of documents and internal communications, as well as extensively interviewing employees, and submitted its findings to the Board.

24.     This comprehensive diligence process was not completed until early April. Among other things:

- Ernst & Young confirmed it verified current bank account balances for all bank accounts, and had obtained bank statements and reconciliations for the period of December 2018 through February 2020 and found no instances of fraud or wrongdoing; and

- Crowell & Moring likewise confirmed its internal investigation, which included review of tens of thousands of emails, text messages and documents in response to the SEC whistleblower allegations, had yielded no showing of fraud or wrongdoing.

Only after receiving this diligence from a "big three" accounting firm (i.e., Ernst & Young) and an Am Law 100 law firm (i.e., Crowell & Moring), did Marcus, Scherbakovsky, and Twohig approve the Series A transaction in their capacity as members of NS8's Board of Directors.

8

25.     On April 15, 2020, NS8's Board of Directors held its quarterly Board meeting for the first quarter of 2020 (the "Q1-2020 Board Meeting"). At the meeting, Rogas and other officers and employees of NS8 presented more false information to the Board demonstrating NS8's growing revenues, customers, cash on hand, and overall financial performance. Rogas further updated the Board on the progress of the proposed Series A and Tender Offer transactions. True and correct copies of the minutes of the Q-1 2020 Board Meeting and the slides presented at the meeting are attached hereto as **Exhibit F-1** and **Exhibit F-2**, respectively.

26.     Also on April 15, 2020, the Board adopted resolutions formally approving the Series A transaction for the express purpose of, among other things, obtaining funds that could be used for the Tender Offer. A true and correct copy of the resolutions are attached hereto as **Exhibit G**.

27.     On April 21, 2020, the Series A transaction closed. The April 2020 Stock Purchase Agreement specifically stated that the investment proceeds could be used to fund the Tender Offer. *See* April 2020 SPA § 1.4.

28.     On May 8, 2020, the Board adopted resolutions formally approving the Tender Offer. The resolutions again acknowledged that NS8 intended to fund the Tender Offer with the proceeds of the recent Series A investments. A true and correct copy of the resolutions is attached hereto as **Exhibit H**.

29.     On May 11, 2020, NS8 issued an Offer to Purchase to its investors (the "Purchase Offer"), a true and correct copy of which is attached hereto as **Exhibit I**. The Purchase Offer stated that NS8 planned to use the proceeds of the April 2020 investments to finance the transaction. *See* Purchase Offer, at 2–3. It also falsely represented to investors that NS8 believed its "anticipated cash flow from operations combined with its current cash and cash equivalents, proceeds raised

from the [April 2020 investments] that are not used in the tender offer . . . and funds potentially available under customary credit facilities, will be adequate for the needs of the Company for at least the next 24 months." *See id.* at 13. NS8 also attached to the Purchase Offer false annual financial statements for 2018 and 2019, as well as false quarterly financial statements for the first quarters of 2019 and 2020. *See id.* at 27.

30.    NS8 set a price of $18.50 per share for the Tender Offer, which price was materially higher than the shares' actual value as it was built up using bank statements doctored by Rogas, Rogas' fictional customers and sales to them, and the financial statements Rogas prepared or caused to be prepared for NS8, which likewise were false and prepared in fraud. Yet, the shares that NS8 repurchased were nearly worthless as the company was, and remained, insolvent, its value effectively a function of its minimal cash-on-hand, nominal monthly revenue, and limited intellectual property and related assets, juxtaposed against the millions per month of payroll, rent, and operating expenses.

31.    Investors desiring to participate in the Tender Offer did so by tendering their shares online through cap table management software provided by eShares, Inc. DBA Carta, Inc. ("Carta"). The deadline to tender shares was June 8, 2020.

32.    NS8 funded settlement payments to the tendering shareholders using cash comingled in its operating account with Silicon Valley Bank and completed the Tender Offer on or about June 23, 2020. A true and correct copy of a wire confirmation showing the transfer of certain funds from NS8's operating account to fund the Tender Offer is attached hereto as **Exhibit J**. Settlement further depleted NS8's assets and worsened both its capacity to cover its liabilities (including the fraud claims each investor possessed upon making their investment based

on the false information provided by NS8) and to fund its actual operating losses. NS8's actual cash on hand shortly after the Tender Offer was only approximately $16 million.

### F.    The Fraud Unravels.

33.    Rogas's fraudulent scheme quickly began to unravel after the Tender Offer. The Board understood that it was imperative that NS8 expand its executive leadership team and these new officers had a significant impact on how the company was run. They identified and questioned discrepancies and irregularities that incumbent NS8 officers had previously ignored, and sought to rationalize and improve internal controls and financial reporting mechanisms. Despite giving lip service to the increased transparency, Rogas in fact delayed ceding his ongoing control over NS8's bank accounts for several more months. A true and correct copy of the *Declaration of Eric Day, SEC v. Rogas*, 20-07628 (S.D.N.Y. Sept. 17, 2020), ECF No. 15 (without exhibits) is attached hereto as **Exhibit K**.

34.    On September 1, 2020, Rogas abruptly resigned after he failed to attend a meeting with Tiffany Kleeman, the recently hired President, at which he was to grant Ms. Kleeman access to NS8's bank accounts. NS8's management and Board of Directors soon after discovered that the company was on the precipice of a severe liquidity crisis and began taking steps to preserve its cash and start an orderly wind-down process. On September 10, 2020, the majority of NS8's over two hundred employees were formally notified that they were being laid off, effective as of September 11, 2020. NS8 had hired these employees as a result of Rogas's fraud and was ultimately forced to lay them off following the fraud's discovery and the extent to which Rogas had overstated NS8's revenues and cash. When NS8 filed its chapter 11 case on October 27, 2020 (the "Petition Date"), the actual balance in its bank accounts was approximately $100,000.

35.    By the time he resigned from NS8, in addition to the Tender Offer Proceeds, Rogas had collected a substantial salary, bonuses, and other compensation from NS8.

36.     The funds that NS8 used to pay the Tender Offer Proceeds and Employment Proceeds to Rogas originated from its bank accounts.

37.     NS8's investors asserted more than $135 million of fraudulent inducement claims in NS8's chapter 11 case for the investments that they made in NS8 based on Rogas's fraud. The Supporting Sponsor Claims were allowed pursuant to the Plan Settlement. The other Investor Claims were ultimately allowed after confirmation.

*[Remainder of page intentionally left blank.]*

13

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on July 10, 2025.

*/s/ Timothy Daileader*
Timothy Daileader
