# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CYBER LITIGATION INC.,[1]<br><br>             Debtor.<br><br>――――――――――――――――――――<br><br>DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust,<br><br>             Plaintiff,<br><br>vs.<br><br>ADAM P. ROGAS,<br><br>             Defendant. | Chapter 11<br><br>Bankr. No. 20-12702 (CTG)<br><br><br><br><br>Adv. No. 24-50180 (CTG)<br><br>**Re: D.I. 23, 25, 26, 27** |

## PLAN TRUSTEE'S REPLY IN SUPPORT OF
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Dated: September 23, 2025
     Wilmington, Delaware

**BLANK ROME LLP**
Stanley B. Tarr (No. 5535)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464
Email: stanley.tarr@blankrome.com

-and-

John E. Lucian (*pro hac vice*)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-5500
Facsimile:    (215) 569-5555
Email: john.lucian@blankrome.com

*Counsel for the Plan Trustee*

---

[1]    Debtor and the last four digits of its federal taxpayer identification number is as follows: Cyber Litigation Inc. (6056). The notice address for Debtor is Cyber Litigation Inc., P.O. Box 34120, Las Vegas, NV 89133.

155335462

**TABLE OF CONTENTS**

**Page(s)**

I.      THIS COURT HAS SUBJECT MATTER JURISDICTION OVER TOLLED CLAIMS
        AND AUTHORITY TO ENTER A FINAL ORDER. ........................................................3

        A.      The Plan Trustee's Prosecution of Tolled Claims Bears A "Close Nexus"
                to the Plan. ........................................................................................................5

        B.      Rogas Previously Consented to this Court's Jurisdiction and Authority.................5

        C.      In the Alternative, This Court May Enter *Proposed* Findings of Fact and
                Conclusions of Law for *De Novo* Review by A Superior Court............................7

II.     THE ROGAS ADMISSIONS ARE BINDING, UNASSAILABLE STATEMENTS OF
        FACT AND HAVE A PRECLUSIVE EFFECT. ...............................................................7

III.    THERE IS NO GENUINE DISPUTE OF ANY MATERIAL FACT REGARDING
        ROGAS' LIABILITY FOR BREACH OF FIDUCIARY DUTIES.................................10

IV.     THERE IS NO GENUINE DISPUTE OF ANY MATERIAL FACT REGARDING
        ROGAS' LIABILITY FOR ACTUAL FRAUDULENT TRANSFERS...........................12

V.      THIS COURT NEED NOT REACH ROGAS' ALLEGED DEFENSES TO THE PLAN
        TRUSTEE'S CONSTRUCTIVE FRAUDULENT TRANSFER, UNJUST
        ENRICHMENT, AND FRAUD CLAIMS. ....................................................................20

i

155335462

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. C.I.R.*,
    698 F.3d 160 (3d Cir. 2012)................................................................................9, 10

*Airco Indus. Gases, Inc. Div. of the BOC Grp., Inc. v. Teamsters
    Health & Welfare Pension Fund of Phila. & Vicinity*,
    850 F.2d 1028(3d Cir. 1988),.............................................................................9, 10

*AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower
    Liquidating Trust)*,
    335 B.R. 309 (Bankr. D. Del. 2005) .............................................................................4

*Basho Technologies Holdco B, LLC v. Georgetown Basho Investors*,
    2018 WL 3326693 (Del. Ch. 2018) ...........................................................................11

*Beard Research, Inc. v. Kates*,
    8 A.3d 573 (Del. Ch. 2010), *aff'd sub nom. ASDI Inc. v. Beard Research, Inc.*,
    11 A.3d 749 (Del. 2010) ............................................................................................11

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*,
    372 F.3d 154 (3d Cir. 2004)..........................................................................................4

*BWI Liquidating Corp. v. City of Rialto (In re BWI Liquidating Corp.)*,
    437 B.R. 160 (Bankr. D. Del. 2010) ..............................................................................4

*In re Am. Basketball League, Inc.*,
    317 B.R. 121 (Bankr. N.D. Cal. 2004) ........................................................................18

*In re Direct Access Partners, LLC*,
    602 B.R. 495 (S.D.N.Y. Bankr. 2019)....................................................................17, 19

*In re Dreier LLP*,
    452 B.R. 391 ................................................................................................................18

*In re Eleva, Inc.*, 2003 WL 21516983,
    (10th Cir. B.A.P. June 30, 2003)..................................................................................19

*In re Sanchez Energy Corp.*,
    139 F.4th 411 (5th Cir. 2025) ......................................................................................19

*Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litigation Inc.)*,
    2023 WL 6938144 (Bankr. D. Del Oct. 19, 2023) .......................................................7, 20, 21

*Ervin v. Vesnaver*,
  2000 Del. Super. LEXIS 312 (Del. Super. Ct. June 20, 2000) ..................................................9

*Executive Benefits v. Arkison*,
  573 U.S. 25 (2014) ..................................................................................................................7

*Giuliano v. Fleming (In re Nobilis Health Corp.)*,
  661 B.R. 891 (Bankr. D. Del. 2024) .................................................................................10, 11

*Merritt v. United Parcel Serv.*,
  956 A.2d 1196 (Del. 2008) .......................................................................................................9

*Michaels v. World Color Press, Inc. (In re LGI)*,
  322 B.R. 95 (Bankr. D. N.J. 2005) .......................................................................................4, 5

*Orabi v, Att'y Gen of the U.S.*,
  738 F.3d 535 (3d Cir. 2014) ....................................................................................................9

*SEC v. Rogas*,
  No. 20-cv-7628 (S.D.N.Y.) (RMB) .......................................................................................14

*Smallhold, Inc. v. Mountain Meadow Mushroom Farms, Inc. (In re Smallhold, Inc.)*,
  2025 WL 2395029 (Bankr. D. Del. Aug. 18, 2025) .................................................................5

*Taylor v. Sturgell*,
  553 U.S. 880 (2008)..................................................................................................................9

*United States v. Awad*,
  598 F.3d 76 (2d Cir. 2010)................................................................................................16, 17

*United States v. Bodouva*,
  853 F.3d 76 (2d Cir. 2017)......................................................................................................20

*United States v. Hall*,
  434 F.3d 42 (1st. Cir. 2006)....................................................................................................16

*United States v. Robilotto*,
  828 F.2d 940 (2d Cir. 1987)................................................................................................16, 17

*United States v. Rogas*,
  No. 20-cr-539 (S.D.N.Y.) (JPC) ..............................................................................................8

*United States v. Torres*,
  703 F.3d 194 (2d Cir. 2012)....................................................................................................20

*United States v. Vampire Nation*,
  451 F.3d 189 (3d Cir. 2006)....................................................................................................16

155335462

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ....................................................................................................11

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015)...........................................................................................................5, 6

*Younge v. Tribune Company (In re Tribune Media Co.)*
    902 F.3d 384 (3d Cir. 2018)..............................................................................................5, 6

**Statutes**

11 U.S.C.
    § 362(d) ................................................................................................................................5
    § 548(A)(1)(a) ....................................................................................................................12

18 U.S.C. § 3664(j)(2) .............................................................................................................20

21 U.S.C.
    § 853....................................................................................................................................17
    § 853(n)(7) ....................................................................................................................15, 17

Del. Code § 1304(a)(1) .............................................................................................................12

**Other Authorities**

Del. Bankr. L.R. 9013-1(f)......................................................................................................5, 6

Fed. R. Crim. P.
    32.2(b)(4) ............................................................................................................................17
    32.2(c) ...........................................................................................................................16, 17
    32.2(c)(2) ............................................................................................................................17

155335462

Plaintiff Drivetrain, LLC, (the "Plan Trustee"), in its capacity as plan trustee of the Cyber Litigation Trust (the "Plan Trust") of the estate of NS8 Inc. n/k/a Cyber Litigation Inc. ("NS8"), replies in support of its motion for summary judgment (D.I. 23) (the "Motion") and in response to Rogas' brief in opposition thereto (D.I. 25), including its attendant Rogas declaration (D.I. 26), and objection to the Daileader Declaration (D.I. 27) (collectively, D.I 25–27, the "Opposition").

### PRELIMINARY STATEMENT[1]

Rogas' Opposition is the quintessential "red herring." It seeks to divert this Court's attention away from the undisputed — and public — record created by Rogas' guilty plea and admissions that he defrauded NS8's investors out of over $123 million through falsified financials and customer lists. The Opposition raises irrelevant counterarguments and introduces an affidavit of immaterial facts about Rogas' efforts to create anti-fraud software and build a company, none of which refutes the detailed collection of now undisputed material facts in the Motion establishing that Rogas' fraudulent acts render him liable for receipt of actual fraudulent transfers in the amount of $17.5 million plus breach of fiduciary duties that defrauded the company's investors – whose claims comprise the $135 million of Class 4 – Tort Damages Claims under the confirmed Plan.

The red herring consists of eight meritless arguments to which the Plan Trustee responds as follows: first, this Court has jurisdiction because Rogas voluntarily and proactively participated in the chapter 11 case.

Second, the Motion does not equate to *sub rosa* claim preclusion. It is based on a plethora of undisputed evidence formed by Rogas' own admissions, and precluded by the issues necessarily litigated and resolved, in his criminal proceeding. Rogas' declaration refutes none of this evidence and is the sole exhibit he relies upon in the Opposition.

---

[1]   Capitalized terms used but not defined *infra* shall have the meanings given to them in the Motion.

155335462

Third, the ongoing criminal forfeiture process does not negate the estate's interest in the tender offer proceeds or other transfers to Rogas. The criminal and civil processes to recover the assets fraudulently obtained by Rogas are not mutually exclusive, but rather complementary.

Fourth, Rogas would have this Court believe that the salary he received while committing fraud on investors was rightfully earned. Since when does committing fraud equal value?

Fifth, Rogas recycles the safe harbor argument made by prior defendants with respect to constructive fraudulent transfers. While those arguments fail as a matter of law, the Court need not reach them here because Rogas' liability for actual fraudulent transfers is incontrovertible.

Sixth, Rogas raises a limitations argument notwithstanding that the company was in existence for only 4 years and all of the significant transfers were made from the $112,712,000 invested by the three largest tort claimants (AXA, Edison and Lightspeed) within 2 years of the bankruptcy filing.

Seventh, Rogas is liable for fraud because his actions harmed the company and its creditors. The tort investor damage claims are the proximate result of his misstatements to and concealment of information from the NS8 Board, third-party auditors, and investors.

Eighth, Rogas mistakenly believes the estate seeks to establish double liability against him. It is clear he did not read the proposed form of judgment, which reduces his liability dollar for dollar with respect to payments already made to the investor tort claimants.

Rogas is the sole reason for this bankruptcy, yet he attempts to portray himself as the victim in his papers. While his ultimate audience for this tactic may not be readily apparent, one thing is: he has failed to establish a genuine dispute of material fact, and the Trustee is entitled to judgment as a matter of law based on Rogas' fraudulent conduct.

2

155335462

## ARGUMENT

1.      The Motion provides a comprehensive amount of factual and legal support for granting summary judgment.  Yet, the Opposition fails to raise any genuine dispute of material fact and relies upon a meandering declaration from Rogas as its sole evidentiary support, which fails to rebut (let alone discuss) any of the key facts upon which the Plan Trustee's claims are based.  Nor does the Opposition cite any applicable bankruptcy or Delaware state law that would preclude entry of summary judgment in favor of the Plan Trustee.

**I.      THIS COURT HAS SUBJECT MATTER JURISDICTION OVER TOLLED CLAIMS AND AUTHORITY TO ENTER A FINAL ORDER.**

2.      Rogas argues that this Court lacks (a) subject matter jurisdiction over state law Tolled Claims[2] and is compelled to dismiss, withdraw, or transfer those claims (Opp., at 10–12) and (b) authority to enter a final judgment on all Tolled Claims to the extent those claims are "non-core" and/or because Rogas has not consented to the Court's jurisdiction (Opp., at 12–13).  Both arguments fail because this Court retained jurisdiction over the Plan Trustee's investigation and prosecution of Tolled Claims, which bear a "close nexus" to the implementation, consummation, and execution of the Plan since those claims were specifically described in the Plan Supplement (Main Case, D.I. 672), and Rogas already consented to this Court's jurisdiction through his earlier participation in the chapter 11 case.  In the alternative, this Court can simply enter proposed findings of fact and conclusions of law for *de novo* review by the District Court.

**A.      The Plan Trustee's Prosecution of Tolled Claims Bears A "Close Nexus" to the Plan.**

3.      The Plan Trustee's prosecution of the Tolled Claims is the *sine qua non* of the Plan's purpose to recover investor funds transferred out of NS8 in connection with the fraudulent

---

[2]      "Tolled Claims" are defined in the *Tolling Agreement* entered into between and among the Plan Trustee and Rogas (as amended), a true and correct copy of which is attached hereto as **Exhibit 1**.

155335462

scheme masterminded and perpetrated by Rogas during his tenure as CEO and as a member of NS8's Board of Directors (to wit, deceiving NS8 and its investors with false financial information and customer data for the purpose of fundraising) and to distribute those recovered proceeds to the beneficiaries of the Plan Trust, who are exclusively those defrauded investors.[3]

4. In considering whether this Court has post-confirmation, "related to" jurisdiction over the Tolled Claims, the essential inquiry is whether there is a "close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166–67 (3d Cir. 2004). The question is how close a connection warrants post-confirmation bankruptcy jurisdiction. *See Resorts*, 372 F.3d at 166. The Third Circuit has held that "(m)atters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* at 167.

5. To retain a bankruptcy court's post-confirmation, "related to" jurisdiction over causes of action, a plan must specifically describe such causes of action. *See BWI Liquidating Corp. v. City of Rialto (In re BWI Liquidating Corp.)*, 437 B.R. 160, 166 (Bankr. D. Del. 2010) (finding there was no post-confirmation related to jurisdiction *because the Plan at issue there did not specifically describe the cause of action*); *also AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower Liquidating Trust)*, 335 B.R. 309, 324 (Bankr. D. Del. 2005) (finding sufficient specificity where the Plan specifically retained jurisdiction over claims arising from the Debtor's sale of stock in Xantrex Technology, Inc.); *and Michaels v. World Color Press, Inc. (In*

---

[3] As Judge Cronan of the SDNY stated at Rogas' sentencing, he perpetrated "a lengthy fraud that entailed [Rogas] creating a host of fraudulent documents ranging from spreadsheets, listing fictitious customers, to monthly bank statements with doctored company assets. And he passed these bogus documents off as authentic to investors, to the auditor, and to potential hires…I agree with the government's characterization of the defendant's fraud as brazen, calculated and long-running." Motion, Ex. C at 76:5-14.

4

155335462

*re LGI)*, 322 B.R. 95, 97 (Bankr. D. N.J. 2005) (finding jurisdiction where the plan specifically identified recovery of the casualty loss as an asset to be distributed to creditors).[4]

6. This Court retained jurisdiction over the Plan Trustee's investigation and prosecution of the Tolled Claims. (*See* Plan, Article V.F, L; Article XIII(6)).[5] As to Rogas specifically, the Plan Supplement expressly preserves "(c)laims, defenses, crossclaims and counter-claims arising from or related to *transfers of money or property of Debtor*" and "(c)laims, defenses, crossclaims and counter-claims arising from or related to *prior service as director and/or officer of Debtor*, including without limitation, claims, defenses, crossclaims, and counter-claims arising from or related to transfers of money or property of Debtor." (*See* Plan Supplement, Ex. 5 (Preserved Causes of Action) (*emphasis added*)).

**B.      Rogas Previously Consented to this Court's Jurisdiction and Authority.**

7. On September 3, 2021, Rogas filed the *Motion of Adam Rogas for An Order Authorizing Payment of Defense Costs and Other Loss Under Directors and Officers Liability Insurance Policy* (Main Case, D.I. 514) (the "Stay Relief Motion"), seeking relief under Bankruptcy Code section 362(d) and consenting to this Court's jurisdiction and authority to enter a final order pursuant to Del. Bankr. L.R. 9013-1(f).

8. Consistent with Supreme Court and Third Circuit precedent, in Delaware, a movant must declare whether it consents to this Court's constitutional authority to enter a final order. *See,*

---

[4]    In *Smallhold, Inc. v. Mountain Meadow Mushroom Farms, Inc. (In re Smallhold, Inc.)*, 2025 WL 2395029 (Bankr. D. Del. Aug. 18, 2025), cited in the Opposition, this Court found it did not have subject matter jurisdiction over the state law breach of contract claim that arose *after* the plan's effective date. *Smallhold* is distinguishable because the claims at issue here arose *prepetition* and were specifically enumerated in the Plan.

[5]    More specifically, the Plan (a) identifies the Plan Trustee as the representative of the Debtor's estate with rights and powers to investigate and prosecute any and all "Causes of Action," (b) expressly preserves all rights of the Debtor's estate from and after the Plan's effective date for the benefit of, assigns to, and vests such rights in the Plan Trust in connection with the "Causes of Action" identified as retained in the Plan Supplement, and (c) retains jurisdiction in this Court to, *inter alia*, "decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action…that may be commenced in the future." *See* Plan, Article V.F, L; Article XIII.(6).

155335462

*e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015); *Younge v. Tribune Company (In re Tribune Media Co.)* 902 F.3d 384 (3d Cir. 2018); Del. Bankr. L.R. 9013-1(f). In *Wellness*, the Supreme Court held that, so long as parties knowingly and voluntarily consent, which may be express or impliedly given, a bankruptcy court can issue final orders on matters that otherwise it would not have the constitutional authority to decide. *See Wellness*, 575 U.S. at 669, 685. In applying that logic, in *Tribune*, the Third Circuit found that a party may impliedly consent to the bankruptcy court's authority through actions rather than words by failing to raise any prior objection to this Court's jurisdiction and authority over the course of numerous filings— implying a "knowing and voluntary" consent based on the party's actions. *See Tribune*, 902 F.3d at 394. Here, Rogas was a movant who proactively sought affirmative relief from this Court and was not only a potential objector who failed to act.

9. Del. Bankr. L.R. 9013-1(f) requires that motions "must contain a statement that the movant does or does not consent to entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution." Del. Bankr. L.R. 9013-1(f). "If no such statement is included, the movant will have waived the right to contest the authority of the Court to enter final orders or judgments." *Id.* Rogas consented to this Court's jurisdiction and authority to issue a final order without qualification and/or limitation in the Stay Relief Motion. (*See* Main Case, D.I. 514, ¶ 2) ("(p)ursuant to Local Rule 9013-1(f), Mr. Rogas consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties."). Rogas did not include language in his Del. Bankr. L. R. 9013-1(f) statement in the Stay Relief Motion limiting consent.

6

10.    In the Stay Relief Motion, Rogas affirmatively submitted himself to this Court's jurisdiction without reservation and sought its determination of the competing interests between himself and the Debtors' interests in estate property—namely the proceeds of the Debtor's insurance policies. Without limiting language or an express carve-out from general jurisdiction and authority, by his actions, Rogas impliedly consented to this Court's jurisdiction and authority for all matters.  The Stay Relief Motion renders Rogas akin to a creditor that files a proof of claim. Rogas cannot cherry pick this Court's jurisdiction, invoking it when he seeks relief against the estate but later denying it when the estate seeks relief against him.

C.    **In the Alternative, This Court May Enter *Proposed* Findings of Fact and Conclusions of Law for *De Novo* Review by A Superior Court.**

11.    Even ignoring that Rogas impliedly consented to this Court's jurisdiction in the Stay Relief Motion, this Court noted the following in this chapter 11 case, "as the Supreme Court stated in *Executive Benefits v. Arkison*, 573 U.S. 25 (2014), in the context of a motion for summary judgment the issue of whether a bankruptcy court may enter a final judgment is a matter of relatively little consequence.  Regardless of whether a bankruptcy court issues a 'judgment' or makes proposed findings and conclusions, a decision granting a motion for summary judgment is subject to the district court's *de novo* review in any event." *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litigation Inc.)*, 2023 WL 6938144 *n. 41 (Bankr. D. Del Oct. 19, 2023). Accordingly, this Court has authority to enter summary judgment.

II.    **THE ROGAS ADMISSIONS ARE BINDING, UNASSAILABLE STATEMENTS OF FACT AND HAVE A PRECLUSIVE EFFECT.**

12.    Rogas argues the Plan Trustee didn't do enough in pursuit of its claims against Rogas because it "took no discovery in this case," "did not depose Mr. Rogas nor seek written admissions of fact," "did not serve any interrogatories, request documents, or engage in any third party discovery," and, therefore, that the Motion is improper because it "is supported by precious

7

little evidence," and fails "to make an evidentiary showing whatsoever." (Opp., at 1–2, 14). He also argues that "(b)y simultaneously arguing that Mr. Rogas cannot contest liability in this case and that the Trustee is entitled to judgment solely on the basis of the DOJ Matter, the Trustee abuses the doctrine of *claim* preclusion by seeking non-mutual offensive preclusion." (Opp., at 14) (*emphasis added*). Apparently, Rogas had forgotten that he pleaded guilty to the extensive fraud that caused NS8's bankruptcy and admitted to the same in his Answer.

13.      Rogas' arguments ignore this and other judicial admissions in his Answer and misapprehend the Plan Trustee's argument about the preclusive effect of the overwhelming evidence put on record in connection with Rogas' guilty plea, his own Sentencing Letter, and his other sworn admissions and statements against interest in the Criminal Proceeding[6] (collectively, the "Rogas Admissions"). All these admissions, consistent with precedent, are binding upon Rogas as unassailable statements of fact about his fraudulent activities in at least 2019 and 2020[7] and in fact preclude him from now contesting civil liability as to the legal or factual ***issues*** resolved in the Criminal Proceeding. These admissions include that: (a) Rogas received transfers of proceeds from NS8, (b) with an actual intent to hinder, delay, or defraud NS8 and its investors, (c) while he was an officer and member of the Board of Directors of NS8, (d) by materially misrepresenting to, and/or concealing bank statements and customer data from, the Board, and third parties engaged by Board members to independently verify such information.

---

[6]    As used herein, "Criminal Proceeding" shall refer to the proceeding pending before Judge Cronan captioned *United States v. Rogas*, No. 20-cr-539 (S.D.N.Y.) (JPC) and "Crim. D.I." shall refer to the docket of the Criminal Proceeding. In a classic case of "do as I say, not as I do," the Opposition itself cites to facts it deems established by reference to the Criminal Proceeding no less than eight times in its "Factual Background" section.

[7]    Significantly, the Opposition does not raise any objections to Paragraph 7 of the Daileader Declaration or Exhibits A-1 through A-10 attached thereto, all of which exhibits include Rogas' emails in which he misrepresented customer data and NS8 revenue ***prior*** to 2019.

8

155335462

14.     Judicial admissions are "(v)oluntary and knowing concessions of fact made by a party during judicial proceedings (e.g., statements contained in pleadings, stipulations, depositions, or testimony; responses to requests for admissions; counsel's statements to the court)." *Merritt v. United Parcel Serv.*, 956 A.2d 1196, 1201 (Del. 2008). Judicial admissions "are traditionally considered conclusive and binding both upon the party against whom they operate, and upon the court." *Id.* at 1201–02. A judicial admission is "not merely another layer of evidence, upon which the . . . court can superimpose its own assessment of weight and validity. It is, to the contrary, an unassailable statement of fact that narrows the triable issues in the case." *Id*. at 1202 n.18 (quoting *Airco Indus. Gases, Inc. Div. of the BOC Grp., Inc. v. Teamsters Health & Welfare Pension Fund of Phila. & Vicinity*, 850 F.2d 1028, 1037 (3d Cir. 1988)); *see also, Ervin v. Vesnaver*, 2000 Del. Super. LEXIS 312, at *2 (Del. Super. Ct. June 20, 2000) ("Judicial admissions are not a means of evidence but a waiver of all controversy and therefore are a limitation on the issues.").

15.     This Court may take judicial notice of the publicly filed documents in the Criminal Proceeding. *See Orabi v, Att'y Gen of the U.S.*, 738 F.3d 535, 537 (3d Cir. 2014). Further, collateral estoppel bars "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (citations omitted). By precluding parties from re-arguing matters that they have already had "full and fair opportunity to litigate," the doctrine "protect(s) against the expense and vexation attending multiple (actions), conserve(s) judicial resources, and foste(rs) reliance on judicial action by minimizing the possibility of inconsistent decisions." *Sturgell*, 553 U.S. at 892 (internal citations omitted). Collateral estoppel applies when: "(1) the issue sought to be precluded (is) the same as that involved in the prior action; (2) that issue (was) actually litigated; (3) it (was) determined by a

9

final and valid judgment; and (4) the determination (was) essential to the prior judgment." *See, e.g., Anderson v. C.I.R.*, 698 F.3d 160, 164 (3d Cir. 2012). A criminal conviction "conclusively establishes the defendant's civil liability" as to those legal or factual issues that were resolved in the criminal proceeding. *See Anderson*, 698 F.3d at 164.

16. Thus, the Rogas Admissions relied upon by the Plan Trustee in the Motion constitute undisputed material facts establishing Rogas received actual fraudulent transfers and breached his fiduciary duties to NS8.

## III. THERE IS NO GENUINE DISPUTE OF ANY MATERIAL FACT REGARDING ROGAS' LIABILITY FOR BREACH OF FIDUCIARY DUTIES.

17. The Opposition does not challenge whether Rogas breached his fiduciary duties to NS8, but raises the "fiduciary duty" claim three times: *first*, in describing the state law Tolled Claims for which Rogas asserts this Court has no subject matter jurisdiction (Opp., at 11); *second*, in stating there is a three year statute of limitation for fiduciary breach claims under Delaware law (Opp., at 30); and *third*, to assert the Plan Trustee has not proven *all* of the damages it seeks for Rogas' breach of fiduciary duty accrued within the relevant limitations period(s) (Opp., *id.*). The first argument is briefed *supra* in Section I. The other two "straw man" arguments fail to raise a genuine dispute of any material fact because the Rogas Admissions establish Rogas' breach of fiduciary duties occurred (at least) in 2019 and 2020 — clearly within the statute of limitations — and this Court fixed the amount of damages suffered by NS8 in connection with confirmation of the Plan. For example, the claims of the 3 largest investors that suffered tort damages as a result of Rogas' fraud (AXA, Edison and Lightspeed) aggregate $112,712,000 in respect of their investments made in NS8 in 2019 and 2020.

18. Directors and officers owe fiduciary duties to the corporations they serve under Delaware law, including the duties of care, loyalty, and good faith. *Giuliano v. Fleming (In re*

10

155335462

*Nobilis Health Corp.)*, 661 B.R. 891, 902–03 (Bankr. D. Del. 2024).  The Rogas Admissions include judicial admissions "he was an officer of NS8 from approximately August 2016 until September 1, 2020 . . . (and) a member of NS8's Board of Directors from August 16, 2016 until September 1, 2020" (Answer, ¶ 107), as well as an admission in his guilty plea to Count One of his Indictment on security fraud that, "to wit, Rogas, while CEO, CFO, and a member of the Board of Directors of NS8, knowingly used falsified bank statements to cause material misrepresentations to be made to investors in connection with two NS8 securities offerings."  (Indictment, Count One, attached as **Exhibit 2**).

19.     There are only two elements necessary to establish a claim for breach of fiduciary duty: "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).  There is no dispute the Rogas Admissions, including that Rogas "made certain financial representations that he knew were not accurate or correct at the time that they were made" (Answer, ¶ 113), "took affirmative steps to prevent others from understanding that certain representations were inaccurate, wrong, or false" (Answer, ¶ 114), and "made certain representations that were inaccurate, incorrect, or false intending to induce third parties to invest in NS8," (Answer, ¶ 118), among others, provide sufficient facts to establish Rogas' liability for breach of fiduciary duty.

20.     Once a breach of duty has been established, a court's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983); *Basho Technologies Holdco B, LLC v. Georgetown Basho Investors*, 2018 WL 3326693 (Del. Ch. 2018) (holding fiduciaries jointly and severally liable for compensatory damages).  As set forth in the Motion, the amount of damages suffered by NS8 was

11

fixed by the confirmed Plan and equals the total amount of investors' tort damage claims allowed thereunder, aggregating $135,670,694 (including $112,712,000 invested by AXA, Edison and Lightspeed in 2019 and 2020).[8]  Accordingly, the amount of damages suffered by NS8 is *res judicata* with respect to Rogas who had notice and the opportunity to be heard with respect to the Plan. (*See* Motion, n. 25).

**IV.    THERE IS NO GENUINE DISPUTE OF ANY MATERIAL FACT REGARDING ROGAS' LIABILITY FOR ACTUAL FRAUDULENT TRANSFERS.**

21.    Under Bankruptcy Code section 548(A)(1)(a) and DUFTA section 1304(a)(1), the substantive elements of the Plan Trustee's actual fraudulent transfer claims are the same.  The statutory claims include (a) a transfer (b) of an interest of NS8 in property (c) with intent to hinder, delay, or defraud its present or future creditors. *See* 11 U.S.C. § 548(a)(1)(A); 6 Del. Code § 1304(a)(1).  There is no factual dispute Rogas received $17,542,459.00 in Tender Offer Proceeds with an intent to defraud NS8's investors.  The Rogas Admissions factually establish as much and preclude Rogas from making an inconsistent argument.  Nevertheless, Rogas attempts to contort the forfeiture proceeding in his criminal case in the Southern District of New York into a means of protecting assets in this proceeding by asserting that there could not have been a transfer of an interest of the Debtor in Tender Offer Proceeds because title in such proceeds somehow vested in the United States (the "Government").  This Court should reject these arguments.

22.    More specifically, Rogas claims that under principles of criminal forfeiture, the Tender Offer Proceeds and Employment Proceeds were never estate property because they were "automatically vest[ed] in the government at the time of [Rogas'] criminal act" (*see* Opp., at 15-

---

[8]    This also defeats Rogas' argument that the Plan Trustee "has not proven that the damages it seeks accrued within the limitations period on its common law claims." (Opp., at 30).

17) and therefore cannot be recovered by the estate in this action.  Rogas is wrong on both the procedural history of forfeiture in his criminal case and the law.

23.     As a procedural matter, the Government has not secured any final order of forfeiture over the estate property that is at issue in the Motion.  Rather, Rogas agreed in connection with his sentencing to a forfeiture money judgment in the amount of $17,542,459, representing the dollar value of proceeds that Rogas personally obtained traceable to Count One of the Indictment (*i.e.,* the amount of the Tender Offer Proceeds actually received by Rogas).  This was a money judgment only; the Government at the time did not seek to forfeit any specific property tied to the fraud. Since the entry of that money judgment, which remains unpaid to this day, the District Court has entered two *preliminary* orders of forfeiture that forfeited *Rogas'* right, title, and interest in certain "Substitute Assets" – assets that when finally forfeited will be credited against the forfeiture money judgment.  As a legal matter, these orders remain "preliminary"; they do not have the effect of passing full title to any of the listed property to the Government until claims by third parties have been resolved and the District Court enters final orders of forfeiture.

24.     There is no small measure of *chutzpah* in Rogas' argument: at the same time that Rogas claims that the Government already has title to the proceeds sought by the estate by virtue of the criminal forfeiture proceeding, his counsel has claimed in the forfeiture proceeding that Rogas' wife and two Rogas trusts (not the Government) have title to certain of the most valuable substitute assets.  In other words, Rogas is trying to play one Court off another in an effort to maximize his family's personal recovery at the expense of the victims of his criminal conduct.

**A.     Relevant Forfeiture Proceedings in the Criminal Case.**

25.     In making his argument, Rogas omits key facts from the forfeiture proceedings in his criminal case.  For this Court's convenience, we briefly summarize the proceedings here.

13

155335462

26.    Rogas was indicted in the Southern District of New York on October 13, 2020. *See* Crim. D.I. 7, Exhibit 2.[9]  The Indictment included a forfeiture allegation stating that Rogas would "forfeit to the United States … any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses." *Id*. ¶ 9.  The Indictment also included a "Substitute Assets Provision" stating that if the forfeitable property was not available for recovery, the Government could "seek forfeiture of any other property of the defendant up to the value of the forfeitable property." *Id.* ¶ 10.

27.    On March 16, 2022, Rogas pleaded guilty.  In connection with his sentencing, the District Court imposed an *Order of Restitution* in the amount of $112,276,409.50 (Crim. D.I. 88, attached as **Exhibit 4**), and consensually entered *Preliminary Order of Forfeiture/Money Judgment* (the "Forfeiture Money Judgment," Crim. D.I. 79, together with Crim. D.I. 80 (*Judgment In A Criminal Case*), attached as **Exhibit 5**) in the amount of $17,542,459, "representing the amount of proceeds traceable to the offense charged in Count One of the Indictment that the Defendant personally obtained." (*See* Crim D.I. 79 at ¶ 1).  The Forfeiture Money Judgment also provided that "(p)ursuant to Title 21, United States Code, Section 853(p), the United States is authorized to seek forfeiture of substitute assets of the Defendant up to the uncollected amount of the Money Judgment." *Id.*, at ¶ 5.  The Forfeiture Money Judgment was not directed at any specific assets; it was simply a dollar figure that represented the amount of proceeds traceable to Count One, and gave the Government the right to seek forfeiture of substitute assets in order to help satisfy the money judgment.

---

[9]    The SEC also filed civil claims against Rogas related to the same conduct.  In that action, a different judge in the Southern District of New York imposed a freeze on certain of the assets at issue here. *SEC v. Rogas*, 20-cv-7628 (S.D.N.Y.)(RMB), SEC D.I. 21, attached as **Exhibit 3**.

14

28.    On August 9, 2023, the District Court entered a "*Preliminary Order of Forfeiture As to Substitute Assets*."  Crim. D.I. 93, attached as **Exhibit 6**.  The Order noted that "the entire Money Judgment against the Defendant remains unpaid."  *Id*. at 1.  The Order then stated that the Government had identified several assets in which Rogas had an ownership interest, including: (i) Rogas' LLCs and financial accounts, (ii) Rogas' property in Las Vegas, and (iii) funds deposited in Rogas' attorney's escrow account (collectively, the "Substitute Assets").[10]  The Order provided:

> All of the Defendant's right, title and interest in the Substitute Assets is hereby forfeited to the United States of America, for disposition in accordance with the law, subject to the provisions of Title 21, United States Code, Section 853(n). . . .  Upon entry of a Final Order of Forfeiture, the Substitute Assets shall be applied towards the satisfaction of the Money Judgment entered against the Defendant.

*Id*. at ¶ 2–3.

29.    On January 30, 2025, the Government filed a second "*Preliminary Order of Forfeiture As To Substitute Assets*."  Crim. D.I. 98, attached as **Exhibit 7**.  This Order noted again that "the Money Judgment against the Defendant remains unpaid," and identified as an additional Substitute Asset Rogas' luxury property in the Dominican Republic.  *Id.*, at 2.

30.    On May 8, 2025, Rogas' spouse, trusts connected to Rogas, and Rogas' attorneys (Pillsbury Winthrop) filed petitions in the criminal proceedings, asserting that the Government could not take title to certain of the Substitute Assets because those parties purportedly had superior interests to the Government's interest in the assets.[11]  *See* Crim. D.I. 101 (filing by family

---

[10]    While not at issue in the Motion, the Plan Trustee contends that at least certain of the Substitute Assets listed in the Order are directly traceable to the proceeds of Rogas' misconduct.

[11]    Rogas' spouse, Barbara Elizabeth Englund, asserted a community property interest in certain of the assets. Rogas' law firm asserted an interest in "all funds on deposit in an attorney escrow account."  And two trusts connected to Rogas claimed legal right, title, and interest in the two real properties identified as Substitute Assets in the preliminary orders of forfeiture – the Las Vegas property and the Dominican Republic property. *See* Crim D.I. 101, 102, 104.

15

trusts), 102 (law firm),[12] 104 (spouse), attached as **Exhibits 8-10**. Rogas' spouse, trusts, and law firm are being represented in that proceeding by Rogas' counsel in this current proceeding, Pillsbury Winthrop.[13]

31.     To date, no final order of forfeiture has been filed in the criminal case. The Department of Justice has a remission program pursuant to which assets finally forfeited in the criminal case can be remitted to the estate for distribution to victims. *See, e.g.*, https://www.justice.gov/jm/jm-9-121000-remission-mitigation-and-restoration-forfeited-properties (explaining remission program).

**B.     The Criminal Forfeiture Proceedings Do Not Prevent Recovery in this Action.**

32.     Rogas' argument that the criminal forfeiture proceedings prevent the Plan Trustee from recovering the Tender Offer Proceeds or the Employment Proceeds fails for multiple reasons.

33.     *First*, Rogas' argument fails because the forfeiture ordered in connection with Rogas' sentencing was a money judgment. *See* Crim. D.I. 79, Exhibit 6. "A money judgment is an *in personam* judgment against the defendant and not an order directed at specific assets in which any third party could have any interest." Fed. R. Crim. P. 32.2(c) advisory committee's note to 2000 adoption; *see also United States v. Vampire Nation*, 451 F.3d 189, 202 (3d Cir. 2006) (quoting *United States v. Hall*, 434 F.3d 42, 59 (1st. Cir. 2006) ("(C)riminal forfeiture is a sanction against the individual defendant rather than against the property itself."); *United States v. Robilotto*, 828 F.2d 940, 949 (2d Cir. 1987) ("Because the forfeiture imposed upon (the defendant) is *in*

---

[12]     In his *Decision & Order* (SEC D.I. 221, attached as **Exhibit 11**) Judge Berman, presiding over the SEC Matter, already determined Pillsbury Winthrop is not entitled to the approximately $4 million in funds transferred by Rogas to Pillsbury Winthrop on September 9, 2020 but Rogas and Pillsbury Winthrop have appealed that judgment to the Second Circuit.

[13]     For reasons including the issues raised by Rogas' Opposition, the Plan Trustee plans to file a statement in the forfeiture proceedings.

155335462

*personam*, the government need not trace the proceeds of (the defendant's specific offense) to identifiable assets"); *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010) (applying *Robilotto*).

34.    *Second*, the forfeiture of the Substitute Assets has not been finalized; forfeiture proceedings with respect to those assets remain pending.  Thus, the Government does not yet have title to these particular assets vis-a-vis the estate.  *See* Fed. R. Crim. P. 32.2(b)(4) (forfeiture "remains preliminary as to third parties until the ancillary proceeding is concluded under Rule 32.2(c)"); *id.* 32.2(c)(2); 21 U.S.C. 853(n)(7) ("*Following the court's disposition of all petitions filed under this subsection . . .* the United States shall have clear title to property that is the subject of the order of forfeiture.") (*emphasis added*).

35.    *Third*, this Court does not need to, and should not try to, resolve forfeiture issues in the criminal case in order to adjudicate whether the estate's transfer of funds from its own bank accounts, resulting from Rogas' fraud, amounted to a fraudulent conveyance.    Under the Bankruptcy Code and DUFTA, the question is whether NS8 transferred "an interest of the debtor in property." *See In re Direct Access Partners, LLC*, 602 B.R. 495, 559 (S.D.N.Y. Bankr. 2019) ("The forfeiture statute (21 U.S.C. § 853) says nothing about the liability to which a criminal defendant may or may not be subject pursuant to non-criminal law.").  There is no dispute that the Tender Offer Proceeds[14] were transferred from NS8's bank accounts. (Motion, at 16).[15]  Unlike Rogas' financial accounts—which were specifically identified in preliminary orders of forfeiture in the criminal case—NS8's bank accounts were not so identified.  Accordingly, there is no factual or legal dispute that an interest of NS8 in property was transferred to Rogas in the form of Tender

---

[14]    Rogas' argument that the Government has title in the Employment Proceeds is not even colorable and thus we do not further address it.  While the Plan Trustee's position is that Rogas was not entitled to the Employment Proceeds, the Government has not contended that Rogas' salary constituted the proceeds of a crime. *See generally* Crim. D.I. 7, Indictment, Exhibit 2.

[15]    True and correct copies of September 2019, April 2020, and June 2020 NS8 Silicon Valley Bank account statements are attached as **Exhibit 12**.

17

Offer Proceeds, Employment Proceeds, and Other Proceeds as he admitted receipt of such funds in his Answer.

36.      *Third*, the Court should not permit Rogas to manipulate proceedings in two courts to achieve an inequitable and self-interested result.  The Plan Trustee has sought to coordinate asset recovery between this proceeding, the SEC action, and the criminal forfeiture proceedings, and expects that assets forfeited in the criminal case will be transferred to the estate for distribution to estate beneficiaries under the Department of Justice's remission program.  *See In re Dreier LLP*, 452 B.R. 391, 413-14 (Bankr. S.D.N.Y. 2011) (agreeing with trustee that estate had an interest in property where there was coordination with government in parallel forfeiture proceedings).  In contrast, Rogas seeks to use one forum against another to hold onto assets at the expense of victims.  In the criminal forfeiture proceedings, Rogas' spouse, two of Rogas' trusts, and Rogas's attorneys assert that their interests in Rogas' assets are superior to the Government's interest and that the Government therefore may not take title to Rogas' assets.[16]  Meanwhile, in this Court, Rogas contends that proceeds from his fraudulent conduct belong to the Government and therefore cannot be recovered by the estate. These maneuvers risk depriving victims of their recovery altogether and should be rejected.[17]

---

[16]    Rogas has a history of seeking to preserve assets for his family and/or mishandling frozen assets following his conviction.  (*See* Sent'g Hearing Tr., Motion Ex. C at 33:21-25, 34:5) (district judge asking: "I would like you to address at some point the $1 million … specifically the money that appears to have gone through different bank accounts and ended up in an account in Mr. Rogas' wife's name" with Rogas' counsel offering no explanation other than that the money was "intended as living expenses"); *also* SEC D.I. 53, attached as **Exhibit 13** (Rogas admitting in SEC Matter that he "violated the asset freeze in this case by spending or transferring approximately $1.7 million without the permission of this Court")).

[17]    The cases Rogas cites do not support his position.  *Dreier* supports the Trustee's position here, because the bankruptcy court in that case agreed that a preliminary order of forfeiture did not divest the estate of its interest in funds for purposes of an avoidance action.  *See Dreier*, 452 B.R. at 412 (closely examining the "Specific Properties" listed in preliminary order of forfeiture to determine whether specific funds in a specific bank account had already been forfeited to the Government and concluding that they had not been).  In *In re Am. Basketball League, Inc.*, 317 B.R. 121 (Bankr. N.D. Cal. 2004), the court held that an avoidance action constituted an "improper collateral attack" on a judgment of forfeiture, where *the Government* litigated against the trustee, and where there was a *final* order of forfeiture.  Here, not only has there not been a final

18

37.     Rogas also contends that "(t)he Trustee's asserted damages on the fraudulent transfer claims have already been satisfied" by restitution, the SEC Matter, and the Forfeiture Money Judgment, which purportedly "are premised on the same harm the Trustee seeks to recover on its statutory claims in this case." (Opp., at 28).  He argues that the Plan Trustee is limited to a "single satisfaction" and that "property that has already been returned cannot be 'recovered' in any meaningful sense." (*See e.g.*, *id.*) (quoting *In re Sanchez Energy Corp.*, 139 F.4th 411, 420 (5th Cir. 2025); *In re Eleva, Inc.*, 2003 WL 21516983, at *2 (10th Cir. B.A.P. June 30, 2003)).  But the cases Rogas relies on have nothing to do with criminal forfeiture and restitution, and in any event the preliminary forfeiture orders in the Criminal Proceeding expressly state that the "Money Judgment against (Rogas) remains unpaid." *See* Crim. D.I. 93, 98, Exhibits 7, 8.

38.     The proposed order in this proceeding respects the principle that victims will not receive a double recovery should the Plan Trustee prevail. Paragraph 4 of the proposed order granting the Plan Trustee's Motion moots Rogas' point about any "duplicative" recovery:

> Damages are awarded to the Plan Trustee . . . provided that Rogas shall be entitled to an offset against such amount equal to the total Tender Offer proceeds actually and indefeasibly recovered by the Plan Trustee from participants in the Tender Offer (which offset shall be net of the Plan Trustee's costs and expenses incurred pursuing such recoveries).

*Cf. Direct Access Partners*, 602 B.R. at 559 (suggesting that defendant could "ask[] for a credit if some part of the forfeited sums had actually been paid to the Trustee").  The proposed order is similar to the mechanism to prevent a double recovery to victims under

order of forfeiture, but also the Trustee is not suing the Government.  To the contrary, the Trustee is actually coordinating with the Government to ensure that Rogas's assets are distributed for the benefit of his victims.

19

criminal law and ensures that the estate beneficiaries will not receive an unjust distribution.[18]

## V.    THIS COURT NEED NOT REACH ROGAS' ALLEGED DEFENSES TO THE PLAN TRUSTEE'S CONSTRUCTIVE FRAUDULENT TRANSFER, UNJUST ENRICHMENT, AND FRAUD CLAIMS.

39.    As to constructive fraudulent transfer, Rogas argues that the Plan Trustee cannot prove NS8's acts or omissions were taken in justifiable reliance upon the material misrepresentations made by Rogas that he knew to be false and, ironically, points to this Court's imputation finding in *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, Adv. Pro. No. 22-50439, 2023 WL 6938144 *2 (Bankr. D. Del. Oct. 19, 2023) to reach an antithetical conclusion the Debtor's estate "cannot claim to have been induced to take any action as a result of its own alleged misrepresentations or omissions." (Opp., at 26–27).  But the imputation of Rogas' intent to NS8 in the context of an actual fraudulent transfer claim of course says nothing about Rogas' fraudulent concealment of customer and revenue data from NS8's Board and its reliance on his fraudulent misrepresentations.  Each of the four cases cited in the Opposition are cited for the proposition a trustee cannot sue for fraud in the absence of evidence the debtor was the victim, which is inapposite here because the Rogas Admissions factually establish (a) Rogas "was the only person with access to NS8's Bank of America account," (Answer, ¶ 16), (b) that "as part of the independent evaluation of key aspects of NS8's business, in March of 2020, a representative from

---

[18]    In criminal proceedings, defendants often are subject to a double-penalty.  This is because "(r)estitution and forfeiture are authorized by different statutes and serve different purposes—one of remediating a loss, the other of disgorging a gain." *United States v. Torres*, 703 F.3d 194, 196 (2d Cir. 2012); *see also United States v. Bodouva*, 853 F.3d 76, 79 (2d Cir. 2017) (noting that "(t)he distinct purposes of forfeiture and restitution undercut any argument that, in the absence of an offset, the imposition of forfeiture and restitution amount to an unfair double disgorgement").  However, that does not mean that *victims* get double recovery: the relevant statute provides that "(a)ny amount paid to a victim under an order of restitution shall be reduced by an amount later recovered as compensatory damages for the same loss by the victim." 18 U.S.C. § 3664(j)(2).  Here, the proposed order prevents such double-recovery for estate beneficiaries.

155335462

a third-party audit entity [hired by NS8's Board of Directors] visited NS8's offices in Las Vegas Nevada . . . [that Rogas] understood that the purpose of the visit was to review certain financial information and documentation, including from NS8's Bank of America account . . . [and that Rogas] provided altered bank statements and other documents to the representative during the visit [to induce NS8's Board of Directors to approve the tender offer]," (Answer, ¶ 40–41) and (c) "when challenged to back up his narrative [Rogas] doctored financial documents to support [NS8's] inflated numbers, eventually by tens of millions of dollars," (Sentencing Letter, at 5–6). In other words, Rogas admits he actively concealed information from NS8 on which the Board (and through it, NS8) justifiably relied in approving the tender offer.

40.     Nevertheless, for the reasons previously determined by this Court in *DDE Partners*, "(b)ecause recovery on plaintiff's remaining claims for constructive fraudulent conveyance and unjust enrichment would be identical to the recovery to which the trustee (might be) entitled on the actual fraudulent transfer claim, those claims are effectively mooted." *DDE Partners*, 2023 WL 6938144, at *2. This Court "therefore does not need to consider the availability of the safe harbor defense to the constructive fraudulent conveyance claim or address the question of whether unjust enrichment is available." *Id.*[19] The same is true here because Rogas' alleged defenses do not apply to actual fraudulent transfers. Similarly, civil damages for Rogas' liability on the fraud count would be duplicative of recovery on account of his liability on the fiduciary breach claim so there is no need for this Court to address the fraud count.

---

[19]     To the extent this Court considers such defenses on their merits, the Plan Trustee incorporates by reference its arguments related to the section 546(e) safe harbor, insolvency, and reasonable equivalent value set forth in its summary judgment briefs in *DDE*. *See DDE Partners*, 2023 WL 6938144, at *2.

21

## **CONCLUSION**

41.     For these reasons, the Opposition fails to establish a genuine dispute of material fact and/or refute that the Plan Trustee is entitled to judgment as a matter of law against Rogas.

Dated:  September 23, 2025
        Wilmington, Delaware

**BLANK ROME LLP**

By: */s/ Stanley B. Tarr*
Stanley B. Tarr (No. 5535)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:     (302) 425-6400
Facsimile:     (302) 425-6464
Email: stanley.tarr@blankrome.com

-and-

John E. Lucian (*pro hac vice*)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-5500
Facsimile:     (215) 569-5555
Email: john.lucian@blankrome.com

*Counsel for the Plan Trustee*

155335462

## <u>SCHEDULE A</u>

*RELEVANT ROGAS JUDICIAL ADMISSIONS*

- "during his time working for NS8, he altered certain documents in a manner so as to provide inaccurate revenue and paying customer figures" (Answer, ¶ 1);

- "he received approximately $17,542,458 in proceeds from tender offers NS8 conducted in 2019 and 2020" (Answer, ¶ 2);

- "he was the only person with access to NS8's Bank of America account" (Answer, ¶ 16);

- "he caused NS8 to provide inaccurate, incorrect, or false financial statements and corporate documents" (Answer, ¶ 18);

- "he manipulated certain bank statements" (Answer, ¶ 18);

- "in connection with fundraising rounds in late 2019 and 2020, communications between himself and other likely included inaccurate revenue or customer figures" (Answer, ¶ 24);

- "as part of the independent evaluation of key aspects of NS8's business, in March of 2020, a representative from a third-party audit entity visited NS8's offices in Las Vegas Nevada...(Rogas) understood that the purpose of the visit was to review certain financial information and documentation, including from NS8's Bank of America account...(and Rogas) provided altered bank statements and other documents to the representative during the visit" (Answer, ¶ 41);

- "(f)or his part, (he) received $17,542,428.50 (in Tender Offer Proceeds)" (Answer, ¶ 49);

- "he was paid a salary by NS8 during his employment" (Answer, ¶ 53);

- "from time to time, he was awarded certain performance-based bonuses" (Answer, ¶ 53);

- "he was an officer of NS8 from approximately August 2016 until September 1, 2020...(and) he was a member of NS8's Board of Directors from August 16, 2016 until September 1, 2020" (Answer, ¶ 107);

- "he made certain financial representations that were inaccurate, incorrect, or false to prospective investors, representatives of NS8, its Board of Directors, and others" (Answer, ¶ 112);

- "he made certain financial representations that he knew were not accurate or correct at the time that they were made" (Answer, ¶ 113);

- "he took affirmative steps to prevent others from understanding that certain representations were inaccurate, wrong, or false" (Answer, ¶ 114); and

- "he made certain representations that were inaccurate, incorrect, or false intending to induce third parties to invest in NS8" (Answer, ¶ 118).)

155335462

## SCHEDULE B

*RELEVANT ROGAS EVIDENTIARY ADMISSIONS AGAINST INTEREST*

- pleaded to Count One of the Indictment: "to wit, Rogas, while CEO, CFO, and a member of the Board of Directors of NS8, knowingly used falsified bank statements to cause material misrepresentations to be made to investors in connection with two NS8 securities offerings."  (Indictment, Count One).

- Rogas made the following evidentiary admissions against interest to Judge Cronan in the Sentencing Letter (Sentencing Letter, pp. 1, 5-6):
    - he "used materially misleading financial statements to raise approximately $123 million from investors for NS8,"
    - he "altered bank statements to show millions of dollars of fictional customer revenue and assets,"
    - he "directly benefitted when NS8 conducted a tender offer with these new investor funds,"
    - his "indefensible actions in this case deceived investors and led to the demise of a promising company,"
    - he "misrepresented (NS8's) total number of paying customers in order to maintain our narrative of success,"
    - "when challenged to back up his narrative (he) doctored financial documents to support (NS8's) inflated numbers, eventually by tens of millions of dollars,"
    - he "knowingly committed this crime for the purpose of deceiving potential investors,"
    - "based on (Rogas') fraudulent representations, (NS8) raised $123 million," and
    - he "personally received $10 million plus an additional $7.5 million to re-purchase additional shares of company stock."

155335462