**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CYBER LITIGATION INC.,<br><br>    Debtor. | Chapter 11<br><br>Case No. 20-12702 (CTG) |
| DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust,<br><br>    Plaintiff,<br><br>v.<br><br>ADAM P. ROGAS,<br><br>    Defendant. | Adv. Proc. No. 24-50180 (CTG) |

## MEMORANDUM OPINION

This Court has written at some length in the past about the claims held by the Cyber Litigation Trust against the early investors in the debtor who participated in the company's tender offer.[1]  The debtor's business was largely a fraudulent scheme, orchestrated by Adam Rogas, its principal.  The company purported to be in the fraud prevention business.  It raised tens of millions of dollars from investors by using false financial statements and business records.  The company then transferred most of that money to the company's early investors (including Rogas himself) in a tender offer in which the company bought back those

---

[1] The debtor in this bankruptcy case was formerly known as NS8, Inc.  It is referred to as the "debtor."

early investors' shares (whose true value was zero, in light of the fact that the alleged business was fraudulent).

In a prior opinion in the *DDE* adversary proceeding, the Court rejected the argument that, because a majority of the company's board was unaware of Rogas' fraudulent scheme, the company lacked the requisite intent to defraud creditors.[2] Rather, the Court found that Rogas' intent to defraud was properly attributable to the company in view of the fact that he had tricked the innocent board members into believing that the company had a legitimate business. Earlier this year, this Court followed its decision in *DDE* in granting partial summary judgment in favor of the litigation trust against Anthony Dawson, another participant in the company's tender offer.[3]

The current motion is the litigation trust's claim against Rogas himself. The trustee seeks to recover the approximately $17 million that Rogas is alleged to have received through the tender offer.[4] In addition, the trust asserts common law claims, including a claim for breach of fiduciary duty, against Rogas. While the trustee originally sought to recover $135 million on its common law claims, the trustee has reduced the damages it seeks to approximately $80 million.[5]

---

[2] *In re Cyber Litig. Inc.*, No. 22-50439, 2023 WL 6938144 (Bankr. D. Del. Oct. 19, 2023). This opinion is referred to as the "*DDE*" opinion.

[3] *In re Cyber Litig. Inc.*, No. 24-50177, 2026 WL 363146 (Bankr. D. Del. Feb. 9, 2026).

[4] Drivetrain, LLC, the trustee of the Cyber Litigation Trust, is referred to as the "plaintiff" or the "trustee."

[5] D.I. 51 at 3.

As described more fully below, the Court concludes in Part I that both the fraudulent transfer and the common law claims are within the Court's subject-matter jurisdiction. The fraudulent transfer claims arise under the Bankruptcy Code and are therefore within § 1334(b)'s "arising under" jurisdiction. Subject-matter jurisdiction over the fiduciary duty claims, however, relies on the "related to" jurisdiction. That analysis requires the application of the Court's recent decision in *SunPower*, which addressed the limits of the post-confirmation related-to jurisdiction.[6] While the question is a close one, the Court construes the plan and confirmation order validly to retain jurisdiction over these claims. The issue underscores, however, the point made in *SunPower* about this Court's intention to avoid these difficulties in future cases by requiring, at the time of confirmation, retention of jurisdiction provisions expressly to describe the cause of action over which jurisdiction is retained and for the plan proponent to explain why the § 1141(b) standard is satisfied as to the identified causes of action.

On the merits, Part II concludes that the trustee is entitled to judgment on the claims for fraudulent transfer, though the record before the Court establishes only the amount of the tender offer proceeds, not the salary Rogas is alleged to have received. Accordingly, the trustee's motion for summary judgment on this claim will be granted in part and denied in part. Part III concludes that the trustee is also entitled to judgment on the claims for breach of fiduciary duty, though not for

---

[6] *See In re SunPower*, No. 25-52473, 2026 WL 2147348 (Bankr. D. Del. July 23, 2026).

the full measure of damages the trustee seeks.[7]  The motion for summary judgment on that claim is therefore also granted in part and denied in part.

In sum, as further described below, the Court concludes that it has subject-matter jurisdiction over the trustee's avoidance claims and, under the preexisting plan provisions and the particular facts of this case, over the fiduciary duty claim. The Court recommends summary judgment for the trustee on liability for actual fraudulent transfer and breach of fiduciary duty.  The undisputed record establishes breach of fiduciary duty damages of $67,998,059.67, the total amount that the record shows the debtor transferred in the tender offer.  While the costs associated with the bankruptcy case may also be recoverable as breach of fiduciary duty damages, the record before the Court is insufficient to grant summary judgment for

---

[7] As described below, the Court concludes that it lacks the constitutional authority to enter final judgment on the fraudulent transfer claim and lacks the statutory authority to enter final judgment on the non-core common law claims.  Accordingly, if this Memorandum Opinion were to finally resolve all claims in the case, the Court would issue it as proposed findings of fact and conclusions of law, pursuant to 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033 for the common law claims and under the authority described in *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 39 (2014), for the fraudulent transfer claims.

The complicating factor is that this Memorandum Opinion recommends that summary judgment be granted in part and denied in part.  An order to that effect would not be a final and appealable order under 28 U.S.C. § 158(a)(1).  It would therefore seem anomalous for this Court now to make proposed findings and conclusions, that would, under Rule 9033, trigger an immediate process of review in the district court while the remaining issues were litigated before this Court.  Accordingly, the Court will defer issuing proposed findings and conclusions, but anticipates that, upon its final resolution of the remaining issues, it will incorporate this Memorandum Opinion, by reference, into the Court's proposed findings and conclusions, thus avoiding the complications the Court noted in *Essar Steel*.  *See In re Essar Steel Minnesota LLC*, No. 17-51210, 2024 WL 4047451 at *7-8 (Bankr. D. Del. Oct. 4, 2024) (noting the possibility that the court's interlocutory rulings may not be reviewed by an Article III court until they merge into the district court's final judgment and are reviewed by the court of appeals); *In re Essar Steel Minnesota LLC*, 667 B.R. 803 (D. Del. 2025) (denying motion for interlocutory appeal of this Court's partial summary judgment decision).

those amounts.  In light of the single satisfaction principle, the trust is not entitled to further recovery against Rogas on account of his receipt of the tender offer proceeds on fraudulent conveyance grounds.  Any such recovery would amount to a double payment.

### Factual and Procedural Background

The underlying facts are not materially disputed, even if the record does contain certain gaps.  Because the motion now before the Court is one for summary judgment, the facts set forth below are those as to which there is no genuine dispute based on the record materials submitted by the trustee in support of the motion and by Rogas in opposition.

Throughout his time as CEO of the debtor, Rogas retained exclusive control over, and visibility into, the debtor's bank account.  Only Rogas had access to the data and metrics underlying the debtor's true sales revenue and customer counts.[8] Rogas maintained this control despite the fact that the debtor had other executive finance and sales officers in place.[9]  Rogas used this exclusive access and control as a means to paint a false picture of financial success.[10]  For example, in 2017, despite generating less than $25,000 in revenue for the entire year, the debtor reported earning over $275,000 in revenue through June of that year.[11]  Further, while annual revenue never exceeded $170,000, the debtor reported annual revenue of

---

[8] D.I. 24 ¶ 5.

[9] *Id.*

[10] *Id.* ¶¶ 5-8.

[11] *Id.* ¶ 7.

$8.5 million in 2018 and $39.6 million in 2019.[12]  Customer counts were no more reliable.[13]  Rogas represented that the company had 380 customers as of October 2017 when the true number was fewer than 45.[14]

Rogas presented fabricated reports and fictitious financials such as these to both the debtor's board and to its potential investors.[15]  Rogas made these material misrepresentations with the intent to "induce third parties to invest in [the debtor]."[16]  Rogas did so despite the fact that he knew the representations were "not accurate or correct at the time they were made."[17]  And for a time, these efforts were successful.  A significant proportion of the investments the debtor received were the direct result of this fraud.[18]  The debtor raised more than $143 million in equity as a direct result of Rogas' fabrications.[19]

In early 2020, Rogas set out to have the company conduct a tender offer in which the debtor would acquire the shares in the company held by its early investors.[20]  Rogas planned to use the funds from an April 2020 investment round to finance the tender offer, and thus cash out the early investors.[21]  Around the same

---

[12] *Id.*

[13] D.I. 24 ¶ 7.

[14] *Id.*

[15] *Id.* ¶¶ 7-8, 10.

[16] D.I. 7 ¶ 118.

[17] *Id.* ¶ 113.

[18] D.I. 24 ¶ 14; D.I. 7 ¶ 118.

[19] D.I. 24 ¶¶ 10-13.

[20] *Id.* ¶ 17.

[21] *Id.*

time, however, it became known to potential investors that the SEC had subpoenaed the debtor and various of its employees.[22]   The SEC investigation related to July 2019 whistleblower complaints alleging securities fraud.[23]   In response to those allegations, the prospective investors engaged highly regarded accountants and law firms to conduct comprehensive due diligence into the debtor's financials.[24]

Once these suspicions arose, Rogas "took affirmative steps to prevent others from understanding that certain representations" made in the company's books and records "were inaccurate, wrong, or false."[25]   And, perhaps remarkably, Rogas succeeded in fooling the prominent accountants and law firms.[26]   The due diligence revealed no wrongdoing, and the tender offer went forward.[27]

The June 2020 tender offer provided cash to early investors and employees in exchange for shares, at a rate of $18.50 per share.[28]   Rogas received $17,542,458 in the transaction.[29]   The trustee's motion for summary judgment, pointing to the first-day declaration, asserts that the debtor paid out more than $72 million, in total, in the transaction.[30]   But in the trustee's letter to the Court after argument on the

---

[22] *Id.* ¶¶ 19, 23.

[23] *Id.* ¶ 16.

[24] D.I. 24 ¶¶ 20-24.

[25] D.I. 7 ¶ 114.

[26] D.I. 24 ¶ 24.  *See* D.I. 24-25 ¶ 33-37.

[27] D.I. 24 ¶¶ 24-30.

[28] *Id.* ¶¶ 17, 30.

[29] D.I. 7 ¶ 49.

[30] D.I. 23-1 ¶ 88.

summary judgment motion, addressed to identifying the specific evidence supporting the claimed damages, the trustee points only to a bank statement showing a payment of $67,998,059.67 that is identified as being the payment related to the tender offer.[31]  After the tender offer, the debtor had less than $16 million in cash on hand.[32]

Shortly after the tender offer, the company's board discovered discrepancies and irregularities in the company's financials.[33]  Rogas resigned in September 2020.[34]  In October 2020 the debtor filed for bankruptcy.[35]

The record in the main bankruptcy case indicates that by the time of the bankruptcy filing in October 2020, the debtor's total cash on hand had declined to

---

[31] D.I. 29-12 at 40 of 51.  This Court would not typically consider evidence that was, such as this bank statement, identified for the first time in a moving party's reply brief in support of its motion for summary judgment.  During the February 2026 status conference, however, the Court invited both parties to provide additional evidence to support the calculation of damages.  Feb. 12, 2026 Hr'g Tr. at 11.  ("And it seems to me that if the Trustee wants to supplement the summary judgment briefing so as to sharpen the analysis of damages, you can do that.  And when that's fully [briefed], you should talk about timing, I'm not going to, unless there's a dispute, sort of announce a deadline or anything about that.  You should talk first.  If there's a dispute you should call me.  And when that's fully briefed, I'll look at it and if I need argument, I'll let you know.  If anyone wants argument, you'll likely get it from me.").  The trustee filed its supplemental letter on June 12, 2026. Rogas chose not to respond to that letter.  The Court accordingly concludes that Rogas had a sufficient and appropriate opportunity to respond to the evidence to which the trustee points, in the June 12, 2026 letter, in support of its contention that there is not a genuine dispute of material fact with respect to damages.  In addition, in light of the bank statement showing a transfer of about $68 million made in connection with the tender offer, the Court cannot conclude that there is no genuine dispute about the contention made in the first-day declaration that the company distributed more than $72 million to investors in the tender offer.

[32] D.I. 24 ¶ 32.

[33] *Id.* ¶ 33.

[34] *Id.* ¶ 34.

[35] *Id.*

just over $1.3 million.[36]   Over the course of the bankruptcy case itself, the Court

approved the payment of professional fees in the amount of $11,060,428.24.[37]

The complaint alleges that in the two years before the petition date, Rogas

received a salary of $629,755.25 and $200,000 in bonuses.[38]   And while asking the

Court to award this measure of damages on summary judgment, the trustee fails to

identify any evidence in the summary judgment record that supports that

allegation.

The trustee, appointed under the terms of the confirmed plan in the main

bankruptcy case, brought this adversary proceeding in October 2024.[39]   The trustee

moved for summary judgment in July 2025.[40]   The motion was fully briefed by

September 2025.[41]   The Court first heard argument on the motion in November

2025.   At the close of that argument, the Court noted that it thought it clear that

the trustee was entitled to summary judgment on the fraudulent transfer claims

but that the common law claims (and in particular, the calculation of the breach of

fiduciary duty damages) raised more challenging questions.   The parties agreed

that in view of the magnitude of the fraudulent transfer claims, it was at least

---

[36] *In re Cyber Litig. Inc.*, Bankr. D. Del. No. 20-12702, D.I. 43-2 (initial DIP budget).   Items on the docket of this main bankruptcy case are cited as "Main Case D.I. __."

[37] Main Case D.I. 784 (order approving final fee applications of Cooley LLP ($6,444,205.09), Blank Rome LLP ($4,607,458.50), and Stretto ($8,764.65)).

[38] D.I. 1 ¶ 53.

[39] D.I. 1.

[40] D.I. 23.

[41] *See* D.I. 25 (Rogas opposition to summary judgment); D.I. 29 (reply in support of summary judgment).

worth exploring whether, as a practical matter, the parties might be able to reach a consensual resolution of the fiduciary duty issues.[42]

After the passage of several months, however, the Court set a status conference for February 12, 2026.[43] At that status conference, Rogas took the view that settlement negotiations had been constructive and were ongoing. The trustee, however, disagreed and urged the Court to resolve the motion. The Court noted certain areas where it sought clarification of the parties' positions based on the November argument. The Court suggested that the parties brief those issues and indicated that if the parties reported that there was no point in permitting further time for settlement discussions, they should let the Court know and it would then proceed to resolve the motions.[44]

In June 2026, the trustee filed a supplemental brief that addressed the issues the Court identified during the February status conference.[45] Rogas did not respond to that letter. The Court held a further status conference on July 13, 2026, at which Rogas sought more time to continue discussions. The trustee urged the Court to resolve the pending motion.[46] The Court then noted that it appreciated the parties' efforts to seek a consensual resolution. In view, however, of the parties' inability to reach a settlement, the trustee's request that the Court rule on the pending motion, and the Court's conclusion that the trustee was entitled to a ruling on its fully-

---

[42] Nov. 18, 2025 Hr'g Tr. at 73-74.

[43] D.I. 46.

[44] Feb. 12, 2026 Hr'g Tr.

[45] D.I. 51.

[46] July 13, 2026 Hr'g Tr.

briefed motion, the Court stated that it would issue its decision as promptly as possible.

## Jurisdiction and authority

The question of subject-matter jurisdiction is disputed. For the reasons set forth in Part I of this Memorandum Opinion, the Court concludes that it has subject-matter jurisdiction over both the fraudulent transfer claims and the breach of fiduciary duty claims. The question of the Court's authority to enter final judgment, however, also warrants a word of discussion.

The subject-matter jurisdiction granted by 28 U.S.C. § 1334(b) is provided to the district court.[47] That jurisdiction may then be referred, under § 157 of title 28, to the bankruptcy judges of the district.[48] A standing order issued by the District Court for the District of Delaware does exactly that – referring to this Court all proceedings within that court's jurisdiction granted in § 1334.[49]

So then what does the bankruptcy court do? This is where the core versus non-core distinction enters the story. As to "non-core" matters (like the common law claims in this action), the bankruptcy court essentially proceeds as would a magistrate judge – making proposed findings and conclusions that are subject to the district court's *de novo* review.[50] As to "core" matters, the bankruptcy court may (at

---

[47] *See* 28 U.S.C. § 1334(b).

[48] 28 U.S.C. § 157(a).

[49] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

[50] 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033.

11

least as far as the statute is concerned) proceed to enter final judgment.[51]   This

statutory scheme was designed in response to the Supreme Court's decision in

*Marathon*, which held that, under Article III of the Constitution, non-Article III

bankruptcy courts could not enter final judgment, absent the consent of the parties,

on matters of "private right."[52]

The problem, however, is that the statutory scheme enacted in response to

*Marathon* did an imperfect job of fixing the problem.   *Stern v. Marshall* held that

the provision of § 157(b) that permitted the entry of final judgment on

counterclaims to proofs of claim was inconsistent with the requirements of

Article III.[53]   And in view of the holding of *Granfinanciera* that fraudulent transfer

claims are matters of private right, the same is true of 28 U.S.C. § 157(b)(2)(H),

which purports to treat fraudulent transfer claims as core matters.[54]   The result is

different, to be sure, in cases in which the defendant filed a proof of claim or

---

[51] 28 U.S.C. § 157(b)(1).

[52] *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

[53] *Stern v. Marshall*, 564 U.S. 462 (2011).

[54] *See* 28 U.S.C. § 157(b)(2)(H); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).  As this Court noted in *DDE*, it is true that the court in *Paragon* suggested that *Stern* left this question open.  *See DDE*, 2023 WL 6938144 at *4 n.36.  That conclusion, however, is difficult to square with the reasoning of *Granfinanciera* (which held that fraudulent transfer claims are matters of private right) in light of *Stern* (which recognizes that the "private right" analysis under Article III is the same as in the jury trial context).  *See Stern*, 564 U.S. at 494; *SEC v. Jarkesy*, 603 U.S. 109, 128 (2024) ("Once such a suit is brought within the bounds of federal jurisdiction, an Article III court must decide it, with a jury if the Seventh Amendment applies.") (internal quotation and citation omitted).  That conclusion is reinforced by the Attorney General's decision, following *Stern*, not to defend the constitutionality of § 157(b)(2)(H) insofar as it authorizes a bankruptcy court to enter final judgment on a fraudulent-transfer claim.  *See* Letter from Eric H. Holder, Jr., Att'y Gen., U.S. Dep't of Justice, to John A. Boehner, Speaker, U.S. House of Representatives (Jan. 19, 2012), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/01-19-2012.pdf.

consents to the entry of final judgment, either expressly or implicitly.[55]  But Rogas has done neither of those things.[56]  As such, this Court's role on the trustee's fraudulent transfer claims is therefore limited to making proposed findings of fact and conclusions of law, all subject to the district court's *de novo* review.[57]  As to the claims for breach of fiduciary duty, those claims do not (contrary to the trustee's allegation) fit within the statutory definition of a core matter under § 157(b)(2).[58] The Court's role with respect to those claims is likewise limited to making proposed findings and conclusions, as 28 U.S.C. § 157(c)(1) provides.

## Analysis

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[59]  The moving party bears the burden of demonstrating the absence of a genuine dispute of material fact.[60]  A moving party may rely on any material included in the summary

---

[55] *See DDE*, 2023 WL 6938144 at \*5; *Katchen v. Landy*, 382 U.S. 323 (1966); *Wellness Int'l Network, Ltd., v. Sharif*, 575 U.S. 665 (2015).

[56] Rogas did consent to the Court's entry of judgment with respect to a motion he filed earlier in the case. *In re Cyber Litig. Inc.*, Bankr. D. Del. No. 20-12702, D.I. 514 ¶ 2.  There is no basis, however, to extend that consent beyond the scope provided.  *See also* D.I. 7 ¶ 8 (declining to consent to the entry of judgment in this adversary proceeding).

[57] As this Court noted in its *DDE* opinion, the question whether a court enters judgment or makes proposed findings and conclusions, in the context of a motion for summary judgment, "is a matter of relatively little consequence" since in either event the bankruptcy court's determination is subject to the same *de novo* review in the district court.  *DDE*, 2023 WL 6938144, at \*5 n.41.  *See also Executive Benefits,* 573 U.S. at 39 (explaining that bankruptcy courts may make proposed findings and conclusions on claims that are statutorily core but as to which they may not enter final judgments under Article III).

[58] *See* D.I. 1 ¶ 6.

[59] Fed. R. Civ. P. 56 (made applicable by Fed. R. Bankr. P. 7056).

[60] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

judgment record, including documents, declarations, and other material.[61]    If the

movant satisfies this burden, the party opposing summary judgment must "set forth

specific facts showing that there is a genuine issue for trial," or summary judgment

will be entered.[62]    In reviewing the evidence presented, a court must draw all

reasonable inferences in the light most favorable to the non-moving party, but shall

not make credibility determinations nor weigh the evidence.[63]    Otherwise put, the

court cannot resolve genuinely disputed questions of fact.[64]    Rather, the role of the

court is to assess the record evidence and determine whether, as a matter of law,

that record would permit a reasonable finder of fact to rule in favor of the non-

moving party.[65]

## I.    The Court has subject-matter jurisdiction over trustee's claims.

This Court has subject-matter jurisdiction over the fraudulent transfer

claims (Counts I–IV) pursuant to 28 U.S.C. § 1334(b), as claims that "arise under"

the Bankruptcy Code.    The fraudulent transfer claims "arise under" the Code since

"the cause of action is based on a right or remedy expressly provided by the

---

[61] Fed. R. Civ. P. 56(c)(1) (identifying the types of "materials in the record" that may be cited in support of a motion for summary judgment).

[62] *Celotex*, 477 U.S. at 322 n.3.

[63] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[64] *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145, 148 (3d Cir. 1998); *Anderson*, 477 U.S. at 249.

[65] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

Bankruptcy Code."[66]   As described above, however, the Court lacks the constitutional authority to enter final judgment with respect to such claims.  It will instead make proposed findings and conclusions subject to the district court's *de novo* review.

The question of subject-matter jurisdiction over the common law claims – for breach of fiduciary duty, fraud, and unjust enrichment – presents the same tricky question that this Court recently addressed in *SunPower*.  The reason the issue is tricky is that *Resorts* explains that there is *some* related-to jurisdiction that survives post-confirmation.[67]   That jurisdiction appears to extend beyond claims that merely seek to *enforce* the plan and confirmation order.  It covers claims that have a "close nexus" to the plan.  The challenge is how to square that holding with (a) the fact that (as *Resorts* notes) the bankruptcy estate typically terminates upon confirmation and (b) the requirement of *Pacor* that the related-to jurisdiction applies only to claims with a conceivable effect on the bankruptcy estate.[68] *SunPower* explains that the best way to do that is to understand the way to retain related-to jurisdiction over a post-confirmation claim is to keep the estate open after the effective date of the plan.[69]   That is expressly permitted by the "[e]xcept as otherwise provided" language of § 1141(b), and the standard for granting such an

---

[66] *In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 197 (3d Cir. 2022) (citation omitted). *See also Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006) (describing the categories of bankruptcy jurisdiction).

[67] *See In re Resorts Int'l, Inc.*, 372 F.3d 154 (3d Cir. 2004).

[68] *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).

[69] *See SunPower*, 2026 WL 2147348.

exception maps closely to the language of *Resorts* about the importance of the claim to effectuating the purpose of the plan.

Even if one understands the doctrine through this lens, that still leaves courts to confront the question whether any given claim has a sufficient connection to the plan to justify the exercise of post-confirmation related-to jurisdiction. As *SunPower* explained, that was the task that the courts confronted in cases like (in addition to *SunPower* itself) *Nu Ride*, *Sanchez Energy*, *BWI Liquidating*, and *AstroPower*.[70]

But as far as jurisdictional rules go, the task of looking back at the plan and having to make an after-the-fact judgment about whether the claim before the court has a "close enough" nexus to the plan to justify the exercise of jurisdiction leaves a lot to be desired. Rules about a court's subject-matter jurisdiction ought to be clear and simple to administer. Because subject-matter jurisdiction can be, and indeed must be, reevaluated at every step in the litigation, it is deeply unhelpful to parties and their counsel for these rules to operate as a form of Rorschach test, with the court finding that there is subject-matter jurisdiction if the ink blot looks like a moth but not if it looks more like a rabbit.

To solve for that problem on a go-forward basis, the Court in *SunPower* set forth what it believes to be a best practice. To the extent a plan proponent intends

---

[70] *See In re Nu Ride Inc.*, No. 24-50179, 2025 WL 1600566 (Bankr. D. Del. June 5, 2025); *Sanchez Energy Corp.*, 159 F.4th 309 (5th Cir. 2025); *In re BWI Liquidating Corp.*, 437 B.R. 160, 166 (Bankr. D. Del. 2010); *In re AstroPower Liquidating Trust*, 335 B.R. 309, 324-325 (Bankr. D. Del. 2005). In addition to these cases discussed in *SunPower*, the same basic question was also presented in *In re EXDS, Inc.*, 352 B.R. 731, 736 (Bankr. D. Del. 2006), and *In re Insilco Technologies, Inc.*, 330 B.R. 512, 517 (Bankr. D. Del. 2005).

16

to preserve post-confirmation jurisdiction over a claim within the related-to jurisdiction, the claim should be expressly identified in the plan, and the Court will make an express judgment about whether keeping the estate open for the purpose of administering that claim is consistent with § 1141(b).  In the absence of clear language to that effect, the Court will presume that the plan did not intend to retain post-confirmation related-to jurisdiction.[71]

But as *SunPower* explains, as to plans that have already been confirmed, one is left with the task of trying to make sense out of the ink blots.[72]  In that regard, the plan here expressly retained jurisdiction over "Causes of Action" as defined in the plan.[73]  And the plan defines that term to include

> any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever belonging to the Debtor, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) Avoidance Actions; (f) any other claims under

---

[71] *SunPower*, 2026 WL 2147348, at *15-18.

[72] *Id.* at *18 (describing how, "as to plans that have already been confirmed," one is left to apply "the analysis of *AstroPower* and *Nu Ride*").

[73] Main Case D.I. 706 § XIII(6).

17

any state or foreign law; and (g) any claims assigned to the Plan Trust by the Sponsor Parties.[74]

Read in isolation, one might conclude that this language – while certainly broad – is insufficiently specific to retain jurisdiction over the fiduciary duty claims against Rogas. And matters are not helped much by the plan supplement, which identifies Rogas as one of 76 individuals against whom the trust preserves a cause of action (without describing the nature of the claims in great detail).[75] If anything, the indeterminate nature of the task of determining whether there is a sufficient nexus between the fiduciary duty claims against Rogas and the confirmed plan further support the approach to this issue adopted in *SunPower*.

On the whole record of this case, however, the Court will conclude that it has subject-matter jurisdiction over the breach of fiduciary duty claim. Rogas' fraud was, without a doubt, *the* root cause of the filing of the debtor's bankruptcy case. In addition, the magnitude of the claims makes them highly material to creditor recoveries. As *SunPower* explained, none of these factors would likely be sufficient on a stand-alone basis. In combination, however, the Court concludes (with some admitted measure of unease over the open-ended nature of the analysis) that the nexus in this case is close enough to satisfy the *Resorts* standard. More specifically, because the facts that underlie the claims against Rogas were the central driver of the bankruptcy filing and the confirmed plan, and because these claims are among

---

[74] Main Case D.I. 706 § I(B)(15).

[75] *See* Main Case D.I. 672-6.

the liquidating trust's most important tools in its effort to compensate creditors for their injuries (which is, of course, the central objective of the plan), the Court concludes that *Resorts*' close nexus standard is satisfied here.

**II.   The Court recommends that summary judgment be granted in part and denied in part on the claims for actual fraudulent transfer.**

As described below, the record supports granting summary judgment in favor of the trustee on his claim for actual fraudulent transfer for the $17,542,458 that Rogas received in the tender offer.  While the trustee is also entitled to judgment on the claim for actual fraudulent transfer for the amount of salary and bonus that Rogas received in the two years before the bankruptcy, the trustee has not presented any evidence supporting his allegations regarding the amount of this compensation.  The trustee's motion for summary judgment will accordingly be granted in part and denied in part.

**A.   The tender offer proceeds paid to Rogas were actual fraudulent transfers recoverable by the trustee.**

Section 548(a)(1)(A) permits the trustee to avoid a transfer of an interest of the debtor in property made within two years before the petition date with actual intent to hinder, delay, or defraud creditors.[76]  Section 550(a) permits recovery of the avoided transfer from the initial transferee.  There is no dispute that the proceeds of the tender offer and Rogas' salary and bonus were paid within two years before the filing of the petition.  As set forth below, the other elements are also satisfied.[77]

---

[76] 11 U.S.C. § 548(a)(1)(A).

[77] *Id.* § 550(a).

**B.    The debtor had an interest in the property transferred to Rogas that has not yet been retroactively vested in the United States.**

For the trustee to recover, the debtor must have had an interest in the property.[78]   The tender offer proceeds Rogas received were transferred from the debtor's bank account.[79]   So in that regard, there is no dispute that the debtor had an interest in the property transferred.

Rogas argues, however, that title to these funds never vested in the debtor. In support of that argument, Rogas relies on the relation-back doctrine in federal forfeiture law, asserting that the title to forfeited funds vests in the federal government as of the time of the criminal act.[80]   And it is true that the relation-back doctrine in fact vests "[a]ll right, title, and interest in property" in "the United States upon the commission of the act giving rise to forfeiture."[81]

The Supreme Court, however, has made clear that the relation-back doctrine does not provide for automatic vesting of title in the government.   Instead, as the Court put it, the doctrine is a "fictional and retroactive vesting of title" that "is not self-executing, but occurs only when the Government wins a judgment of forfeiture."[82]   To this end, contrary to the position Rogas asserts, the Court

---

[78] *Id.* § 548(a)(1) ("The trustee may avoid any transfer … of an interest of the debtor in property.").

[79] D.I. 24 ¶ 36.

[80] D.I. 25 at 16 ("Under the 'relation back' doctrine, title to property that is subject to forfeiture – such as those at issue here – automatically vests in the government at the time of the defendant's criminal act.").

[81] 21 U.S.C. § 853(c).

[82] *U.S. v. Parcel of United States v. Parcel of Land, Bldgs., Appurtenances & Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 112 (1993).

emphasized that the doctrine does *not* provide for "immediate, undecreed, secret vesting of title in the United States at the time of the illegal transaction," and instead requires a judicial order to take effect.[83]

Bankruptcy courts have thus recognized that this doctrine *can* "divest a bankruptcy estate of its property," but the doctrine "does not necessarily forfeit a defendant's property interest merely because such property is *subject* to forfeiture."[84]  The relevant question is not whether the funds were potentially subject to forfeiture, but whether the criminal forfeiture proceeding has resulted in an adjudication that extinguishes the debtor's asserted interest in the particular property transferred.  Under Rule 32.2 of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to the defendant at sentencing, but, when it concerns specific property, remains preliminary as to third parties until the conclusion of the ancillary forfeiture proceeding.[85]

The record reflects that preliminary orders of forfeiture were entered against Rogas.  Those orders may therefore have become final as to Rogas, who was in fact sentenced for the criminal acts at issue.  But the Court has identified no final order in any ancillary proceeding resolving any third-party interest in the tender-offer proceeds, nor any determination that the particular funds transferred by the debtor

---

[83] *Id.* at 113.

[84] *In re Dreier LLP*, 452 B.R. 391, 411 (S.D.N.Y. 2011).

[85] *See* Fed. R. Crim. P. 32.2(b)(4), (c).

were property to which the United States obtained clear title.[86] Accordingly, the criminal forfeiture proceedings do not establish, on this record, that the debtor lacked an interest in the funds when it transferred them.

### C.    The remaining elements of the fraudulent transfer claim are satisfied, for the reasons set forth in the *DDE* opinion.

The remaining elements of fraudulent transfer – that the debtor made the transfer with the actual intent to hinder, delay, or defraud creditors – are not disputed here. With respect to the tender offer proceeds, the issue is precisely the same one the Court addressed in the *DDE* opinion, and the trustee relies on substantially the same evidence. The Court accordingly reaches the same result.

Nor is there a genuine dispute of material fact regarding the avoidability, on actual fraudulent transfer grounds, of the salary and bonuses paid to Rogas in the two years before the bankruptcy. Rogas' counsel acknowledged, during the February 12, 2026 hearing, that "with respect to our client, the question is damages, not liability."[87] As described below, however, the record does not contain evidence supporting the trustee's damages claims. Summary judgment on the fraudulent transfer claim must therefore be denied in part.

---

[86] *See United States v. Rogas*, Crim. No. 20-00539 (S.D.N.Y.), ECF Nos. 79, 91, 93, 98. The Court takes judicial notice of those docket entries. *See Orabi v. Att'y Gen. of the U.S.*, 738 F.3d 535, 537 n.1 (3d Cir. 2014); Fed. R. Evid. 201.

[87] Feb. 12, 2026 Hr'g Tr. at 7.

**D.    While Rogas' salary and bonuses in the two years before the petition date are avoidable as fraudulent transfers, the amount of those transfers cannot be decided on the existing summary judgment record.**

Regarding the amount of the salary and bonuses paid that are avoidable on actual fraudulent transfer grounds, the complaint alleges that Rogas received $629,755.25 in salary and $200,000 in bonuses in the two years before the bankruptcy filing.[88]  Rogas' answer admits that he received a salary and bonus but asserts that he "lacks sufficient knowledge or information with respect to the specific amounts of salary and bonuses paid by [the debtor] and, on that basis, denies the allegation."[89]

In response to the Court's prior request that the plaintiff identify the claimed damages with sufficient specificity to permit consideration on summary judgment, the trustee filed a letter dated June 12, 2026.[90]  But as "evidence" in support of the amount of the alleged salary and bonuses it seeks to recover as a fraudulent transfer, the trustee's letter cites only to the allegations made in the complaint.[91]  But allegations, of course, are not "evidence" and cannot support the entry of summary judgment under Rule 56.[92]  Indeed, in its memorandum in support of summary judgment, the trustee effectively acknowledges that it has not come forward with evidence quantifying this aspect of its damages, stating that it

---

[88] D.I. 1 ¶ 53.

[89] D.I. 7 ¶ 53.

[90] D.I. 51.

[91] *Id.* at 3 n.1.

[92] *See, e.g., Anderson,* 477 U.S. at 256 (at the summary judgment stage a party "may not rest upon mere allegation[s] … of his pleading").

23

"reserves the right to prove the amount of Employment Proceeds Rogas received at trial or otherwise following the Court's disposition of this Motion."[93]  In view of that concession, the trustee's position in the June 2026 letter that it is entitled to summary judgment in this amount is surprising.  Whatever the explanation may be, the motion is denied to that extent.

### III.   Rogas breached his fiduciary duties to the debtor, though the proven damages on summary judgment are limited to the payments made to participants in the tender offer.

#### A.   Rogas breached his fiduciary duties to the debtor.

Under Delaware law, directors and officers owe fiduciary duties to the corporation they serve, including the duty of care and the duty of loyalty.[94]

The duty of care requires that fiduciaries act on an informed basis before making a business decision and act prudently in carrying out their responsibilities.[95]   Courts analyze whether the process leading to the relevant decision reflects "good faith consideration," and place little emphasis on the substance of the decision itself.[96]   To show a breach of the duty of care, a plaintiff must prove that the fiduciary was grossly negligent.[97]   This requires "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[98]

---

[93] D.I. 23-1 at 10 n.8.

[94] *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749-751 (Del. Ch. 2005).

[95] *Id.*

[96] *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[97] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005).

[98] *Id.*

The duty of loyalty requires that the fiduciaries place the interests of the corporation above their own interests.[99]  To show a breach of the duty of loyalty, a plaintiff must prove either that (1) the defendants were conflicted and pursued their own interests above those of the company or (2) the defendant failed to pursue the best interests of the company in good faith.[100]  The requirement to act in good faith is a "subsidiary element" of the duty of loyalty.[101]

Generally, then, under Delaware law, the inquiry for a breach of fiduciary duty focuses largely on the good faith of the fiduciary.  The Delaware Supreme Court has recognized the most salient examples of conduct lacking good faith, those being: "[1] where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, [2] where the fiduciary acts with the intent to violate applicable positive law, [and 3] where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[102]

---

[99] *Walt Disney,* 907 A.2d at 751; *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014).

[100] *Orchard Enterprises*, 88 A.3d at 32-33 ("A plaintiff can call into question a director's loyalty by showing that the director was interested in the transaction under consideration or not independent of someone who was.  Or a plaintiff can demonstrate that the director failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith." (citations omitted)).

[101] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[102] *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 67 (Del. 2006) (citation omitted).

In this case, Rogas does not dispute that he owed fiduciary duties to the debtor. Nor does he dispute that he breached those duties.[103] There is no dispute that Rogas operated as CEO and a member of the debtor's board of directors from the founding until his departure in 2020.[104] As the CEO and a member of the board, Rogas owed fiduciary duties to the debtor. These duties included the duty of loyalty and thus the duty of good faith – which the undisputed factual record shows Rogas violated in the ways described by the Delaware Supreme Court.

*First*, Rogas fabricated the debtor's customer and financial data from as early as 2017 through to his exiting the company in 2020.[105] Rogas did so intentionally, knowing that the information contained therein was false, and intending that investors rely on the information.[106] The outside investors did rely on the reports – as did the debtor itself in making the decision to raise equity capital.[107] The debtor also relied on these reports, and the purported growth contained therein, in making decisions to hire employees, to pay out bonuses and other executive compensation, and to buy back shares – seen most saliently in the tender offer discussed at length

---

[103] *See* D.I. 25 (discussing fiduciary duty only (1) in relation to the subject-matter jurisdiction of this Court and (2) in relation to the limitations period).

[104] D.I. 7 ¶ 11.

[105] D.I. 24 ¶¶ 4, 7-8, 10, 14-15, 25 (describing the fabricated figures that the debtor, acting through Rogas, reported and contrasting them with the true figures from 2017 through 2020).

[106] D.I. 23-3 at 27.

[107] D.I. 24 ¶¶ 10-15, 25.

26

above.[108]   None of these decisions can be said to have been in the best interests of the debtor.

Rogas' purported motivation – that the fraud was necessary to afford the debtor and his team the time needed to generate sustainable revenue – does not provide a defense.  Under Delaware law, "a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."[109]   Rogas acted intentionally with the express purpose to mislead – deceiving both the debtor's board and its investors.  As a result, Rogas did not act in good faith.

*Second*, Rogas knew his actions violated the law.  He knew, "at the time he made th[e] misrepresentations" that they were "wrong and illegal."[110]  As a result, Rogas did not act in good faith.

*Third*, again, Rogas knew that it was "illegal to make misrepresentations to investors."[111]  Rogas understood that what he was doing was wrong and illegal and consciously disregarded his duty to obey the law and report accurate information to both the debtor and its investors.  In fact, Rogas took affirmative steps to *prevent* the discovery of his actions.[112]  As a result, Rogas did not act in good faith.

---

[108] *Id.* ¶¶ 4-8, 10, 25.

[109] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004).

[110] D.I. 23-3 at 27.

[111] *Id.* at 26.

[112] D.I. 7 ¶ 114.

There can be no genuine dispute that Rogas did not act in good faith in the performance of his duties as the debtor's CEO and as a member of the board. As a result, this Court concludes that Rogas breached his fiduciary duties to the debtor.

**B.    The only damages as to which there is no genuine dispute of material fact are the payments made to tender offer recipients.**

To receive a remedy for breach of fiduciary duty, the plaintiff must "establish by a preponderance of the evidence either that the plaintiff suffered harm or that the fiduciary wrongfully received a benefit."[113]  The plaintiff must show that a "sufficient causal linkage exists between the breach of duty and the remedy sought to make the remedy an apt means of addressing the breach."[114]  Certain principles aid the plaintiff in recovery – for example, "once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."[115]  Additionally, "the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[116]  It remains true, though, that the damages for a breach of fiduciary duty must be "logically and reasonably related to the harm or injury for which compensation is being awarded."[117]  And on summary judgment, it remains the obligation of the moving party to point to record evidence showing that the damages sought are not subject to genuine dispute.

---

[113] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022).

[114] *Id.*

[115] *Id.*

[116] *Thorpe II*, 676 A.2d 436, 445 (Del. 1996).

[117] *Metro Storage*, 275 A.3d at 859.

28

At bottom, if a logical and reasonable connection exists, certainty is not required where a wrong has been proven and an injury established.[118]  This allows reasonable estimates lacking in mathematical certainty if there is a basis for a responsible estimation.[119]

In this case, the trustee seeks to recover approximately $80 million resulting from Rogas' fiduciary duty breaches.[120]  This amount – (1) the total amount of the tender offer, plus (2) the court-approved fees and costs for the estate's professionals, plus (3) the cash left in the estate on filing – represents what the trustee believes to be the total harm to the enterprise, based on the existing summary judgment record, resulting from Rogas' breach.[121]

To support recovery of the tender offer proceeds, the trustee contends that Rogas' breach caused the debtor to make the transfers, causing that amount of harm to the enterprise.  As for the professional costs and cash in the estate, the trustee alleges that Rogas' breach, as the direct cause of the bankruptcy, caused the debtor to incur these costs and burn the cash in the estate, in effect causing this amount of harm to the enterprise.[122]

The Court is persuaded that the summary judgment record supports the first of these theories.  The amounts paid out to early investors were, as the Court explained in its opinions in *DDE*, *Dawson,* and Part II of this Memorandum

---

[118] *Id.*

[119] *Id.*

[120] D.I. 51.

[121] *Id.*

[122] *Id.*

Opinion, actual fraudulent transfers that were made at the direction and behest of Rogas.  Causing the company to pay nearly $68 million to various early investors, in exchange for obtaining shares that a director knows are worthless, violates the director's fiduciary duty to the company.  The trustee is thus entitled to the entry of summary judgment for the $67,998,059.67 that the trustee has shown was paid out in the tender offer.

The Court is not persuaded, however, that the trustee's second and third theories of damages are supported by the current summary judgment record.  As the Court understands the overarching principles from the Delaware state law authorities described above, the trustee is entitled to the recovery of damages sustained by the corporation that proximately resulted from the breach of the fiduciary duties.  But even with the flexibility afforded in determining breach of fiduciary duty damages, the trustee's measures of damages are simply too slapdash to support the entry of summary judgment.

The trustee first argues that the fees that the Court approved as necessary and reasonable costs of administering the bankruptcy case are recoverable as breach of fiduciary duty damages.  There is, to be sure, at least a kernel of common sense to this approach.  One of the harms that logically and foreseeably follows from running a fraudulent business is the risk that, if and when the fraud is revealed, the company could plummet into bankruptcy.  Bankruptcy turns out to be an expensive process.  So the Court accepts the premise that the costs associated with

30

liquidating the business, whether in or out of bankruptcy, may well be recoverable as breach of fiduciary duty damages.

The flaw in the trustee's theory, however, is the unstated assumption that every dollar in the $11 million in fees that the court approved as necessary and reasonable is a cost of liquidation. Some of what the debtor and Committee professionals were likely focused on during the bankruptcy case, for example, presumably included investigating and pursuing the very claims against Rogas that are asserted in this adversary proceeding. But recovery of those costs, however, is barred by the American Rule, under which each party (absent a basis for fee shifting) is responsible for paying its own fees and costs.[123] The trustee has made no effort to demonstrate that the fees it seeks to recover are for tasks that are ordinarily occasioned by the need to liquidate a failed business, rather than tasks associated with investigating or pursuing the claims against Rogas. The trustee therefore has failed to meet its burden on summary judgment.

That failure is even more obvious with respect to the last category of claims – cash that the debtor had on hand as of the filing of the bankruptcy. Here, the trustee's theory is presumably that the debtor burned through this cash in connection with its efforts to administer the liquidation, and that this amount is therefore recoverable on the same theory as the legal fees. But based on the summary judgment record before the Court, that is little more than an assumption.

---

[123] *See generally Johnston v. Arbitrium (Cayman Islands) Handels AG,* 720 A.2d 542 (Del. 1998) (explaining the Delaware law follows the American Rule, subject to an exception in which a party engages in bad faith conduct in the litigation itself).

The summary judgment record is devoid of any evidence at all showing how the cash that came into the bankruptcy estate was actually spent. So again, even accepting the measure of latitude that may be afforded a plaintiff in proving breach of fiduciary duty damages, the leap of faith required to accept the trustee's theory is simply too large to support the entry of summary judgment.

### C.    The trustee may not recover the same damages twice.

Rogas further argues the trustee's requested damages double count. To be sure, the trustee is *not* entitled to double recovery on any amounts.[124] The two amounts as to which the trustee is entitled to summary judgment – the $17,542,458 that Rogas received in the tender offer and the $67,998,059.67 paid to all tender offer recipients – are wholly overlapping. As such, the trustee's judgment based on these amounts should be properly capped at $67,998,059.67.

The trustee may well be, based on the evidence submitted at trial, entitled to additional damages, such as for the salary and bonus paid to Rogas and the costs of administering the bankruptcy case. To the extent these damages are properly proven at trial, they would increase the amount of the judgment to which the trustee would become entitled.

### IV.    In view of the foregoing, there is no need to address issues of constructive fraudulent transfer, fraud, and unjust enrichment.

The trustee's claims for constructive fraudulent transfer, fraud, and unjust enrichment seek to recover damages entirely duplicative of the recoveries that have already been addressed above. Because these claims would provide no recovery

---

[124] *See In re MTE Holdings LLC*, 2024 WL 3272224, at *10 (Bankr. D. Del. July 1, 2024).

beyond the damages addressed above, the Court need not reach the trustee's alternative theories of constructive fraudulent transfer, fraud, and unjust enrichment at this stage.

### Conclusion

For the foregoing reasons, the Court concludes that the trustee is entitled to proposed findings and conclusions recommending the entry of summary judgment in the amount of $67,998,059.67.  To the extent the trustee seeks proposed findings and conclusions from this Court recommending the entry of summary judgment in that amount (and is prepared to forego further damages), the trustee should docket a letter so stating, and the Court would be prepared to incorporate this Memorandum Opinion, by reference, into proposed findings and conclusions issued pursuant to 28 U.S.C. § 157(c)(1) and Bankruptcy Rule 9033 as to the non-core claims and under *Executive Benefits* as to the fraudulent-transfer claims.

To the extent the trustee seeks the opportunity to demonstrate additional damages, the parties should reach out to chambers to schedule a status conference to address further proceedings.  In view of this disposition, the Court will not issue a further order before hearing further from the parties regarding next steps.

Dated: August 11, 2026

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

33